FILED

NOV 14 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

CASE NUMBER   1:06MS00508

JUDGE: John D. Bates

DECK TYPE: Miscellanous

DATE STAMP: 11/14/2006

CARPENTERS HEALTH & WELFARE
FUND, et al.,

                Plaintiffs,

     vs.

THE COCA-COLA COMPANY, et al.,

              Defendants.

: PLAINTIFFS CARPENTERS HEALTH
: AND WELFARE FUND OF
: PHILADELPHIA AND VICINITY AND
: LOCAL 144 NURSING HOME PENSION
: FUND'S MOTION TO COMPEL
: DOCUMENT PRODUCTION FROM K.
x CHRIS TODD AND MEMORANDUM IN
SUPPORT THEREOF; ORAL ARGUMENT
REQUESTED

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................ 1

II.  BACKGROUND TO THIS MOTION AND STATEMENT OF
     FACTS ......................................................................................................... 3

III. Mr. Todd Lacks a Cognizable Objection to Complying With
     Plaintiffs' Subpoena ................................................................................... 5

     A.   The Requested Documents Are Not Protected by the Attorney-
          Client Privilege ................................................................................ 5

     B.   Producing the Documents Does Not Implicate Mr. Todd's Nor
          Ms. Minick-Scokalo's Fifth Amendment Right ................................ 7

     C.   Mr. Todd Will Not Suffer Any Undue Burden In Responding to
          Request No. 2 ................................................................................. 11

IV.  CONCLUSION ........................................................................................... 12

# TABLE OF AUTHORITIES

**Page**

*Banks v. Office of the Senate Sergeant-at-Arms,*
    236 F.R.D. 16 (D.D.C. 2006) ...................................................................................6

*Bear Stearns & Co. v. Wyler,*
    182 F. Supp. 2d 679 (N.D. Ill. 2002)......................................................................10

*Fisher v. United States,*
    425 U.S. 391 (1976) ...........................................................................................7, 11

*Minebea Co. v. Papst,*
    228 F.R.D. 34 (D.D.C. 2005) .................................................................................6

*Ohio v. Reiner,*
    532 U.S. 17 (2001) .............................................................................................9, 11

*Rimsat, Ltd. v. Hilliard,*
    207 B.R. 964(D.D.C. 1997)...................................................................................12

*Tri-State Hosp. Supply Corp. v. United States,*
    No. 00-1463(HHK/JMF), 2005 U.S. Dist.
    LEXIS 33156 (D.D.C. Dec. 16, 2005) ...................................................................6

*Tuite v. Henry,*
    98 F.3d 1411 (D.C. Cir. 1996)................................................................................7

*United States CFTC v. Whitney*
    441 F. Supp. 2d 61 (D.D.C. 2006).........................................................................12

*United States v. Doe,*
    465 U.S. 605 (1984) .............................................................................................11

*United States v. Hubbell,*
    530 U.S. 27 (2000) .....................................................................................8, 9, 10

*United States v. Hunton & Williams,*
    952 F. Supp. 843 (D.D.C. 1997)............................................................................12

**Page**

*United States v. Marra*,
   No. 05-2509(JCL), 2005 U.S. Dist.
   LEXIS 23411 (D.N.J. Oct. 5, 2005) ...................................................................... 10

*United States v. Ponds*,
   454 F.3d 313 (D.D.C. 2006) .................................................................................... 9

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   §45 ........................................................................................................................... 7
   §45(d) ............................................................................................................. 2, 3, 4, 7

Plaintiffs Carpenters Health and Welfare Fund of Philadelphia and Vicinity and Local 144

Nursing Home Pension Fund ("plaintiffs") respectfully move this Court for an Order compelling Mr.

K. Chris Todd to produce documents to a subpoena issued in the underlying federal securities fraud

action, captioned *Carpenters Health & Welfare Fund v. The Coca-Cola Company*, Case No. 1:00-

CV-2838-WBH (N.D. Ga.).

## I.    INTRODUCTION

Mr. Todd is the attorney for Ms. Tamara Minick-Scokalo, a former employee of The Coca-

Cola Company ("Coke" or the "Company"), the company defendant in the underlying securities

action. During her employment, Ms. Minick-Scokalo prepared various documents, including a

report identifying the impropriety of Coke's channel stuffing activities aimed at inflating its revenue

and earnings. Such documents go to the heart of plaintiffs' complaint, which alleges, *inter alia*,

Coke and certain of its senior officers[1] violated the federal securities laws by artificially increasing

Coke's publicly reported financial results through shipping excess and unwanted concentrate to

Coke bottlers.

Plaintiffs have repeatedly attempted to obtain Ms. Minick-Scokalo's documents from Coke

and from Ms. Minick-Scokalo directly, but to no avail. Coke contends it cannot locate Ms. Minick-

Scokalo's documents. Ms. Minick-Scokalo presently resides in Switzerland and is beyond plaintiffs'

---

[1]    These Individual Defendants are M. Douglas Ivester (former Chairman and Chief Executive Officer of Coke), Jack L. Stahl (former Executive Vice President and Chief Operating Officer of Coke), James E. Chestnut (former Executive Vice President and Chief Financial Officer of Coke) and Douglas Daft (former Senior Vice President, Chief Operating Officer and Chief Executive Officer of Coke).

direct subpoena power. Plaintiffs are nevertheless attempting to subpoena Ms. Minick-Scokalo through the Hague Convention. But this process is uncertain, and experience dictates it may take many months, if not a year, to accomplish, potentially making the considerable effort useless for trial. Moreover, plaintiffs understand that Ms. Minick-Scokalo no longer has custody of the relevant documents, and Mr. Todd does. On that basis plaintiffs have advanced this subpoena.

Mr. Todd objects to the subpoena on two grounds. First, he asserts the documents are protected by the attorney-client privilege. But the documents plaintiffs seek are readily identifiable, purely business-related documents; predate the attorney-client relationship; and are not themselves privileged. Indeed, Ms. Minick-Scokalo has already freely told plaintiffs' investigator about the requested documents. Even if attorney-client privilege were a proper objection to production, which it is not, Mr. Todd still must provide the privilege log Fed. R. Civ. P. 45(d)(2) requires. This, he has not done.

Second, Mr. Todd also contends, though not specifically in his written objections, that the mere act of producing the requested documents would violate *his* or possibly Ms. Minick-Scokalo's Fifth Amendment right against self-incrimination. This is utterly baseless. Neither Mr. Todd nor Ms. Minick-Scokalo is the subject of any investigation or potential criminal charge. Nor can Mr. Todd demonstrate any possible criminal exposure arising from the *act* of producing the requested documents. Mr. Todd's unfounded views of the Fifth Amendment offers no footing for his resistance to an admittedly proper subpoena. For these reasons, plaintiffs' motion to compel should be granted.

## II.    BACKGROUND TO THIS MOTION AND STATEMENT OF FACTS

The underlying class action was brought on behalf of purchasers of Coke common stock between October 21, 1999 through March 6, 2000 who allege they were defrauded by Coke's misrepresentations to the securities market. ¶1.[2]  Specifically, plaintiffs allege Coke inflated its financial results by, among other things, forcing Coke bottlers in Japan and other regions to accept unwanted and unneeded Coke concentrate in order to meet projected 1999 sales numbers. ¶¶4, 148-172. Worldwide, defendants shipped hundreds of millions of dollars worth of excess and unneeded concentrate to its bottlers in 1999. ¶19. Over half of this channel stuffing was forced on its Japanese bottlers. ¶128.

During the Class Period, Ms. Minick-Scokalo, then a mid-level marketing executive at Coke Japan, prepared a detailed internal report outlining the impropriety of Coke's concentrate loading practices. ¶152. Ms. Minick-Scokalo's report demonstrated how the unsustainable growth in concentrate loading would ultimately be revealed and could ruin Coke. *Id* She presented this report to her Division President, Michael Hall, and to Douglas Daft, President of Coke's Middle Far East Group who later became Coke's CEO. *Id.* Daft reacted angrily, throwing Minick-Scokalo's report

---

[2]      Unless otherwise noted, all references to "¶" are to the Amended Consolidated Class Action Complaint for Violation of the Securities Exchange Act of 1934, filed June 2, 2003 in the U.S. District Court, Northern District of Georgia, Atlanta Division (Ex. A to Declaration of Ted Minahan in Support of Plaintiffs Carpenters Health and Welfare Fund of Philadelphia and Vicinity and Local 144 Nursing Home Pension Fund's Motion to Compel Document Production From K. Chris Todd ("Minahan Decl.")).

Unless otherwise noted all emphasis has been added and citations omitted.

back in her face. *Id.* Ms. Minick-Scokalo made yet another similar presentation to Coke's then current CEO, Douglas Ivester.

Defendants turned a blind eye to Ms. Minick-Scokalo's findings and concern, and continued Coke's concentrate loading practices in order to meet analysts' earnings expectations. *See* Minahan Decl., Ex. B at 3. For this conduct, Coke was formally investigated by the Securities and Exchange Commission ("SEC") and ultimately consented to a cease-and-desist order, requiring it to present complete and accurate financial and business information to investors. *See Id.*, Ex. B.

Without question, Ms. Minick-Scokalo's documents are highly relevant to plaintiffs' case. They demonstrate that Coke's concentrate loading practices were improper and of significant internal concern. They also evidence defendants Daft and Ivester's knowledge of the concentrate loading practices and their awareness of the consequences to the Company. Ms. Minick-Scokalo apparently gave these documents to her then attorney, Mr. Todd, and she now resides in Switzerland.

On October 5, 2006, plaintiffs served Mr. Todd, an attorney with Kellogg, Huber, Hansen, Todd, Evans & Figel P.L.L.C., with a document subpoena. *Id.*, Ex. C. The subpoena explicitly requested only two categories of documents. *Id.* The first was transcripts of Ms. Minick-Scokalo's testimony to any government entity concerning Coke. *Id.* To this, Mr. Todd averred he had no responsive documents. *Id.*, Ex. D. The second request asked for "[a]ll reports or presentations or other documents generated or received by Tamera Minick-Scokalo during her employment at Coke." *Id.*, Ex. C. Mr. Todd objected that this request violated his attorney-client relationship with Ms. Minick-Scokalo:

> I object to Request No. 2 on the ground that if such documents existed, I cannot respond to this Request without relying on and disclosing privileged and confidential information provided to me by my client, Ms. Minick-Scokalo. Identifying the existence of any possible documents in my possession as both

responsive to the Request would necessarily require that I rely on and reveal privileged and confidential information about        the existence, genesis, purpose, content, and import of those documents, thereby violating the attorney-client privilege.

I further object to this Request on the ground that it is inappropriate and incompatible with the confidentiality of the attorney-client relationship to request documents from me in my capacity as Ms. Minick-Scokalo's attorney. A request for documents generated or received by Ms. Minick-Scokalo in the course of her employment with Coke should be made directly to her.

*Id.*, Ex. D.

On October 26, 2006, plaintiffs' counsel and Mr. Todd conferred regarding his assertion of the attorney-client privilege. *Id.*, Ex. E. Mr. Todd stated for the first time that the mere fact of producing these documents would also violate his Fifth Amendment right against self-incrimination. On October 27, 2006, plaintiffs' counsel sent Mr. Todd's a letter demonstrating that his attorney-client and Fifth Amendment privilege objections lacked merit.

On November 1, 2006, Mr. Todd responded, again asserting the attorney-client privilege and his, and, for the first time, Ms. Minick-Scokalo's purported Fifth Amendment rights. *See Id.*, Ex. F. Mr. Todd and plaintiffs' counsel conferred further, and Mr. Todd reaffirmed his objections and reasserted his unwillingness to produce any responsive documents. *See Id.*, Ex. G. Plaintiffs informed Mr. Todd they had no option but to bring this motion. Mr. Todd told plaintiffs he would oppose such a motion. *See Id.* at ¶2.

## III.    Mr. Todd Lacks a Cognizable Objection to Complying With Plaintiffs' Subpoena

### A.    The Requested Documents Are Not Protected by the Attorney-Client Privilege

The documents plaintiffs seek are important business-related documents. Ms. Minick-Scokalo's created these documents in the ordinary course of her employment at Coke. *See* ¶152.

- 5 -

Ms. Minick-Scokalo was not an attorney. Through an interview with plaintiffs' investigator, she related that her internal Coke reports identified the problems of "using concentrate loading to inflate Coke's sales numbers." *Id.* The key report was created by Ms. Minick-Scokalo and presented to two non-attorneys, defendants Daft and Ivester, to warn of purely business concerns. ¶¶35, 152. Accordingly, there is no underlying attorney-client privilege adhering to these documents.[3]

Mr. Todd's contention that these documents have somehow gained privileged status is erroneous. Documents do not change status simply by handing them to an attorney. *See Banks v. Office of the Senate Sergeant-at-Arms*, 236 F.R.D. 16, 21 (D.D.C. 2006) ("[T]here are several documents that consist of letters, facsimiles, or e-mails forwarding documents from SSA employees to counsel. While the fact of the transmittal might be attorney-client privileged, such transmittal does not shield from discovery the forwarded documents. The forwarded documents are only privileged if they would have been privileged in the hands of the SSA."); *Tri-State Hosp. Supply Corp. v. United States*, No. 00-1463(HHK/JMF), 2005 U.S. Dist. LEXIS 33156, at *11 (D.D.C. Dec. 16, 2005) ("While the fact of the transmittal might be an attorney-client privileged communication, that does not in itself shield from discovery the documents forwarded with that letter or facsimile. The forwarded documents are only privileged if they would have been privileged in the hands of the client."); *see Fisher v. United States*, 425 U.S. 391, 403-04 (1976) ("This Court and the lower courts

---

[3]   That these documents were not privileged is plainly demonstrated by Ms. Minick-Scokalo's willingness to disclose the substance of these documents to plaintiffs' investigator. *See* ¶152. To keep otherwise privileged matters confidential, the privilege's holder must not disclose the privileged matters to third parties. *See Minebea Co. v. Papst*, 228 F.R.D. 34, 35-36 (D.D.C. 2005) (disclosure of privileged communications to third parties waived the attorney-client privilege). This obviously was never a concern for Ms. Minick-Scokalo.

have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by client in order to obtain more informed legal advice.").

Because there is no underlying privilege for the requested documents, their mere transfer to Mr. Todd does not shield them from discovery. Moreover, the identify and responsiveness of these documents do not turn on an attorney-client communication, as Mr. Todd suggests. These are simply Coke documents prepared in the course of Ms. Minick-Scokalo's employment some four years before she provided them to Mr. Todd. They are not simply random words on a page that require some external communication to verify their responsiveness. That responsiveness is clear on the documents' unprivileged face.[4]

### B. Producing the Documents Does Not Implicate Mr. Todd's Nor Ms. Minick-Scokalo's Fifth Amendment Right

Mr. Todd asserts the mere fact of producing documents to plaintiffs implicates his and possibly Ms. Minick-Scokalo's Fifth Amendment right against self-incrimination.[5]  The Fifth

---

[4]    If Mr. Todd earnestly contends these documents are attorney-client privileged, he must produce a privilege log. *See* Fed. R. Civ. P. 45(d)(2) ("[t]he claim shall be made expressly and **shall** be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim."). However, Mr. Todd has refused to produce such a log. This clearly violates the Federal Rules. *See Tuite v. Henry*, 98 F.3d 1411, 1416-17 (D.C. Cir. 1996) (holding under Fed. R. Civ. P. 45 it is mandatory that the objecting party produce a privilege log).

[5]    Mr. Todd cannot refuse to produce the documents simply because the documents themselves may be incriminating. *United States v. Hubbell*, 530 U.S. 27, 36 (2000) ("It is clear, therefore, that respondent Hubbell could not avoid compliance with the subpoena served on him merely because the demanded documents contained incriminating evidence, whether written by others or voluntarily prepared by himself.").

Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." Mr. Todd has absolutely no basis to contend that the **act** of producing the requested documents would violate that Fifth Amendment right. Neither Mr. Todd nor Ms. Minick-Scokalo are under suspicion of any crime or are facing any likely charge. Indeed, Ms. Minick-Scokalo is a mere percipient witness in a civil action, and Mr. Todd simply is her attorney. No amount of speculation on Mr. Todd's part can sufficiently demonstrate how the mere act of producing the documents at issue could incriminate Mr. Todd. More than supposition is needed. In his November 1, 2006 letter, Mr. Todd makes a vague reference to a U.S. Attorney's investigation of Coke. However, that investigation, conducted in conjunction with the SEC, was concluded in April 2005. *See* Minahan Decl., Ex. H. Moreover, if the documents at issue were so patently incriminating, why would Ms. Minick-Scokalo so freely and willingly discuss them with plaintiffs' investigator? The unavoidable conclusion is they do not incriminate Ms. Minick-Scokalo and cannot incriminate Mr. Todd. They are, however, highly relevant to plaintiffs' claims against Coke.

Under the scenario Mr. Todd proffers, self-incrimination can only arise where the communicative act of acknowledging the existence or possession of documents can incriminate the documents' custodian. This is not the case here, as the case law clearly demonstrates.

In *Hubbell*, 530 U.S. at 30-31, defendant Webster Hubbell was investigated for possible federal law violations concerning the Whitewater Development Corporation. Under a plea bargain, Hubbell pled guilty to certain crimes and agreed to provide complete and truthful information regarding the ongoing Whitewater investigation. *Id.* Independent Counsel later served Hubbell a document subpoena to determine if Hubbell had complied his plea agreement. *Id.* The Supreme Court held that Hubbell's act of producing documents had a testimonial effect and was therefore

violative of his Fifth Amendment right: "It is abundantly clear that the testimonial aspect of respondent's act of producing subpoenaed documents was the first step in the chain of evidence that led to his prosecution." *Id.* at 42.

The difference between Mr. Todd and Mr. Hubbell is clear. Hubbell was served a document subpoena for the express purpose of determining if he still had any responsive documents. *Id.* Hubbell's disclosure that he, in fact, did have documents implicated a plea agreement violation, thus subjecting him to criminal prosecution. *Id.* There is no parallel here for Mr. Todd or Ms. Minick-Scokalo. Ms. Minick-Scokalo voluntarily revealed the documents' existence and content some time ago. Mr. Todd's production of the requested documents now does not communicate anything about their existence nor implicate some wrongdoing by either Mr. Todd or Ms. Minick-Scokalo. He simply holds documents relevant to a securities fraud claim.

Under *Hubbell*,

> [T]o determine whether an act of production implicates the Fifth Amendment, the court looks only to the ***communicative aspects of the act of production itself and to whether those tacit averments as to the existence and location of the documents add anything significant*** "to the sum total of the Government's information."

*United States v. Ponds*, 454 F.3d 313, 323 (D.C. Cir. 2006). Additionally, for the Fifth Amendment protection to apply, the witness must provide "'reasonable cause to apprehend danger from a direct answer.'" *Ohio v. Reiner*, 532 U.S. 17, 21 (2001). Mr. Todd fails to evidence any circumstance that meets either of these tests.

The circumstances here are similar to *United States v. Marra*, No. 05-2509(JCL), 2005 U.S. Dist. LEXIS 23411 (D.N.J. Oct. 5, 2005). There, Marra, a tax preparer, contended that producing the IRS-requested documents concerning a client would violate ***his*** Fifth Amendment right. *Id.* at

- 9 -

*6. Marra was not under investigation by the IRS, was not indicted and was not subject to any criminal proceeding. *Id.* at *9. The court found these facts compelled a distinction from *Hubbell*:

> Hubbell was the one under investigation and compelled to testify before a grand jury. Second, Hubbell was asked to produce his own personal records, not those of other corporate entities. Finally, the prosecutor in Hubbell had no independent knowledge of Hubbell's wrongdoings or the existence of documents supporting it until he received Hubbell's assistance and compliance with the subpoena. Here, Marra is not under investigation; apart from Marra's billing records, he is not being asked to produce personal documents; and the Government presumably knows that Reiher and the corporations filed tax returns.

*Id.* at *21.

*Bear Stearns & Co. v. Wyler*, 182 F. Supp. 2d 679 (N.D. Ill. 2002) is to the same effect. Relying heavily on *Hubbell*, a defendant objected to a document request. *Id.* at 683. The court held *Hubbell* did not control, as the defendant failed to provide any credible reason why the *act* of producing documents would incriminate him:

> Wyler fails to explain how his production of the documents at issue would have an incriminating aspect.
>
> . . . A witness must tender some credible reason why a response would pose a real danger of incrimination. . . . While the production of such records may be testimonial, Wyler has simply provided the court with no information to suggest how the testimonial aspects of that production might be incriminating.

*Id.* at 684.[6]

---

[6]   *See Fisher v. United States*, 425 U.S. at 410-11 ("In light of the records now before us, we are confident that however incriminating the contents of the accountant's workpapers might be, the act of producing them — the only thing which the taxpayer is compelled to do — would not itself involve testimonial self-incrimination.").

Here, like *Marra* and *Wyler*, neither Mr. Todd nor Ms. Minick-Skokalo are the subject of any

criminal investigation. And certainly neither would have any criminal exposure arising from the

existence or possession of the Minick-Skokalo documents, which were created in 1998 through

2000. Even the United States Department of Justice has ended its criminal investigation of Coke –

of which neither Ms. Minick-Skokalo or Mr. Todd were ever targets – in April 2005. Minahan

Decl., Ex. H. There is simply no danger of incrimination here. *See United States v. Doe*, 465 U.S.

605, 613 (1984) (an "incriminating effect" is necessary for the Fifth Amendment to apply.).

Moreover, "[t]hat inquiry is for the court; the witness' assertion does not by itself establish the risk

of incrimination. A danger of 'imaginary and unsubstantial character' will not suffice." *Ohio*, 532

U.S. at 21. Finally, plaintiffs are not requesting documents Mr. Todd prepared himself. Rather, the

documents at issue are Ms. Minick-Skokalo's and are simply held by Mr. Todd. On balance, the

circumstances here do not come close to warranting a Fifth Amendment protection against document

disclosure.

### C.     Mr. Todd Will Not Suffer Any Undue Burden In Responding to Request No. 2

Plaintiffs' subpoena request is very limited: "All reports or presentations or other documents

generated or received by Tamera Minick-Skokalo during her employment at Coke." Minahan Decl.,

Ex. C. Initially, the "'burden of showing that a subpoena request is unreasonable is on the

subpoenaed party.'" *United States v. Hunton & Williams*, 952 F. Supp. 843, 855 (D.D.C. 1997).

Mr. Todd will not be burdened, even minimally, in producing these documents. Plaintiffs request

documents pertaining to one person, Ms. Minick-Skokalo, and for a narrow period of time. This is a

far cry from any burden considered undue by the Federal Rules: "Undue burden occurs when the

subpoena is so broad that compliance will severely disrupt its normal business operations." *United*

- 11 -

*States CFTC v. Whitney*, 441 F. Supp. 2d 61, 69 (D.D.C. 2006); *accord, Rimsat, Ltd. v. Hilliard*, 207

B.R. 964, 970 (D.D.C. 1997) (document subpoena not burdensome); *Hunton & Williams*, 952 F.

Supp. at 855 (subpoena narrowed to specific parameters not burdensome).

## IV.   CONCLUSION

Mr. Todd has no right to withhold the documents from production. The requested documents

are undeniably business-related documents that do not and cannot implicate the attorney-client

privilege. Nor will Mr. Todd or Ms. Minick-Scokalo be incriminated in producing these documents.

Neither face any possible criminal charge on which the existence and production of these documents

has any bearing. Accordingly, plaintiffs' motion to compel should be granted and Mr. Todd should

produce all responsive documents within 10 days after entry of this Court's Order.

DATED: November 13, 2006

Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
NANCY M. JUDA
ROGER ADELMAN
Washington D.C. Bar No. 056358

ROGER ADELMAN

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
STEVEN W. PEPICH
DANIEL S. DROSMAN
JAMES A. CAPUTO
SCOTT H. SAHAM
TED MINAHAN
GAVIN M. BOWIE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DENNIS J. HERMAN
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

- 13 -

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
Sandra Stein
1845 Walnut Street, 25th Floor
Philadelphia, PA 19103
Tel: 215/988-9546
Fax: 215/988-9885

CHITWOOD HARLEY HARNES LLP
MARTIN D. CHITWOOD
Georgia Bar No. 124950
STUART J. GUBER
Georgia State Bar No. 141879
JAMES M. EVANGELISTA
Georgia State Bar No. 707807
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: 404/873-3900
404/876-4476 (fax)

Co-Lead Counsel for Plaintiffs

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
Michael J. VanOverbeke
Thomas C. Michuad
Michael E. Moco
79 Alfred Street
Detroit, MI 48201
Tel: 313/578-1200
Fax: 313/578-1201

Additional Counsel for Plaintiffs

S:\CasesSD\Coke\BRF0030765.doc

- 14 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.  That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.  That on November 13, 2006, declarant served the PLAINTIFFS CARPENTERS HEALTH AND WELFARE FUND OF PHILADELPHIA AND VICINITY AND LOCAL 144 NURSING HOME PENSION FUND'S MOTION TO COMPEL DOCUMENT PRODUCTION FROM K. CHRIS TODD AND MEMORANDUM IN SUPPORT THEREOF; ORAL ARGUMENT REQUESTED by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.  That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of November, 2006, at San Diego, California.

_____
CINDI J. LAMBERT

COKE (LEAD)
Service List - 11/10/2006   (200-357-1)
Page 1 of 1

**Counsel For Defendant(s)**

M. Robert Thornton
Jeffrey Cashdan
Stephen Devereaux
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
   404/572-4600
   404/572-5100 (Fax)

Ronald L. Olson
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
   213/683-9100
   213/687-3702 (Fax)

**Counsel For Plaintiff(s)**

Martin D. Chitwood
Chitwood Harley Harnes LLP
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
   404/873-3900
   404/876-4476 (Fax)

Daniel M. Shanley
DeCarlo & Connor
533 South Fremont Avenue, 9th Floor
Los Angeles, CA 90071-1706
   213/488-4100
   213/488-4180 (Fax)

William S. Lerach
Steven W. Pepich
Scott H. Saham
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
   619/231-1058
   619/231-7423 (Fax)

Michael J. VanOverbeke
Thomas C. Michaud
Michael E. Moco
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
   313/578-1200
   313/578-1201 (Fax)

**Courtesy Copy**

Sandra Stein
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103
   215/988-4546
   215/988-9885 (Fax)

C. Chris Todd
Kellogg Huber Hansen Todd Evans
  & Figel PLLC
1615 M Street N.W., Suite 400
Washington DC 20036

Nancy M. Juda
Roger Adelman
Lerach Coughlin Stoia Geller Rudman
  & Robbins LLP
1100 Connecticut Ave, N.W. Suite 730
Washington D.C. 20036
   202/822-6762
   202/828-8528 (fax)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | x | |
| CARPENTERS HEALTH & WELFARE FUND, et al., | : | Miscellaneous Case No. _____ |
| | : | |
| | : | (Case No. 1:00-CV-2838-WBH (N.D. Ga.)) |
| Plaintiffs, | : | |
| | : | DECLARATION OF TED MINAHAN IN |
| vs. | : | SUPPORT OF PLAINTIFFS CARPENTERS |
| | : | HEALTH AND WELFARE FUND OF |
| THE COCA-COLA COMPANY, et al., | : | PHILADELPHIA AND VICINITY AND |
| | : | LOCAL 144 NURSING HOME PENSION |
| Defendants. | : | FUND'S MOTION TO COMPEL |
| | x | DOCUMENT PRODUCTION FROM K. |
| | | CHRIS TODD |

I, TED MINAHAN, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California. I am associated with the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, one of the counsel of record for plaintiffs Carpenters Health and Welfare Fund of Philadelphia and Vicinity and Local 144 Nursing Home Pension Fund in the above-entitled action. I make this Declaration in support of plaintiffs' Motion to Compel Document Production from K. Chris Todd. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      Pursuant to Local Rule 7(m), Mr. Todd and I met and conferred telephonically on October 25, 2006, and again on November 1, 2006 to resolve Mr. Todd's objections. The parties could not arrive at a resolution and Mr. Todd informed me he will oppose a motion to compel.

3.      Attached are true and correct copies of the following exhibits:

Exhibit A:      Amended Consolidated Class Action Complaint for Violation of the Securities Exchange Act of 1934, filed June 2, 2003 in the U.S. District Court, Northern District of Georgia, Atlanta Division;

Exhibit B:      Securities and Exchange Commission Accounting and Auditing Enforcement Release No. 2232, Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-And-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 (Apr. 18, 2005);

Exhibit C:      Subpoena for K. Chris Todd;

Exhibit D:      October 17, 2006 correspondence from K. Chris Todd to Scott Saham;

Exhibit E:      October 26, 2006 correspondence from Ted Minahan to K. Chris Todd;

Exhibit F:      November 1, 2006 correspondence from K. Chris Todd to Ted Minahan;

Exhibit G:      November 2, 2006 correspondence from Ted Minahan to K. Chris Todd; and

- 1 -

Exhibit H:    Press Release, The Coca-Cola Company, The Coca-Cola Company Comments on SEC Settlement (April 18, 2005).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _13_ day of November, 2006, at San Diego, California.

TED MINAHAN

S:\CasesSD\Coke\DEC0036458.doc

- 2 -

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 0 2 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF GEORGIA

# ATLANTA DIVISION

|  |  |
|---|---|
| CARPENTERS HEALTH & WELFARE FUND, et al., | x : File No. 1:00-CV-2838-WBH : **(Consolidated)** : |
| Plaintiffs, | : : |
| vs. | : : |
| THE COCA-COLA COMPANY, | : : |
| Defendant. | : x |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

**FILED**

NOV 1 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

54

Except as otherwise specifically set forth below, plaintiffs allege the following on information and belief based upon, among other things, the investigation of their counsel, including interviews with numerous former employees of the Coca-Cola Company, as identified below:

## SUMMARY AND OVERVIEW

1.    This is a class action on behalf of all purchasers of the common stock of The Coca-Cola Company ("Coke" or the "Company") between 10/21/99 and 3/6/00 (the "Class Period"). During 89-97, Coke was one of the world's premier growth companies, consistently reporting 8+% and 15+% annual increases in revenues and earnings per share ("EPS"), respectively. Under the leadership of its Chairman and Chief Executive Officer ("CEO") Roberto Goizueta, Coke restructured its business during 89-97 by selling off its majority ownership interest in several of its bottling companies around the world, generating hundreds of millions of dollars in profits for Coke as part of the so-called "49% solution," while retaining effective control over its bottlers and the huge worldwide distribution network into which Coke sold beverage concentrate. Coke generated its revenues and profits by selling beverage concentrate (measured in gallons of concentrate or cases) and "toll" products (pre-mixed and bottled products) to its bottlers, who, in turn, bottled Coke beverage products and sold them to grocery chains and

consumers (measured in cases of beverage) – with over 70% of Coke's revenues and profits coming from overseas sales. Coke-Japan constituted 25%-30% of Coke's worldwide operating income during the Class Period. As part of "restructuring its business model," during the 3rdQ96 Coke announced it had *reduced, i.e.,* "deloaded," the inventory levels of beverage concentrate held by its bottlers to relieve its bottlers' inventory burdens, improve the financial condition of its bottlers and reduce concentrate inventories to more optimal levels. In reality, as Coke purportedly "restructured" its business model, reporting very positive results, it boosted earnings in part by generating millions in profits from selling off Coke's majority interests in its bottlers. By the end of 96, *Coke had captured 50% of the worldwide non-alcoholic beverage market*, as Coke was achieving annual concentrate gallonage and EPS growth of 8% and 19%, respectively.

2.    As a result, Coke's stock was a very strong performer and the Company's market capitalization grew dramatically from approximately $87 billion to nearly $131 billion during 1996. Goizueta became one of the most highly respected CEOs in the world and was extraordinarily bullish about Coke's prospects for continued strong, profitable growth, as shown by the following statements made by him during 96-97:

- 2 -

**7/15/96:**

The Coca-Cola Company ... reported today that second-quarter earnings per share increased 20 percent ....

*"This Company is piling growth on top of growth, and that equals strong performance today and continued vast opportunity for tomorrow"*....

**10/15/96:**

The Coca-Cola Company ... reported today that third-quarter earnings per share increased 22 percent ....

*"... [O]ur business continued its strong performance, exceeding our publicly stated long-term goal for earnings per share growth ....*

*"... [T]he solid performance we foresee for our business over both the short and long term position us well to continue to deliver the reliable earnings growth we have had over the past fifteen years."*

**1/31/97:**

The Coca-Cola Company ... today reported a 19 percent increase in earnings per share in 1996 ... on top of a 19 percent increase in 1995.

*"1996 was another record year for The Coca-Cola Company, with strong earnings, unit volume and market share gains, once again meeting every one of our long-term objectives...."*

"Our 1996 results are the product of years of methodically investing ... in our worldwide infrastructure including ... bottlers. *Those investments have brought our global business system to a new higher level of performance which points to strong momentum going into the new year and augurs well for the years ahead. This chapter in the Coca-Cola story is just starting."*

**4/14/97:**

The Coca-Cola Company ... reported today that first-quarter earnings per share increased 43 percent ....

> *"Our extremely strong first quarter unit case volume gain demonstrates the continuing power of our aligned global bottling system and is a solid start towards, once again, achieving our long term volume and EPS growth objectives ...."*

**7/17/97:**

The Coca-Cola Company ... reported today that second-quarter earnings per share increased 26 percent ....

> "Our bottling investment strategy is yielding an increasingly aligned Company/Bottler system with greater capability to capture the huge opportunities for profitable growth" ....

> <div align="center">*    *    *</div>

> *"The Company's results in the first half of 1997 ... leave the Company poised for a year of unusually strong growth"* ....

In fact, Goizueta was so euphoric about Coke's prospects he often spoke of *"our infinite opportunity for growth."*

3.       Tragically, Goizueta suddenly died in 10/97. M. Douglas Ivester – an accountant who had been Coke's Chief Financial Officer ("CFO") before serving as Goizueta's second-in-command for several years – succeeded Goizueta as Coke's Chairman and CEO. Unfortunately, as Ivester took over, economic slowdowns in some of Coke's most important overseas markets began to adversely affect Coke's

business. Also by late 97, Coke had largely exhausted its ability to continue to generate profits by one-time sales of its large interests in major bottlers to third parties, which left Coke much more dependent on the performance of its now-weakening ongoing core business operations to produce profitable growth than it had been in prior years. Thus, beginning in late 97 and early 98, Coke's revenue growth slowed dramatically. As Coke's revenues flattened in 97 and then actually *declined* in 98, Coke's EPS *fell* from $1.64 in 97 to just $1.42 in 98, a far cry from Coke's historic 8+% and 15%-20% per year revenue and EPS growth, and Coke's return on shareholder equity plunged from 56.5% in 97 to 42% in 98. Coke's stock (which had undergone a two-for-one split in mid-96) collapsed from $88-15/16 in 7/98 to as low as $56-5/8 by 9/98 – *a loss of over $85 billion in shareholder market capitalization in just two months*! This sharp decline in Coke's stock price is shown below:



As a result of this sharp decline, Coke's stock had badly under-performed the stocks of similar companies since Ivester succeeded Goizueta, which was a great embarrassment to Ivester and a disappointment to Coke's shareholders and Board of Directors.

### Coca Cola Co.
### vs. Proxy Peer Group
### October 1997 - September 1998



4.    By early 99, Coke's stock recovered somewhat on investors' hopes that Coke, under Ivester's leadership, would show better results during 99. However, during the first part of 99, the actual performance of Coke's business worsened, due to the increasingly negative impact of the same types of problems that had hurt Coke's results during 97-98. In order to conceal the true extent of the negative impact of these adverse conditions on Coke's operations, during the 1stQ99, Ivester and Coke's three other top officers, Jack L. Stahl (Coke's President and Chief Operating Officer ("COO")), James E. Chestnut (Coke's CFO) and Douglas Daft

(Senior Vice President of Coke and President of Coke's Middle and Far East Group), caused Coke to ship millions of dollars of excessive, unwanted and unneeded beverage concentrate to several of Coke's major bottlers – amounts of concentrate well beyond levels justified by consumer demand – including to Coca-Cola Enterprises ("CCE") (Coke's largest bottler), which bottled Coke for the United States and Western Europe (except Germany), Coca-Cola Erfrischungsgetränke AG, which bottled Coke for Germany, Coca-Cola Beverages, which bottled Coke for the Baltic States and Russia, several Coca-Cola bottlers in Japan and Coca-Cola SABCO, which bottled Coke for South Africa – thus boosting Coke's revenues, net income and EPS, as detailed in ¶¶128-172.  In some cases, defendants went so far as to improperly recognize revenue on transactions without even shipping the excessive, unwanted concentrate or syrup, as detailed in ¶¶173-175.  As a result of being forced to accept these excessive beverage concentrate shipments, even though Coke's beverage concentrate shipments to its bottlers overall declined in the 1stQ99 compared to the 1stQ98, these key Coke bottlers began to accumulate excessive amounts of concentrate inventory during the 1stQ99, above the 31-33 days of supply needed to efficiently operate their bottling businesses or justified by current consumer demand.

5.    To make matters worse, in 6/99 a serious health scare involving Coke

occurred in Belgium when it was reported that contaminated Coke had apparently

caused illness requiring medical treatment of 250 Belgian children.  This quickly

mushroomed into the worst Coke contamination scare in history and the

Company's worst public relations crisis ever, which Ivester appeared to many to

be unable to manage or control.  Some European countries briefly banned the sale

of Coke, and Coke was forced to engage in the largest recall of its products in its

history.  Consumption of Coke declined sharply in Europe.  In order to conceal the

true extent of the negative impact of the fundamental problems which were already

adversely impacting Coke's business, as now exacerbated by the European health

scare, during the 2ndQ99 Ivester, Stahl, Chestnut and Daft again forced Coke

bottlers, including those for the U.S. and Western Europe, Germany, Japan and

Southern Africa, to accept millions of dollars of additional shipments of excessive,

unwanted and unnecessary beverage concentrate well beyond the levels justified

by consumer demand.  Thus, even though Coke's beverage concentrate shipments

to its bottlers overall declined in the 2ndQ99, compared to the 2ndQ98, the

excessive shipments to these key bottlers further elevated the number of days of

concentrate inventory in these bottlers' hands to even more excessive levels than

those that existed at the end of the 1stQ99.

6.     Notwithstanding Coke's secretly forcing hundreds of millions of dollars of excessive, unwanted and unneeded concentrate on key bottlers during the first half of 99, Coke's publicly represented first-half 99 results were still disappointing.   As a result of those disappointing results, plus the negative publicity surrounding the European health scare and Coke's early 9/99 warning to analysts that its 3rdQ99 results would be slightly less than earlier forecast, by 10/99, Coke's stock fell to its lowest level in several years – just $47-5/16 per share, about half the level at which Coke stock sold in 7/98 – *a decline that had now wiped out $105 billion in Coke shareholder market capitalization during Ivester's regime*! This decline in Coke's stock – which took it to its lowest levels in four years – is shown below:



7.    This decline in Coke's stock price was especially disturbing because it represented a very substantial under-performance by Coke stock compared to the stocks of similar companies, including Coke's arch-rival, Pepsi:



**Coca Cola Company**
vs. Peer Group
July 1, 1998 - October 1, 1999



**Coca Cola Company**
vs. Pepsico
July 1, 1998 - October 1, 1999

8.    This large 98-99 stock price decline angered Coke's shareholders –

especially its large institutional shareholders who were pressuring Coke to improve

its performance.  Coke's large 98-99 stock decline caused substantial unrest in

Coke's Board of Directors, especially with key directors Herbert Allen (Allen & Co.)

and Warren Buffet (Berkshire Hathaway), who controlled companies which were

huge Coke shareholders, owning millions of Coke shares.  By mid-99, the Board

was questioning Ivester's leadership of the Company so seriously that it was

beginning to threaten Ivester's continuation as Chairman and CEO.  Because of the

poor performance of Coke during 98 and the first half of 99 and the problems Coke

encountered due to the European health scare, analysts and investors viewed

Coke's 3rdQ and 4thQ99 as critical quarters for Coke – when Ivester would

demonstrate that his management team had overcome these problems and was

restoring Coke's EPS growth to its historic 15%-20% levels.  As Coke's 3rdQ99

unfolded, the adverse impact of the European health scare, combined with

continued sluggish consumer demand for Coke's beverages in many parts of the

world, was even worse than Coke's executives had anticipated.  Ivester, Stahl,

Chestnut and Daft realized that, unless something was done, Coke's 3rdQ99 results

were going to be even worse than the slightly reduced levels forecast by Coke in

early 9/99 – results that would infuriate Coke's large shareholders and its Board,

likely resulting in Ivester's ouster from his position of power, prestige and profit as Coke's CEO and Chairman.

9.    Thus, Ivester, Stahl, Chestnut and Daft again caused Coke's bottlers in Japan, the Baltic States and Russia, Germany, Southern Africa and the United States/Western Europe to accept millions of dollars of excessive, unwanted and unneeded shipments of Coke beverage concentrate, as detailed in ¶¶128-172. Still, Coke's reported overall beverage concentrate shipments to its bottlers declined 6% and 2% in the 1stQ and 2ndQ99 compared to the like periods in 98. However, had Coke's gallonage shipments of beverage concentrate in the 1stQ and 2ndQ99 been based on true consumer demand and thus its bottlers' true inventory needs, they would have *declined by much higher percentage amounts* from the 98 shipment levels. But by secretly causing key bottlers to again accept shipments of hundreds of millions of dollars of excessive, unwanted and unneeded concentrate, by manipulating shipment information for fountain syrup, and by improperly recognizing revenue, Coke was able to publicly report 3rdQ99 *flat* gallonage shipments of beverage concentrate compared to the 3rdQ98, falsify Coke's 3rdQ99 revenues, net income and EPS, as detailed in ¶¶128-172, and meet its 3rdQ99 revenue, net income and EPS forecasts, thus concealing the true extent of the decline of Coke's business due to negative macro-economic factors in several of its

overseas markets, the adverse impact of the European health scare and the lack of expected performance of certain investments – *investments that Coke later wrote off*.

10.     While Coke's 3rdQ99 shipments of excessive amounts of beverage concentrate to bottlers enabled Coke to meet its 3rdQ revenue and EPS forecasts, they very much exacerbated the already ruinous concentrate inventory over-supply situation with those major bottlers. By the end of the 3rdQ99, *i.e.*, 9/30/99, Ivester, Stahl, Chestnut and Daft knew that during 99 Coke had shipped some $300-$400 million of excessive, unneeded and unwanted beverage concentrate to CCE and other key Coke bottlers in Japan, North America, Germany, Europe and South Africa, thus inflating Coke's internal 99 revenues, net income and EPS. When Coke reported its 3rdQ99 results on 10/21/99 – the start of the Class Period – which met forecasted levels of revenue and EPS, Coke reported *flat* beverage concentrate gallonage shipments, *deceptively indicating that Coke had met forecasted levels of results when, in fact, Coke did so only by making millions of dollars of unjustified and excessive concentrate shipments and manipulating syrup information*, as detailed in ¶¶128-172.

11.     Worse yet, Coke also deceptively presented its declining and then flat gallonage shipments of concentrate during 99 *as a positive development by telling*

- 15 -

analysts that its flat gallonage shipments were due to Coke bottlers "voluntarily" reducing their levels of beverage concentrate inventory, which was the opposite of what was actually happening! Coke also indicated to analysts that the "voluntary" beverage concentrate inventory reduction by these bottlers *was improving the financial condition of those bottlers and had set the stage for substantial revenue growth by Coke as consumer demand for its products picked up in late 99 and early 00, because that rejuvenation of consumer demand would result in bottlers stepping-up their purchases of beverage concentrate from Coke to replenish their "lean" inventories.* This enabled Coke to credibly but falsely tell investors that its business trends were *"very encouraging,"* that the Company was seeing *"steady improvements"* in Europe and Japan and that Coke's 3rdQ99 results *"set[ ] the stage for positive momentum"* for Coke going forward. Coke also forecast 4thQ99 EPS of $.30-$.31, 99 EPS of $1.29-$1.31, 00 EPS of $1.50-$1.60 and 01 EPS of $1.75+, indicating *that because consumer demand was now beginning to strengthen, Coke expected beverage case shipments to accelerate materially in the 4thQ99. According to Coke, this would result in an increase in beverage concentrate shipments to Coke's bottlers, because their inventories of beverage concentrate had become "lean" during 99 due to their voluntary efforts to destock or deload beverage concentrate inventory. Again,* as detailed in ¶¶128-172, *just the opposite was true, and Coke's statements regarding current business conditions and its EPS*

*forecasts for the balance of 99 and 00 were knowingly false based on then-known information.*

12.    Thus, Coke was able to credibly forecast strong revenue and EPS growth in the 4thQ99 and during 00 in part *because it led investors to believe that concentrate inventory levels of Coke's bottlers had been reduced to such low levels that the emerging increase in consumer demand for Coke would immediately translate into increased shipments of concentrate to bottlers.* Then, in early 11/99, Coke told key analysts that it was imposing *the largest concentrate price increase in history* on CCE, Coke's domestic and Western European bottler, in part due to strengthening consumer demand for Coke, and that it hoped to increase concentrate prices to other key bottlers as well.  Again, Coke told analysts that bottler inventories were "*lean*" and at proper levels due to bottlers' voluntary destocking of concentrate inventories during 99.  Coke said this was positive, as Coke bottlers would not be working down concentrate inventories in 00.  This imminent increase in gallonage shipments of beverage concentrate, combined with the largest concentrate price increases in Coke's history was an extremely bullish combination for Coke – *increased sales at increased prices equals strong profit growth*!

13.    As a result of Coke meeting its 3rdQ99 forecasts and this very bullish message to analysts and the investment community, including forecasts of 4thQ99

EPS of $.30-$.31, full year 99 EPS of $1.27-$1.32, 00 EPS of $1.50-$1.60 and 01 EPS

of $1.75+, Coke's stock recovered sharply from its early 10/99 low of $47-5/16 to

as high as $69 on 12/3/99 – a huge increase in Coke's stock price in about 90 days,

which restored over $52 billion in Coke stockholder market capitalization. This

sharp increase in Coke's stock price, by which it very nearly climbed back to its 99

high by early 12/99, is shown below:



**Coca Cola Co.**
**January 4, 1999 - December 6, 1999**
**Daily Share Prices**

14.     However, the rosy picture Coke had painted could not last. During

Coke's rapid expansion during the Goizueta years, Coke had caused its key bottlers

in Russia, the Baltic States, India and Japan to very rapidly expand their physical facilities in an effort to greatly expand Coke sales in those countries. In Russia, for instance, Coke and its European bottler, Coca-Cola Beverages, vastly expanded the bottling facilities to produce Coke products for sale in Russia and the Baltic States. However, as detailed in ¶¶176-188, due to serious economic problems in Russia, the Baltic States and India, the hoped-for and forecasted huge increases in the sale of Coke beverage products in those countries did not materialize.

15.    By the end of 98 or early 99, two of Coke's largest bottling facilities in Russia were actually not operating and were essentially vacant, being used mostly for storage of other materials, rather than the production of Coke beverages. Russia's economic and currency crisis – including the collapse of the Ruble – greatly worsened during 98, which badly hurt all soda sales there including Coke's, and Coke fired more than 300 of its staff in Russia after 8/98. During the first nine months of 99, Coke's business in Russia worsened, as its sales in Russia decreased 60% between 8/98 and 9/99, and Coke announced it would lay off 29% of its remaining office staff in Russia as of 9/30/99. As a result, and as detailed in ¶¶176-185, Coke and its top executives knew by 9/30/99 that Coke would never recover its investment in these two Russian bottling facilities. This meant those facilities had to be written down, which would result in a very substantial multi-hundred

million dollar write-down of the Russian bottling assets. Likewise, by mid-99, as detailed in ¶186, defendants knew that Coke's operations in India were not paying off and should be written down.

16. Furthermore, in Japan during the Goizueta years, Coke along with its bottlers there decided to vastly expand the network of Coke beverage vending machines, including locating thousands of vending machines in new and previously unutilized locations. By mid-99, defendants knew they should have written off an additional $196 million worth of assets, almost all of which related to the write-off of vending machines and vending assets in Japan. As detailed in ¶¶189-195, beginning in at least 94, if not earlier, Coke funneled payments to its bottlers in order to offset the high price Coke was charging for product, or to help defray its bottlers' operating expenses. To mask the negative impact these payments had on Coke's own financial statements, defendants improperly classified some of these payments as assets in Coke's financial statements in order to amortize these marketing expenses over many years, instead of immediately recognizing the payments for what they in essence really were – a refund or subsidy for a portion of the high price the bottlers paid for product or ordinary marketing support payments that were required to be expensed as incurred. By

mid-99, Coke was carrying over $196 million in assets on its balance sheet related to Japanese vending assets that it did not own and could not even locate.

17.    However, because taking write-offs related to its Russia, India and Japanese assets would very adversely impact Coke's reported earnings during what was already a difficult year of 99 and because such a write-down would also signify the truly weak condition of Coke's operations in those three important countries, Ivester, Stahl, Chestnut and Daft deliberately refused to take these required write-downs and chose instead to conceal these asset impairments and improper capitalizations of marketing payments to Japanese bottlers, thus further artificially inflating Coke's reported 3rdQ99 results, as detailed in ¶¶ 176-195.

18.    During the 4thQ99, Coke's business continued to perform very poorly with very weak demand for concentrate, as key Coke bottlers had by now already accumulated hundreds of millions of dollars worth of excess inventories of concentrate – close to 40 days' worth of inventory. Ivester, Stahl, Chestnut and Daft were under tremendous pressure to have Coke report good 4thQ99 results, not only to meet the forecasts they had been making since Coke reported its 3rdQ99 results on 10/21/99, but also to demonstrate to analysts and investors that Coke's business was returning to its historic EPS growth levels under the Ivester management team. As detailed in ¶¶128-172, because Coke's actual concentrate volume sales in the

4thQ99 were not meeting the levels forecast or necessary to meet Coke's 4thQ99 forecasts, and in order to continue to conceal the true extent of the deterioration in Coke's business, Ivester, Stahl, Chestnut and Daft again caused Coke's bottlers in Japan, the U.S. and Western Europe, Germany, and Southern Africa to accept over *$200 million in additional excessive, unneeded and unwanted shipments of concentrate – again far beyond the levels justified by consumer demand for Coke beverages in those areas.* As a result of these additional beverage concentrate shipments, these bottlers had now accumulated concentrate inventories of *over 40 days', in some cases 56 days' – a grossly excessive amount of inventory for a commodity product like beverage concentrate which has a limited shelf life.* This shipment of hundreds of millions of dollars in excessive concentrate to bottlers, *plus* the actual (for CCE) and potential (for Coke's other bottlers) large price increase in concentrate, exacerbated the already troubled financial condition of these bottlers. As a result, bottlers made outraged protests to Coke over its abuse of its control of these bottlers and threatened to refuse to continue with this subterfuge of "purchasing" hundreds of millions of dollars of unneeded concentrate.

19.    By 12/99, Ivester realized that his management team could not continue its falsification of reported results to meet Coke's forecasted levels of revenues and EPS by improperly recognizing revenue and forcing key bottlers to

accept over $600 million of unneeded, unnecessary and unwanted concentrate

during 99, as detailed in ¶¶128-172. Also by 12/99, Ivester and the other individual

defendants realized that they could no longer conceal the overvaluation of Coke's

interest in its bottling assets in Russia, the Baltic States and India and the improper

classification of payments to Japanese bottlers. Those assets would have to be

written down at year end when Coke's independent auditors reviewed Coke's

financial statements, which would cause Coke to likely suffer a 4thQ99 *loss* rather

than the forecasted *earnings* of $.30-$.31 per share Coke had been forecasting. Thus,

the individual defendants knew Coke would have to write off hundreds of millions

in assets in the 4thQ99, resulting in a loss instead of the $.30-$.31 EPS forecast.

Furthermore, they knew Coke would have to "deload" the excessive inventory by

sharply reducing concentrate shipments to these anchor bottlers in at least the first

half of 00, which would have a very adverse impact on Coke's sales, revenues, net

income and EPS during at least the first half of 00 – reducing revenues by at least

$600 million and pre-tax profits by at least $400 million.

    20.    While Coke's stock had performed very poorly and under-performed

stock of comparable companies, including Pepsi, during the months before the

beginning of the Class Period on 10/21/99, throughout the Class Period, when

Coke was making false and misleading statements, Coke's stock out-performed

comparable stocks, including Pepsi, as shown below:



**Coca Cola Co.**
vs. Pepsico
October 5, 1999 - March 7, 2000



**Coca Cola Co.**
vs. Proxy Peer Group
October 5, 1999 - March 7, 2000

21.     Aware that all was not well, on 12/5/99, Coke's Board held an emergency secret special meeting, engineered by Allen and Buffet, at which Ivester was effectively fired – forced to resign but allowed to "retire" so he could keep his retirement benefits and avoid an ugly and embarrassing public confrontation. Thereafter, on 12/6/99, Ivester – who was only 52 years old, had no children and had served as Coke's Chairman and CEO for just two years – suddenly announced he was *voluntarily "retiring,"* to be succeeded by Daft, then Senior Vice President and President of Coke's Middle and Far East Group. Because this unexpected

- 25 -

resignation shocked analysts and investors, Coke's stock plunged from $68-3/16 on
12/6/99 to $58-3/4 on 12/7/99 – a $25 billion, two-day market capitalization loss
– due to concerns that Ivester's sudden "retirement" indicated there were serious
undisclosed problems at Coke.

22.     To refute these concerns, Coke falsely assured analysts that Ivester's
retirement was *voluntary and did not indicate that there were any serious
undisclosed problems with Coke's business, that Coke had weathered the economic
problems of the last two years extremely well, that Ivester would not have retired
unless Coke's business was doing well and that Coke did not anticipate any
significant change in the way it did business. Coke also reassured the market on
12/6/99 that Coke's core business strategy would not change, and "[n]othing has
changed about the business outlook.*" Coke also deceptively assured analysts that
Coke's 10/99 and 11/99 shipments *were up* – concealing that this was only because
Coke was continuing to ship hundreds of millions of dollars worth of unneeded
and unwanted beverage concentrate to key bottlers in Japan, North America,
Europe, Germany, and South Africa, who now had accumulated at least $600
million in excessive concentrate inventories, again falsely representing that Coke's
business was improving and thus, Coke would meet its 4thQ99, full year 99 and
year 00 forecasted results.

- 26 -

23.     On 1/26/00, in a press release Coke reported its 4thQ99 results – *a loss of $45 million or $.02 per share – far below the $.30-$.31 EPS forecasts, due, in part, to write-offs of $813 million, including $543 million due to Coke's over-valuation of its interests in bottling assets in Russia and the Baltic States and $196 million for vending assets in Japan.* In Coke's press release, Daft stated: "Despite these accounting write-downs, we remain fully committed to growing our business in these countries and believe the regions offer tremendous opportunity for per capita growth." Coke also announced it was firing 6,000 Coke employees – 21% of Coke's global workforce – the largest firings in Coke's history! The $813 million in write-offs exceeded all of Coke's reported 3rdQ99 net income of $787 million. As detailed in ¶¶176-195, the extent of these write-offs was enormous; after the write-off of $739 million ($543 million in Russia and the Baltic States plus $196 million in Japan), the remaining carrying value of the assets was only $297 million. Thus, if Coke is to be believed, 70% of these assets suddenly became worthless in the 4thQ99. Worse yet, Coke also shocked investors by revealing that its 00 results *would be much lower than earlier forecast,* due to Coke deciding to have its key domestic and overseas bottlers, including those described earlier, engage in a huge beverage concentrate "destocking" or "deloading" program to reduce their levels of beverage concentrate inventory from over 40 days', and in some cases 56 days', inventory to

- 27 -

less than 33 days. *This was a truly massive reduction – amounting to 25% of worldwide Coke system concentrate inventories – which would cost Coke at least $600 million in revenue and $400 million in pretax income in the first half of 00 alone*! These shocking disclosures about the beverage concentrate inventory levels of key Coke bottlers *were completely contrary to everything Coke had said to analysts and investors about its bottlers' beverage concentrate inventory levels during 99 and as recently as a month or two earlier! Due to the resulting adverse impact of the massive inventory deload or destock on Coke's 00 revenues and EPS, analysts slashed the 00 EPS forecasts for Coke. Investor reaction also savaged Coke's stock*. Coke's stock, which had recovered to as high as $66-7/8 on 1/21/00 and traded as high as $66-1/16 on 1/25/00, fell sharply to $62-3/4 on 1/26/00, $58-7/16 on 1/27/00 and to $55-1/16 by 2/3/00.

24.    On 1/27/00, *The Wall Street Journal* reported:

*In a massive round of layoffs pushed by an activist board of directors, Coca-Cola Co. said it is slashing 20% of its work force, or 6,000 employees.*

*The embattled soft-drink giant said it would take $1.6 billion in one-time charges, far bigger than expected. More charges will follow this year, and Coke also warned that reducing shipments of soft-drink concentrate to bottlers selected by Coke would lower earnings in the first six months of the year.*

*The cuts were a bombshell* ....

*Coke also reported its first earnings loss in at least a decade. Wall Street, baffled by the unexpected inventory write-down and fearing that Coke inflated its fourth-quarter sales by overselling concentrate, drove down Coke's stock.*

<p align="center">* * *</p>

*... Wall Street was surprised by a provision for reductions in bottlers' inventories of soft-drink concentrate, the ingredient that Coke sells to its bottlers.*

25.    Coke's financial performance is set forth below:

<div align="center">

THE COCA-COLA COMPANY
Quarterly Results
(in millions, except EPS)

</div>

| | 1stQ | 2ndQ | 3rdQ | 4thQ | Year |
|---|---|---|---|---|---|
| | | 1995 | | | |
| Net operating revenues | $3,854 | $4,936 | $4,895 | $4,333 | $18,018 |
| Gross profit | $2,409 | $3,060 | $2,946 | $ 2,663 | $11,078 |
| Net income | $638 | $898 | $802 | $648 | $2,986 |
| EPS | $.25 | $.35 | $.32 | $.26 | $1.18 |
| Beverage concentrate shipments compared to prior year | 13% | 8% | 9% | 4% | 8% |

| | | 1996 | | | |
|---|---|---|---|---|---|
| | 1stQ | 2ndQ | 3rdQ | 4thQ | Year |
| Net operating revenues | $4,224 | $5,286 | $4,687 | $4,476 | $18,673 |
| Gross profit | $2,694 | $3,380 | $2,873 | $2,988 | $11,935 |
| Net income | $713 | $1,050 | $967 | $762 | $3,492 |
| Diluted EPS | $.28 | $.42 | $.38 | $.30 | $1.38 |
| Beverage concentrate shipments compared to prior year | 8% | 9% | 1% | 14% | 8% |

| | | 1997 | | | |
|---|---|---|---|---|---|
| | 1stQ | 2ndQ | 3rdQ | 4thQ | Year |
| Net operating revenues | $4,138 | $5,075 | $4,954 | $4,701 | $18,868 |
| Gross profit | $2,843 | $3,466 | $3,295 | $3,249 | $12,853 |
| Net income | $987 | $1,314 | $1,011 | $817 | $4,129 |
| Diluted EPS | $.39 | $.52 | $.40 | $.33 | $1.64 |
| Beverage concentrate shipments compared to prior year | 7% | 9% | 14% | | 10% |

| | | 1998 | | | |
|---|---|---|---|---|---|
| | 1stQ | 2ndQ | 3rdQ | 4thQ | Year |
| Net operating revenues | $4,457 | $5,151 | $4,747 | $4,458 | $18,813 |
| Gross profit | $3,139 | $3,652 | $3,301 | $3,159 | $13,251 |
| Net income | $857 | $1,191 | $888 | $597 | $3,533 |

- 30 -

| Diluted EPS | $.34 | $.48 | $.36 | $.24 | $1.42 |
| Beverage concentrate shipments compared to prior year | 13% | 9% | 5% | -4% | 6% |

|  | 1stQ | 1999 2ndQ | 3rdQ | 4thQ * | Year |
| --- | --- | --- | --- | --- | --- |
| Net operating revenues | $4,400 | $5,335 | $5,139 | $4,931 | $19,805 |
| Gross profit | $3,097 | $3,743 | $3,489 | $3,467 | $13,796 |
| Net income | $747 | $942 | $787 | ($45) | $2,431 |
| Diluted EPS | $.30 | $.38 | $.32 | ($.02) | $.98 |
| Beverage concentrate shipments compared to prior year | -6% | -2% | 0% | 8% | 0% |

* 4thQ99 includes impairment charges of $813 million

|  | 1stQ ** | 2000 2ndQ | 3rd Q | 4th Q | Year |
| --- | --- | --- | --- | --- | --- |
| Net operating revenues | $4,391 | $5,621 | $5,543 | $4,903 | $20,458 |
| Gross profit | $2,993 | $3,944 | $3,807 | $3,510 | $14,254 |
| Net income | ($58) | $926 | $1,067 | $242 | $2,177 |
| Diluted EPS | ($.02) | $.37 | $.43 | $.10 | $.88 |
| Beverage concentrate shipments compared to prior year | -4% | 4% | 8% |  |  |

** 1stQ 00 includes write-down of $405 million for Indian bottling operations

| | 1stQ | 2001 2ndQ | 3rd Q | 4th Q | Year |
|---|---|---|---|---|---|
| Net operating revenues | $4,479 | $5,293 | $5,397 | $4,923 | $20,092 |
| Gross profit | $3,134 | $3,714 | $3,705 | $3,495 | $14,048 |
| Net income | $863 | $1,118 | $1,074 | $914 | $3,969 |
| Diluted EPS | $.35 | $.45 | $.43 | $.37 | $1.60 |
| Beverage concentrate shipments compared to prior year | 11% | 2% | | | |

26.    During 2/00 and 3/00, Coke's stock continued to fall as analysts continued to digest Coke's shocking 4thQ99 loss and the revelation of its huge concentrate "deload" and how negative the implications of this information were for Coke's ongoing business performance.  During this period, Coke executives continued to conceal from Coke's auditors, the market and the investing public the truly serious nature and actual negative impact of the problems which were adversely impacting Coke's business, in an attempt to cause analysts to continue to believe, despite Coke's 1/26/00 disclosures, that Coke would, in fact, continue to achieve its historic 8+% and 15%-20% revenue and EPS growth. Notwithstanding these continuing concealments and nondisclosures, analysts became increasingly convinced that Coke's long-term growth prospects had become permanently impaired and that the concentrate inventory reduction would likely

be worse (larger) than earlier disclosed and spread to more bottlers in other parts of the world, and so analysts lowered their rating on Coke and reduced the 00 and 01 EPS forecasts for Coke. On 3/7/00, *Bloomberg* reported that, based on the revelations of the past several weeks and continuing conversations with Coke executives, analysts had concluded that Coke would not be able to achieve a return to its historic 8+% and 15%-20% revenue and EPS growth at any time in the foreseeable future. Coke's stock fell to just $44-13/16 on 3/7/00 – its lowest price in years – marking a total loss of over $54.5 billion in market capitalization since 1/21/00.



27.    On 4/4/00, after the close of trading on the NYSE, Coke held a conference call to tell analysts that Coke's 1stQ 00 results and its 00 prospects would be worse than earlier forecast – a briefing that analysts found to be very disappointing and that confirmed their increasing skepticism over Coke's ability to achieve the long-term 15% EPS and 7%-8% revenue *growth* that until recently it had continued to insist it could achieve.    On 4/5/00, *The Wall Street Journal* reported:

Coke's Forecast for Sales Growth Falls Short of Analyst Estimates

    *Coca-Cola Co. released expectations for growth in world-wide sales volumes for the first quarter and the year that fell short of analysts' estimates, raising questions about how quickly the beverage company will be able to come through on a promise to deliver 7% to 8% volume growth over the long term.*

28.    Coke filed its 10Q for 3rdQ00 on 10/27/00. It reported that Coke had recorded charges of approximately $94 million in 3rdQ 00 which were attributed to "costs associated with the Company's Realignment." This brought total charges recorded for the first nine months of 00 up to approximately $965 million. Of this $965 million, Coke attributed approximately $405 million to the impairment of its Indian bottling assets, and approximately $560 million to the Realignment.

29.    On 3/5/01 *CNBC News* reported that Coke's President and COO, Stahl, resigned from Coke's management team after 20 years at the Company, citing a conflict with Daft. On 3/7/01, Coke filed its 00 10K, reflecting a further decline in net income from $3,533 million in 98, and $2,431 million in 99, down to $2,177 in 00, with EPS declining from $1.43 per share in '98, to $.98 per share in 99 down to $.88 per share in 00. It also revealed that Coke's economic profit declined precipitously in that three-year range as well, down from $2,480 million in 98, and $1,128 million in 99, down to $ 861 million in 00. In 4/01, Coke lowered its 01 sales growth

projections from a previously reported 6% – 7% down to 5% – 6% and its EPS estimates down from 15% to 11% – 12%.

30.    On 7/19/01, Coke reported its 2ndQ 01 results, and though earnings were slightly higher than the prior year, at $ 1.1 billion, or $.45 a share, compared to $ 926 million, or $.37 a share in 2ndQ 00, Coke also revealed that the higher net earnings were due to lower advertising expenditures and that 2ndQ 01 revenue had actually fallen 4% to $ 5.29 billion, compared to $5.48 billion in the second quarter last year. Upon this news, Coke's stock price fell $.91, closing at $46.22 per share. According to the *Atlanta Constitution*'s report on July 19, 2001, these lower revenues caused analysts to doubt Coke's ability to hit its annual goal of 5%-6% growth. Finally, on 7/23/01, Coke announced that it would appoint Brian Dyson, a veteran former Coke executive, as vice chairman and COO of Coke to assume oversight of Coke's day-to-day operations from Daft.

31.    The foldout chart following this page graphically presents key events related to this case:



Coca Cola Co.
October 21, 1999 - March 7, 2000
Daily Share Prices

Dollars Per Share

**10/21/99**
• Coke reports 3rdQ99 results -- Rev $5.1 billion; Net income $787 million; EPS $.32
• "Trends very encouraging"
• "Seeing steady improvements" in Germany and Japan
• Results "set the stage for positive momentum for our business"
• Flat beverage gallonage shipments due to voluntary bottler inventory reductions
• Forecasts 4thQ99 EPS $.30 - $.31 and 00 EPS $1.50 - $1.60

**11/99**
• Coke announces largest concentrate price increase in history
• "Underlying fundamentals improving"; "European recall has subsided"
• Bottler concentrate inventory "leaner"; substantial destocking over past year bodes well for Coke. Analysts do not forecast bottlers will work down inventory in 00.
• Analysts raise 00 EPS estimates

**12/5/99**
• "Ivester voluntarily "retires""
• "Retirement does not signal undisclosed problems with Coke's business."
• "Nothing has changed about business outlook"
• Core business strategy "will not change"

**1/00**
Coke affirms forecast of 4thQ99 EPS of $0.30 -$0.31, 00 EPS of $1.48 - $1.54 and 01 EPS of $1.73 - $1.75

**1/17/00**
Management "examining every aspect of operations ... no decisions have been made ..."

**1/26/00**
• 4thQ loss due to $813 million in writeoffs for Russian/Japan assets. Eliminates 70+% of asset values.
• Coke fires 6,000 employees - largest layoff in history
• Bottler beverage concentrate inventory destocking will eliminate $800 million in Coke sales and $400 million pretax income in first half of 00. Eliminates 25% of bottlers' inventories worldwide.
• Coke's 00 EPS to be much lower than forecast.

Bloomberg reports analysts concluded Coke would not be able to return to 6-8% revenue and 15%-20% EPS growth

10/21/99  11/03/99  11/16/99  11/30/99  12/13/99  12/27/99  01/07/00  01/21/00  02/03/00  02/16/00  03/01/00

$45  $50  $55  $60  $65  $70

## JURISDICTION AND VENUE

32.    The claims asserted arise under §10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act, as Coke is headquartered here, false statements were made here, and acts giving rise to the violations complained of occurred here.

## THE PARTIES

33.    Plaintiffs Carpenters Health & Welfare Fund of Philadelphia & Vicinity and Local 144 Nursing Home Pension Fund, who were appointed as Lead Plaintiffs in these consolidated actions by Court order entered on 5/7/01, purchased millions of dollars worth of shares of Coke common stock at artificially inflated prices during the Class Period and were damaged thereby. Plaintiff Gaetan LaValla also purchased shares of Coke common stock at artificially inflated prices during the Class Period, as detailed in the certification attached to his complaint, and was damaged thereby. The allegations of this paragraph are based upon plaintiffs' personal knowledge.

34.    Defendant The Coca-Cola Company ("Coke") is headquartered in Atlanta, Georgia. Coke's common stock trades in an efficient market on the New York Stock Exchange ("NYSE"). Coke controlled each of the individual defendants.

- 37 -

35.    (a)    Defendant M. Douglas Ivester ("Ivester") was CFO of Coke until 91, when he became President and COO of Coca-Cola USA. In 94, Ivester became President and COO of the Coke. In late 97, Ivester became Chairman and CEO of Coke, positions he held until he was fired – being forced to resign and retire – on 12/6/99. Prior to the Class Period, Ivester paid himself a total of $3.5 million in incentive compensation payments in 97 and 98. Upon his termination, Ivester received premature vesting of all outstanding stock options and guaranteed payments of $1.5 million on 2/1/00, 2/1/01 and 2/1/02, in lieu of payment under the Company's Long-Term Incentive Plan.

(b)    Defendant Jack L. Stahl ("Stahl") was promoted to Executive Vice President of Coke on 1/18/00. Prior to that, Stahl had served as a Senior Vice President. Stahl was also elected President and COO on 2/17/00 but resigned from Coke in 3/01. He had been with Coke for 20 years and had risen in the ranks under Goizueta and Ivester, starting out as an investor relations specialist and eventually becoming CFO and head of Coke's North American operations. In 2000, Stahl was paid $1.275 million pursuant to Coke's Executive Performance Incentive Plan ("EPIP") based on Coke's reported earnings performance. Payments made under the EPIP are performance related and are allegedly based on the individual's contributions to the improvement of reported operating results, growth and

- 38 -

profitability of the Company. Stahl was paid a $275,000 discretionary incentive award in 98 and was paid $315,000 pursuant to Coke's EPIP in 97. Stahl received 500,000 shares of Coke stock in 2/00, to "ensure [his] retention," but he forfeited those shares when he resigned in 3/01 and instead received premature vesting of all outstanding stock options and $3.5 million in cash, plus $153,000 in lieu of payment under the Company's Long-Term Incentive Plan, received, in part, in exchange for entering into the following agreement:

> In return for the payments, benefits and actions delivered ... you agree ... to keep confidential all confidential information relating to the business of the Company and not to disparage the Company, its officers or employees.

Stahl also received option awards at the time of the Company's annual award of such grants.

(c)    Defendant James E. Chestnut ("Chestnut") was CFO of Coke until 12/15/99 when he left that position and became Executive Vice-President of Coke's Operations Support. In 2000, Chestnut was paid $687,500 pursuant to Coke's EPIP based on Coke's reported earnings performance. He received a $275,000 discretionary incentive award in 98 and a $315,000 payment under Coke's EPIP in 97. Chestnut received a stock option award of 270,000 shares of Coke stock in 2/00, purportedly "to ensure retention of Company leadership during a critical

time of the Company's transition." Chestnut also received option awards at the time of the Company's annual award of such grants.

(d)    Defendant Douglas Daft ("Daft") has been with the Company since 69, holding various executive positions since 84. He served in several different capacities during the Class Period. He was Senior Vice President of the Company from 91 until 12/5/99 and served as President of Coke's Middle and Far East Group and had management responsibility for the Africa Group and the Schweppes Beverage Division from 10/29/99 until 12/5/99. Daft became a director and served as President and COO of the Company from 12/5/99 through 2/17/00. Beginning on 2/17/00, Daft assumed the dual roles of Chairman of the Board and CEO of the Company. He currently serves as Chairman of the Executive Committee of the Board of Directors. During the Class Period, Daft increased his salary approximately 275% from $415,250 in 98 and $459,833 in 99, to $1,268,750 in 00. Additionally, in 00, Daft paid himself a $3 million bonus pursuant to Coke's EPIP based on Coke's reported earnings performance. He also paid himself $131,554 in "other compensation," $87,281,250 in restricted stock awards, and a "retention" stock option award of 650,000 shares of Coke stock (with a three-year cliff vesting schedule) he claimed was necessary to "ensure retention of Company leadership during a critical time of the Company's transition." In all, Daft caused

Coke to pay him nearly *$92 million* in compensation in 00, plus the retention stock options, at the same time that Coke's net income *available to common share owners* was plummeting from $3,553 million in 98 and $2,431 million in 99, to $2,177 million in 00.

## SCIENTER AND SCHEME ALLEGATIONS

36.    The bases for allegations regarding defendants' scienter include, among other things, the following:

(a)    Defendants had the motive and opportunity to artificially inflate Coke's financial performance and stock price in order to financially benefit themselves, as alleged below in ¶¶64-70;

(b)    Defendants' scheme to artificially inflate Coke's reported financial performance and stock price involved numerous and significant violations of GAAP, as alleged below in ¶¶121-196, and these GAAP violations necessitated defendants' direct involvement as they consented to, authorized and participated in these wrongful practices;

(c)    The temporal proximity between defendants' optimistic and materially false public misstatements and Coke's subsequent corrective disclosure of the true negative conditions plaguing the Company (information which was

diametrically inconsistent with defendants' prior public statements made shortly before these corrective disclosures) further supports a strong inference of scienter;

(d)    The individual defendants occupied high-level management positions within Coke where they had access to Coke's inventory and accounting policies and practices, putting them on notice of the wrongful practices alleged herein;

(e)    Coke had state of the art computerized information systems that tracked and monitored its bottlers' and customers' concentrate and syrup inventory levels, which provided defendants with real time information regarding the extent of the concentrate loading that was utilized to artificially inflate Coke's reported revenue and earnings during the Class Period, as detailed below in ¶¶42-47;

(f)    The individual defendants had actual knowledge of the scheme used to manipulate and inflate Coke's stock price during the Class Period and numerous former Coke executives and employees have identified the individual defendants' active participation in these manipulative and deceptive practices, as specified in further detail at ¶¶ 140-142, 149, 151-152, 154-155, 159, 161, 164, 172-173, 184, 190-193; and

(g)    Information obtained from former employees of Coke and its bottlers, including but not limited to the following:

- 42 -

    (i)      a former Coke quality assurance executive;

    (ii)      a former CCE accounting executive;

    (iii)      a former Coca-Cola consolidated executive;

    (iv)      a former Coke finance manager;

    (v)      a former Coke vice president;

    (vi)      a former Coke vice president;

    (vii)      a former Senior Coke finance executive;

    (viii)      a former Coke vice president; and

    (ix)      a former high level Coke business manager.

## A.    Defendants' Scheme

37.    Defendants are liable for intentionally and knowingly making false statements or for failing to disclose adverse facts *or* for intentionally and knowingly participating in a fraudulent scheme by which they inflated the price of Coke stock.

38.    During 87-97, Coke restructured its business by selling off the majority interest in several of its bottling companies around the world – *the so-called "49% solution."* This foisted on Coke's bottlers the heavily capital asset intensive operations of beverage bottling and distribution, *i.e.,* bottling plants, trucks, vending machines, etc., while permitting Coke to retain effective control over the

bottlers and providing it with a huge worldwide distribution network into which to sell beverage concentrate.

39.     As part of "restructuring" its business model, during the 3rdQ96 Coke announced it was *reducing, i.e.*, "deloading," the inventory levels of beverage concentrate held by its bottlers to relieve the bottlers' inventory burden, improve the bottlers' financial condition and reduce their concentrate inventories to more optimal levels. By the end of 96, Coke and its bottlers had captured 50% of the worldwide non-alcoholic beverage market and was achieving annual concentrate gallonage and EPS growth of 8% and 19%, respectively, and appeared poised for continuing 15%-20% EPS growth going forward.

40.     Goizueta died in 10/97 and was succeeded by Ivester. Unfortunately, as Ivester took over, Coke encountered economic slowdowns in some of its most important overseas markets, which began to adversely affect Coke's business. By the second half of 97, as economic conditions in several of Coke's important foreign markets worsened, sales of Coke beverage products in those markets slowed. Also by late 97, Coke had largely exhausted its ability to continue to generate profits by one-time sales of part of its ownership interests in major bottlers to third parties, leaving Coke much more dependent on the performance of its now weakening, ongoing core business operations to produce profitable growth than it had been in

prior years. Thus, beginning in late 97 and early 98, Coke's revenue growth slowed

dramatically. As Coke's revenue growth flattened in 97 compared to 96, and then

actually *declined* in 98 compared to 97, Coke's EPS *fell* from $1.64 in 97 to just $1.42

in 98, a far cry from Coke's historic 15%-20% per year EPS growth. Coke's return

on shareholder equity plunged from 56.5% in 97 to 42% in 98. Coke's stock

collapsed from $88-15/16 in 7/98 to as low as $56-5/8 by 9/98 – *a loss of over $85*

*billion in shareholder market capitalization in just two months*! This sharp

decline in Coke stock price is shown below:



As a result of this sharp decline in Coke's stock price, the stock had badly under-performed the stocks of similar companies since Ivester succeeded Goizueta, a stock performance that was a terrible embarrassment to Ivester and his top management team.



### Coca Cola Co.
### vs. Proxy Peer Group
### October 1997 - September 1998

41.     Coke owned significant stock in certain key bottlers and has representatives on the Board of Directors of those bottlers consistent with its stock ownership. This stock ownership and Board membership, when combined with the fact that the bottlers are completely dependent upon Coke as the sole source of supply of the product they sell, gave Coke defacto control over its bottlers, as

detailed ¶¶128-172. While Coke has, from time to time, publicly disclaimed having

such control in order to avoid being forced under applicable accounting principles

to consolidate the bottlers' financial statements with its own, this disclaimer was,

in fact, fiction, as it is indispensable to the proper operation of Coke's business that

it maintain effective control of its bottlers, as these bottlers are the source of a vast

majority of Coke's revenue and the only way to distribute its products throughout

the world and thus protect and enhance the key Coke trademarks worldwide.

42.    In order to monitor and control Coke's worldwide operations –

including those of its bottlers – Coke has an extremely sophisticated computerized

financial and accounting control and reporting system.   This financial and

accounting system – which was overseen by Coke's CFO, Chestnut – enabled Coke

to closely track consumer demand for its products on a geographic basis

corresponding to its bottlers' territories throughout the world by precisely

measuring the number of cases of beverage product sold by its bottlers each week

and to precisely account for the number of gallons of Coke beverage concentrate in

the hands of each of its bottlers each week, measured both in total gallons *and* in

each bottler's "*days of sales*" of Coke beverage products.   Coke's top officers,

including the individual defendants, regularly received these reports, which are a

key tool used by them to manage Coke's business. In the U.S., Coke's top officers

also regularly received reports regarding concentrate and bottler sales entitled "Value System" and "Case Sales System" reports. Additionally, Coke's marketing department prepared "Bottler Reported Case Sales" reports for the United States on a weekly basis. According to one former Senior Coke Sales Development Manager, members of Coke's field marketing organization also monitored bottler sales in their respective territories and compared them to other United States territories, and this information was stored and maintained on Coke's SAP computer system.

43.     Coke's bottlers also used sophisticated computer systems to monitor sales and other important aspects of their business. According to a former CCE (Coca-Cola Enterprises, Coke's largest bottler) Divisional Marketing Account Manager, CCE tracked all sales on a database system called "Margin Minder." Margin Minder allowed CCE to generate reports on case sales, comparisons to prior year sales and gross profits, which could be customized to generate reports on any aspect of CCE's sales. According to another former CCE employee involved in inventory analysis, CCE managed finished product inventory levels by preparing daily and monthly inventory reports that detailed the finished product inventory counts which were compiled by entering information into CCE's SAP database. Similarly, according to a former financial analyst at the Philadelphia Coca-Cola Bottling Company, that company also prepared "Daily Sales Margin Reports" and

monthly "Case Load Reports" (which identified sales of specific Coke brands by territory) using the Margin Minder software program. This data was regularly transmitted to Coke so that Coke could anticipate product demand from its bottlers.

44.    Armed with data concerning bottler demands, Coke kept apprised of actual customer demand.  For example, Coke-Japan distributed "Daily Sales Performance Reports" to Coke-Japan's top executives, including Daft.  In Japan, Coke's top executives also regularly received reports regarding sales by bottlers entitled "INforM" and "Dealer Information System" reports.  Thus, the individual defendants each actually knew the exact amount of beverage concentrate inventory in the hands of each Coke bottler and how that inventory compared to each bottler's sales of Coke products.  Coke's accounting control and reporting system also enabled defendants to closely track sales of "toll" products, which are finished products sold by Coke.  Toll products arrive fully processed and packaged by a third party and require no bottling by Coke's bottlers. Coke resells toll products to its bottlers who in turn distribute them to retailers.

45.    Because most of Coke's revenues came from selling beverage concentrate to its bottlers, the sale of beverage concentrate to Coke's large bottlers, the factors that determined the rate of those sales, and the potential revenue

resulting from those sales were imperative to Coke's top executives. Because

beverage concentrate is a commodity product which can be easily and quickly

produced (it is just a mixture of water, sugar and flavorings), Coke's bottlers had

no need to maintain large inventories of beverage concentrate to meet consumer

demand as would be the case with the inventory of a product that was difficult to

produce or took substantial periods of time to produce. The concentrate also has

a limited shelf-life. However, because Coke recorded revenues upon the *shipment*

of beverage concentrate to its bottlers, rather then the use of that concentrate to

produce or sell a product, Coke had a strong interest in shipping concentrate to

*bottlers even if the bottlers did not want to take additional concentrate or already*

had enough concentrate to properly and efficiently operate their businesses.

46.    Coke's top executives – including the individual defendants – were

keenly focused on how much inventory of beverage concentrate each of Coke's

bottlers had on hand at any given time because this was the key indicator of future

demand for Coke's beverage concentrate from these bottlers and thus Coke's future

revenue, net income and EPS growth. Coke's top executives – including the

individual defendants – also received very detailed monthly financial reports,

prepared by Chestnut's financial department, which provided detailed information

with respect to the financial condition and performance of Coke and each of Coke's

- 50 -

key bottlers around the world. The financial package provided Coke's beverage concentrate shipments and revenues not only on a consolidated basis but broken out as to each bottler around the world on a monthly and year-to-date basis, including a comparison of actual results to those planned or budgeted. Coke's high level executives also received volume reports on a daily basis which were broken out by market. Thus, Coke's executives knew precisely how much beverage concentrate Coke had sold to each of its bottlers.

47.     These monthly financial packages provided details as to the financial condition and performance of each of Coke's bottlers, including their beverage sales (measured in dollars or appropriate local currency) as well as case volume, and also included calculations of the number of days of sales each bottler had in Coke beverage concentrate inventory and trend analysis comparing concentrate inventory growth of bottlers and their revenue growth. Coke and the individual defendants knew on an ongoing basis how much inventory of Coke beverage concentrate each Coke bottler had and whether or not these Coke bottlers were under- or over-inventoried, given their rate of sales of Coke beverage products. *Coke did not publicly disclose on a regular basis the number of days of sales in beverage concentrate inventory in the hands of its bottlers. Coke kept this information secret so that analysts would be unable to detect whether Coke was*

*manipulating its shipments of beverage concentrate to key bottlers to artificially inflate Coke's revenues, net income and EPS.*

48.     As such, Coke executives – including the individual defendants – knew that they had the ability to directly impact Coke's revenues, net income and EPS in any given quarter by manipulating Coke's shipments of beverage concentrate to key bottlers. Because any "extra" shipments of beverage concentrate in a quarter to Coke's bottlers would come on top of Coke's ongoing beverage concentrate shipments, these shipments would not entail any significant additional overhead for Coke and would therefore have a disproportionately accretive impact on Coke's net income and EPS.

49.     During the first part of 99, the actual performance of Coke's business worsened due to the increasingly adverse impact of the negative economic conditions in several of Coke's key foreign markets. In order to conceal the true extent of the negative impact of these adverse conditions on Coke's operations, during the 1stQ99 Ivester, Stahl, Chestnut and Daft arranged for Coke to ship millions of dollars of excessive, unwanted and unneeded beverage concentrate in amounts well beyond levels justified by consumer demand. Coke made such shipments to many of its major bottlers, including CCE (Coke's largest bottler), which bottled Coke for the United States and Western Europe (except Germany);

Coca-Cola Erfrischungsgetränke AG ("CCEAG"), which bottled Coke for Germany; Coca-Cola Beverages, which bottled Coke for Russia and the Baltic States; fifteen Japanese bottlers[1] and Coca-Cola SABCO, which bottled Coke for South Africa. This boosted Coke's 1stQ99 revenues, net income and EPS. However, as a result of being forced to accept the beverage concentrate shipments, these key Coke bottlers began to accumulate excessive amounts of concentrate inventory during the 1stQ99, above the 31-33 days of supply needed to efficiently operate their bottling businesses or justified by current consumer demand.

50.    In 6/99, a serious health scare involving Coke occurred in Belgium when it was reported that contaminated Coke had apparently caused illness requiring medical treatment of some 250 Belgian children.    This quickly mushroomed into the worst Coke contamination scare in history and the Company's worst public relations crisis ever, which many believed Ivester did not effectively manage or control. Some European countries briefly banned the sale of Coke, and Coke was forced to engage in the largest recall of its product in its history. Consumption of Coke declined sharply in Europe and modestly in some other parts of the world. In order to conceal the true extent of the negative impact of the fundamental problems which were adversely impacting Coke's business, as

---

[1]    Mergers have caused the number of Japanese bottlers to decline during the late 1990s and thereafter.

now exacerbated by the European health scare, during the 2ndQ99 Ivester, Stahl,

Chestnut and Daft again forced the Coke bottlers for the U.S. and Western Europe,

Germany, the Baltic States and Russia, Japan and South Africa to accept millions of

dollars of additional shipments of excessive, unwanted and unnecessary beverage

concentrate well beyond the levels justified by consumer demand. While these

shipments boosted Coke's 2ndQ99 revenues, net income and EPS, this further

elevated the number of days of concentrate inventory in these bottlers' hands to

higher and even more excessive levels than those that existed at the end of the

1stQ99.

51.    Notwithstanding Coke and the individual defendants secretly forcing

hundreds of millions of dollars of excessive, unwanted and unneeded concentrate

on key bottlers during the first half of 99, Coke's beverage concentrate shipments

declined by 6% and 2% in the 1stQ and 2ndQ of 99 compared to the comparable 98

periods, and Coke's publicly disclosed first half 99 results were still disappointing.

Because of those disappointing results, plus the negative publicity surrounding the

European health scare and Coke's early 9/99 warning to analysts that its 3rdQ99

results would be slightly less than earlier forecast, by 10/99 Coke's stock fell to its

lowest level in several years – just $47-5/16 per share, about half the level Coke

stock sold for in 7/98 – *a decline that had wiped out $105 billion in Coke*

*shareholder market capitalization!*  This large and now protracted stock price decline caused outrage among Coke's shareholders – especially its large institutional shareholders who were pressuring Coke to improve its performance. This decline in Coke's stock – which took it to its lowest price levels in four years – is shown below:



**Coca Cola Co.**
**January 2, 1997 - October 4, 1999**
**Daily Share Prices**

52.     This decline in Coke's stock was especially disturbing because it represented a very substantial under-performance by Coke stock compared to the stocks of similar companies including Coke's arch-rival, Pepsi:

### Coca Cola Company
#### vs. Peer Group
#### July 1, 1998  - October 1, 1999



### Coca Cola Company
#### vs. Pepsico
#### July 1, 1998  - October 1, 1999



53.    Coke's large 98-99 stock decline caused substantial unrest within Coke's Board of Directors, especially with key directors Allen and Buffet, who controlled companies which were substantial Coke shareholders. Certain Board members, along with Coke's large institutional shareholders and analysts who followed the Company, were demanding improved performance. The decline in Coke's stock price also raised serious questions about Ivester's leadership of the Company, so much so that it was beginning to threaten Ivester's continued tenure as Chairman and CEO. Because of the poor performance of Coke during 98 and the first half of 99 and the serious problems Coke encountered due to the European health scare, analysts and investors viewed Coke's 3rdQ99 and 4thQ99 as critical quarters for Coke – when Ivester would demonstrate that his management team was overcoming these problems and could restore Coke's EPS growth to its 15%-20% historic levels. However, as Coke's 3rdQ99 unfolded, the adverse impact of the European health scare, combined with continued sluggish consumer demand for Coke beverages in many parts of the world, was even worse than Coke's executives had feared and, as a result, Ivester, Stahl, Chestnut and Daft realized that unless something was done, Coke's 3rdQ99 results were going to be even worse than the slightly reduced levels forecast by Coke in early 9/99. Thus, Ivester, Stahl, Chestnut and Daft caused Coke's bottlers in Japan, the Baltic States and Russia,

Germany, South Africa, the United States and Western Europe to again accept millions of dollars of excessive, unwanted and unneeded shipments of Coke beverage concentrate, as detailed in ¶¶128-172. In some cases, defendants went so far as to improperly recognize revenue on transactions without even shipping the excessive, unwanted concentrate or syrup, as detailed in ¶¶173-174. Despite these efforts, Coke's reported beverage concentrate shipments to its bottlers declined 6% and 2% in the 1stQ and 2ndQ99, compared to the same periods in 98. Had Coke's gallonage shipments of beverage concentrate in 99 to its bottlers reflected true consumer demand and its bottlers' actual inventory needs, the beverage concentrate shipments would have declined by much higher margins from the 98 shipment levels. Instead, the excessive shipments permitted Coke to achieve flat concentrate shipments in 99, compared to 98. And by secretly forcing key bottlers it controlled to again accept shipments of hundreds of millions of dollars of excessive, unwanted and unneeded concentrate during the 3rdQ99, and by improperly recognizing revenue, Coke was able to publicly report 3rdQ99 *flat* gallonage shipments of beverage concentrate compared to the 3rdQ98 and manipulate, falsify and artificially inflate Coke's 3rdQ99 revenues, net income and EPS, as detailed in ¶¶122-197, thus concealing the true extent of the decline of Coke's business due to negative macro-economic factors in several of its overseas markets and the adverse

impact of the European health scare, allowing Coke to meet its 3rdQ99 revenue, net income and EPS forecasts.

54.    While Coke's 3rdQ99 shipments of excessive amounts of beverage concentrate to bottlers enabled Coke to meet its 3rdQ revenue and EPS forecasts, they very much exacerbated the already serious concentrate inventory over-supply situation with those major bottlers. By the end of the 3rdQ99, 9/30/99, Ivester, Stahl, Chestnut and Daft knew that during 99 Coke had shipped some $300-$400 million of excessive, unneeded and unwanted beverage concentrate to key Coke bottlers, thus inflating Coke's interim 99 revenues, net income and EPS. When Coke reported its 3rdQ99 results which met forecasted levels of revenue and EPS on 10/21/99 (the start of the Class Period), Coke reported *flat* beverage concentrate gallonage shipments, *deceptively indicating that Coke had met forecasted levels of results despite those flat shipments when, in fact, Coke did so only by making millions of dollars of unjustified and excessive concentrate shipments*. Worse yet, Coke also deceptively presented its declining and then flat gallonage shipments of concentrate during 99 *as a positive development by telling analysts that its flat gallonage shipments were due to Coke bottlers voluntarily reducing their levels of beverage concentrate inventory, which was the opposite of what was actually happening!* Coke also indicated to analysts that the voluntary beverage concentrate

- 59 -

inventory reduction by these bottlers *was improving the financial condition of those bottlers and had set the stage for substantial revenue growth by Coke as consumer demand for its products picked up in late 99 and early 00, because that pick-up in consumer demand would result in bottlers stepping up their purchases of beverage concentrate from Coke to replenish their lean inventories.* This enabled Coke to credibly but falsely forecast 4thQ99 EPS of $.30-$.31, 99 EPS of $1.27-$1.32, 00 EPS of $1.50-$1.60 and 01 EPS of $1.75+, *stating that because consumer demand was now beginning to strengthen, Coke expected beverage case shipments to accelerate materially in the 4thQ99, which would result in an increase in beverage concentrate shipments to Coke's bottlers, because their inventories of beverage concentrate had become "lean" during 99 due to their voluntary efforts to destock or deload beverage concentrate inventory. Again, just the opposite was true, and Coke's EPS forecasts for the balance of 99 and 00 were knowingly false.*

55.    Thus, Coke was able to credibly forecast strong revenue and EPS growth in the 4thQ99 and during 00 in part *because concentrate inventory levels of Coke's bottlers had been reduced to such low levels that the emerging increase in consumer demand for Coke would immediately translate into increased shipments of concentrate to bottlers.* Then, in early 11/99, Coke told key analysts that it was imposing *the largest concentrate price increase in history* on CCE, Coke's domestic and Western European bottler, in part due to strengthening

- 60 -

consumer demand for Coke, and that it hoped to increase concentrate prices to other key bottlers as well. This increase in gallonage shipments of beverage concentrate, reportedly being instituted because bottlers' concentrate inventories were low, combined with the largest concentrate price increases in Coke's history, was an extremely bullish combination for Coke – *increased sales at increased prices equals strong profit growth*! As a result of Coke meeting its 3rdQ99 forecasts and *this very bullish message* to analysts and the investment community, including forecasts of 4thQ99 EPS of $.30-$.31, full year 99 EPS of $1.27-$1.32, 00 EPS of $1.50-$1.60 and 01 EPS of $1.75+, Coke's stock recovered sharply from its early 10/99 low of $47-5/16 to as high as $69 on 12/3/99 – a huge increase in Coke's stock price in about 90 days, which restored over $52 billion in Coke stockholder market capitalization. This sharp increase in Coke's stock price, by which it very nearly climbed back to its 99 high, is shown below:



**Coca Cola Co.**
**January 4, 1999 - December 6, 1999**
**Daily Share Prices**

56.    By maintaining the fiction of independence of its anchor bottlers, despite Coke's control over them, Coke accounted for its interest in those bottlers by what is known as the "equity method" of accounting, incorporating into Coke's balance sheet and income statement its share of the financial results of the bottlers' operations measured by its percentage ownership of the bottlers' stock. As a result, Coke retained a significant financial interest in the value of the assets of its key

- 62 -

bottlers, even though those bottlers' actual assets were not consolidated on Coke's balance sheet. Under the equity method of accounting, the significant write-downs or write-offs of the assets of a particular bottler would only be reflected on Coke's financial statements in an amount equal to Coke's percentage ownership interest in that bottler.

57.    For this reason, Coke's top financial officers kept close tabs on the value of the assets of its key bottlers. During Coke's rapid expansion during the Goizueta years, Coke caused certain of its key bottlers, especially in Russia, the Baltic States, India and Japan, to very rapidly expand their physical facilities in an effort to greatly expand Coke sales in those countries. In Russia, for instance, Coke and its European bottler, Coca-Cola Beverages, vastly expanded the bottling facilities there to produce Coke products for sale in Russia and the Baltic States. However, due to serious economic problems in Russia, the Baltic States and India, the hoped-for and forecasted huge increases in the sale of Coke beverage products in those countries did not materialize.

58.    By the end of 98 or early 99, two of Coke's largest bottling facilities in Russia were actually not operating and were essentially vacant, being used mostly for storage of other materials, rather than for the production of Coke beverages. Russia's economic and currency crisis – including the collapse of the Ruble – greatly

worsened during 98, having a ruinous effect on non-essential beverage sales in Russia. As a result, Pepsi took a $218 million write-off for the impaired value of its own Russian assets during 98. Likewise Cadbury Schweppes took a $100 million write-off of its Russian assets in 98. Yet Coke took *no* write down of its Russian assets even during the first nine months of 99, as the economy in Russia, and thus Coke's sales there, continued to worsen materially:

- Coke's sales in Russia decreased 60% between 8/98 and 9/99 and its sales in the Baltic States also declined sharply.

- Coke fired more than 300 of its staff in Russia beginning in 8/98.

- Coke was laying off 29% of its remaining office staff in Russia as of 9/30/99.

As a result, by 9/30/99, Coke and its top executives knew that Coke and its Russian bottler would never recover their investment in these two bottling facilities, demonstrating that those assets were "impaired" in accounting performance and requiring that those assets be written down to the lower of cost or market, which meant a very substantial multi-hundred million dollar write-down for the Russian bottling assets alone, as detailed in ¶¶176-185 above. Likewise, by mid-99, as detailed in ¶186, defendants knew that Coke's operations in India were not paying off. Thus, they knew that in this instance as well, these assets had to be written

down. The bases for the allegations in this paragraph are set forth in ¶¶176-188, and are incorporated herein by reference.

59.    Furthermore, in Japan, Coke and its bottler, Coca-Cola West Japan KK, decided to vastly expand the network of Coke beverage vending machines throughout Japan, including locating thousands of vending machines in new and previously unutilized types of locations. As detailed in ¶¶189-195, beginning in at least 94, if not earlier, Coke funneled payments to its bottlers in order to offset the high price Coke was charging for product or to help defray its bottlers' operating expenses. To mask the negative impact these payments had on Coke's own financial statements, defendants improperly classified some of these payments in Coke's financial statements as assets in order to amortize the expense over many years, instead of recognizing the payments for what they in essence really were – a refund or subsidy for a portion of the high price the bottlers paid for product or ordinary marketing support payments that should have been expensed as incurred. By mid-99, defendants knew they should have written off an additional $196 million worth of assets, almost all of which related to the write-off of vending machines and vending assets in Japan. The bases for the allegations in this paragraph are set forth in ¶¶189-195 and incorporated herein by reference.

60. However, because taking these write-offs related to assets in Russia and India, and the Japan vending assets would severely impact Coke's reported earnings during what was already proving to be a difficult year in 99, and because such a write-down would also signify the truly weak condition of Coke's operations in those three important countries, Ivester, Stahl, Chestnut and Daft deliberately refused to take these required write-downs and concealed them, thus artificially inflating Coke's reported interim 99 results, including its 3rdQ99 results.

61. During the 4thQ99, Coke's business continued to perform very poorly, with very weak demand by bottlers for concentrate as key Coke bottlers had by now already accumulated hundreds of millions of dollars worth of excess inventories of concentrate – close to 40 days', and in some cases 56 days', worth of inventory. Ivester, Stahl, Chestnut and Daft were under tremendous pressure to have Coke report favorable 4thQ99 results, not only to meet the forecasts they had been making since Coke reported its 3rdQ99 results on 10/21/99, but also to demonstrate to analysts and investors that Coke's business was, in fact, returning to its historic EPS growth levels under the Ivester management team. Because Coke's actual concentrate volume sales in the 4thQ99 were not meeting the levels forecast or necessary to meet Coke's 4thQ99 revenue, net income and EPS forecasts, in order to continue to conceal the true extent of the deterioration in Coke's

business, Ivester, Stahl, Chestnut and Daft again caused Coke's bottlers in the U.S. and Western Europe, Germany, Japan, the Baltic States and Russia and South Africa to accept over *$200 million in additional excessive, unneeded and unwanted shipments of concentrate – far beyond the levels justified by consumer demand for Coke beverages in those areas*. As a result, these bottlers had now accumulated grossly excessive concentrate inventories of *over 40 days' and, in some cases 56 days', supply – a clearly excessive amount of inventory for a commodity product like beverage concentrate with a limited shelf life*. This shipment of hundreds of millions of dollars in excessive concentrate to bottlers, *plus* the actual (for CCE) and potential (for Coke's other bottlers) large price increase in concentrate, exacerbated the already troubled financial condition of these anchor bottlers. As a result, bottlers made outraged protests to Coke decrying Coke's abuse of its control of these bottlers and threatened to refuse to continue to accept these hundreds of millions of dollars of unneeded concentrate.

62.     One indication of how Coke forced excessive, unwanted and unneeded concentrate on key bottlers is the volume of concentrate purchases by CCE – Coke's largest bottler in the world – during 99. In each quarter of 99, CCE was forced by Coke to accept more concentrate inventory than was justified by CCE's sales growth or consumer demand. In 1999, Coke loaded CCE with approximately $86 million

in such unneeded concentrate. On an annualized average basis, CCE's concentrate inventories soared 16% during 99, while it sales growth grew only 8% – creating a 50% shortfall, as demonstrated by the following chart by quarter:



As a result of being forced by Coke to purchase millions of dollars of excessive concentrate during 99, CCE's business was badly damaged. After reporting a 4thQ99 loss in early 00, CCE revealed dramatically lowered growth expectations going forward, resulting in analysts sharply reducing CCE's 00 and 01 EPS forecasts. CCE then reported a 1stQ 00 loss. CCE's stock collapsed from over $36 in early 99 to below $15 in 5/00, as shown below:



**Coca Cola Enterprises, Inc.**
**January 4, 1999 - May 19, 2000**
**Daily Share Prices**

63.    The actions by Ivester, Stahl, Chestnut and Daft in causing key Coke

bottlers to accept unwanted, unnecessary and thus excessive amounts of Coke

beverage concentrate to artificially inflate Coke's reported interim 99 and year-end

results, improperly recognizing revenue, in refusing to write down Coke's impaired

Russian, the Baltic States and India bottling assets, in improperly classifying

payments to Japanese bottlers, as detailed in ¶¶122-197, were deliberate and

conscious decisions and actions taken by them with the intent to manipulate Coke's

reported financial results upward, artificially inflate the price of Coke common

stock and deceive analysts, investors, the investment community and purchasers of Coke stock during the Class Period.

## B.    Motive and Opportunity to Commit Fraud

64.    Defendants' motive and opportunity to pursue the fraudulent scheme that inflated Coke's reported profits and the trading price of its stock provides further evidence of intentional wrongdoing. Each defendant had the opportunity to commit and participate in the fraud alleged herein. As Coke's top officers and directors, they controlled the preparation of Coke's financial statements, as well as Coke's press releases, corporate reports, SEC filings and communications with analysts. Thus, they controlled the public dissemination of and could falsify the information about Coke's finances, business and prospects that reached the public and affected its stock price.

65.    Moreover, defendants had the motive to commit and participate in the fraud alleged herein. Coke had a unique executive compensation program that gave its executives the opportunity to earn millions of dollars in annual incentive payments and long term incentive compensation that encouraged executives to increase unit case volume "sales," operating income and share prices *at all costs*. This unusual compensation scheme gave Coke's executives – including the individual defendants in this action – a lucrative and direct economic motivation

to manipulate upward Coke's 99 and 00 volume performance and reported profits and to artificially inflate Coke's stock price during 99 and 00.

66.    Coke's lucrative executive compensation structure during the Class Period consisted of three primary components: (i) Base salary; (ii) Annual Incentives; and (iii) Long-Term Incentives. Executives could participate in one of two types of annual incentive plans: the Annual Performance Incentive Plan or the Executive Performance Incentive Plan ("EPIP"), with the awards under the EPIP being more favorable because they provided tax advantages and were calculated based 95% on unit case volume growth and earnings per share. Long-term incentives comprised the largest portion of the total compensation package for executive officers and included awards of restricted stock, stock options, and Long-Term Performance Incentive Plan ("LPIP") awards. LPIP awards were also based on "unit case volume growth, growth in economic profit, operating profit margin and share of sales." Thus, awards made pursuant to both the EPIP and LPIP were designed to give executives incentive to report higher case volume and to keep reported revenues and share prices up at all costs.

67.    In fact, according to Judith Fischer, managing director of Executive Compensation Advisory Services in Alexandria, Va., "[c]ompensation, especially at Coca-Cola, has been extremely lucrative for executives." However, as noted by

- 71 -

Paul Lapides, director of the Corporate Governance Center at Kennesaw State University, this type of compensation results in "[t]he pressure to deliver on analysts' expectations quarter after quarter after quarter [which] becomes very wearing [and] CEOs more so than in the past are finding themselves wearier keeping up with those expectations over longer periods of time."

68.    Thus, during the Class Period, when demand for concentrate was low due to over-stocked inventories and depressed global sales, the defendants caused Coke to force bottlers to accept millions of dollars of additional shipments of excessive, unwanted and unnecessary beverage concentrate well beyond the levels justified by consumer demand, in order to keep case volume up and to prevent further decline in Coke's share price. In some cases, defendants went so far as to improperly recognize revenue on transactions without even shipping the excessive, unwanted concentrate or syrup, as described in ¶¶173-175. Coke's executives faced a real threat of receiving nothing but their base salary if they could not keep reported volume growth and reported financial growth elevated because their incentive pay was tied directly to volume growth and financial results. *In fact, this actually happened in 99, when all incentive awards were withheld due to poor volume and revenue performance.* As explained in Coke's 00 Annual Proxy Statement, in 99, "[a]ctual growth in unit case volume and economic profit for the

three-year period determined the level of payout, and economic profit performance fell below the minimum of the range, therefore yielding no payout for the performance period to plan participants." Thus, due to poor financial and volume growth in 96-98, *no awards were made under either the EPIP or the LPIP in 1999*.

69.    The risk of not receiving incentive pay in 00 posed a daunting threat to the individual defendants.  For instance, in 98, Daft's base salary was $415,250, but he obtained an additional $3.3 million in annual and long-term incentive pay, *comprising approximately 88% of his total annual pay*.  Similarly, in 98, Stahl received a base salary of $465,000, but obtained $3.4 million annual and long-term incentive compensation, *comprising approximately 88% of his total annual pay as well*.  Without the incentive pay in 99, both of these defendants were forced to accept what amounted to approximately 12% of their 98 compensation.  Coke's 3/01 Proxy Statement listed the results of the executive compensation program for the individual defendants for 98, 99 and 00:

| NAME & PRINCIPAL POSITION | FISCAL YEAR | SALARY | BONUS [EPIP or Discretionary Award] | OTHER ANNUAL COMPEN-SATION | RESTRICTED STOCK AWARDS | SECURITIES UNDERLYING OPTIONS | LPIP PAYOUTS |
|---|---|---|---|---|---|---|---|
| Douglas Daft Chairman & CEO | 1998 1999 2000 | $415,250 459,833 1,268,750 | $275,000 0 3,000,000 | 0 0 $131,554 | $2,700,000 0 87,281,250 | 0 125,000 650,000 | $351,900 0 0 |
| Jack L. Stahl President & COO | 1998 1999 2000 | 465,000 485,000 734,792 | 275,000 0 1,275,000 | 0 0 0 | 2,700,000 0 8,728,125 | 0 125,000 500,000 | 429,300 0 0 |

- 73 -

| NAME & PRINCIPAL POSITION | FISCAL YEAR | SALARY | BONUS [EPIP or Discretionary Award] | OTHER ANNUAL COMPEN-SATION | RESTRICTED STOCK AWARDS | SECURITIES UNDERLYING OPTIONS | LPIP PAYOUTS |
|---|---|---|---|---|---|---|---|
| James E. Chestnut Exec. VP | 1998 1999 2000 | 365,000 400,000 455,000 | 275,000 0 687,500 | 0 0 0 | 2,531,250 543,125 7,273,438 | 0 117,500 270,000 | 351,900 0 0 |
| M. Douglas Ivester Former Chairman and CEO | 1998 1999 2000 | 1,250,000 1,354,167 250,000 | 1,500,000 0 0 | 0 0 81,850 | 16,875,000 0 0 | 0 250,000 0 | 702,000 0 0 |

70.    Accordingly, throughout the Class Period, the individual defendants were under tremendous pressure to keep reported case unit volumes up, to keep reported financial results up and to prop up Coke's share price, *or face receiving paltry compensation again in 00*. This tremendous threat provided ample motive to the individual defendants to keep volume growth and financial results up, to improperly recognize revenue and to prop up Coke's share price. In addition to having the opportunity to manipulate Coke's reported financial reports, the individual defendants, and Coke itself, had the power, and thus the opportunity, to force the bottlers to accept the shipments of unneeded concentrate that would allow defendants to meet their goals. And as a result of their scheme, Daft, Stahl and Chestnut did in fact receive bonuses of $3 million, $1.275 million and $687,500 respectively in 2000.

## FALSE AND MISLEADING STATEMENTS

71.    On 10/21/99, the beginning of the Class Period, Coke reported its

3rdQ99 results, net operating revenues of $5.1 billion, net income of $787 million

and EPS of $.32, via a release stating:

> "*Some of the trends in the quarter are very encouraging*," commented
> M. Douglas Ivester, chairman, Board of Directors, and chief executive
> officer...." In fact, we achieved record third quarter case sales in every
> one of our operating groups and in many of our key markets such as
> Japan, Mexico, Brazil and the United States.... *We believe this sets the
> stage for positive momentum for our business* ...."
>
>           *    *    *
>
> As the Company looks into the fourth quarter and into the year
> 2000, it is encouraged with the trends in the following key areas:
>
>           *    *    *
>
> —   European Product Withdrawal – Over the past several months,
>      the Company aggressively invested in marketing activities
>      throughout Europe to ensure the long-term health of its brands.
>      *The Company is seeing steady improvements* ....
>
>           *    *    *
>
> For the third quarter, diluted earnings per share were $0.32.
> *These results reflect gallon shipments being even with the prior year*
> ....
>
>           *    *    *
>
> *Worldwide gallon shipments in the third quarter of 1999 were even
> with the prior year quarter on a reported basis.*

72.     On 10/21/99, subsequent to the release of its 3rdQ99 results, Coke held a conference call for analysts, money and portfolio managers, institutional investors and large Coke shareholders to discuss Coke's 3rdQ results, its business and its prospects and had follow-up conversations with analysts Carpenter of DLJ, Levy of Schroder & Co., Romm of Credit Suisse First Boston, Solomon of Smith Barney, Thompson of Prudential Securities and Lane of Merrill Lynch.   During these communications, Ivester, Stahl or Chestnut stated:

- Coke's business trends were very encouraging.   Coke had turned the corner and was now positioned to return to its historic 15%-20% EPS growth rate.

- Coke was seeking steady improvement of its business in Europe and Japan – two of its largest and most important overseas markets.

- Despite weak economic conditions in several of Coke's major overseas markets and the aftermath of the European health scare, Coke had achieved flat concentrate gallonage shipments in the 3rdQ99.

- Coke's flat concentrate gallonage shipments were due to key bottlers voluntarily reducing their beverage concentrate purchases to reduce their beverage concentrate inventories; this was positive for Coke, as bottler purchases of beverage concentrate would accelerate when consumer demand picked up in key overseas markets – which was now happening.

- Coke expected sharply increased beverage concentrate gallonage shipments in the 4thQ99 and strong beverage concentrate gallonage increases in 00, leading to strong 00 EPS growth.

- Coke was now forecasting 4thQ99 EPS of $.30-$.31, 99 EPS of $1.29-$1.31 and 00 EPS of $1.50-$1.60.

- 76 -

73.    On 10/22/99, *The Wall Street Journal* reported on Coke's 3rdQ99 results

and its conference call:

> The earnings were in line with analysts' expectations.

> \*    \*    \*

> **But Coke says it is encouraged by some trends, such as "improving business conditions" in ... Germany and Japan.**

> \*    \*    \*

> **World-wide gallon shipments of concentrate, the soft-drink base ingredient that Coke sells to its bottlers, remained flat, as bottlers outside the U.S. reduced their inventories to free up cash for marketing programs and other needs.**

74.    On 10/22/99, Schroder & Co. issued a report on Coke by Levy which

was based on and repeated information provided to her in the 10/21/99 conference

call and in follow-up conversations with Ivester, Stahl or Chestnut.  The report

forecast 4thQ99 EPS of $.30 and raised the 99 EPS forecast for Coke to $1.29 from

$1.28 and the 00 EPS forecast to $1.54 from $1.48.  The report stated:

*    Volume growth accelerated in September in many markets, including Germany ....

*    We have raised our global volume growth forecasts ... in 2000, and ... in 2001.

*    Concentrate gallonage growth should begin to match reported case sales in 4Q:99, after four quarters of bottler destocking ....
     *This is critical to earnings growth, as gallons, not bottler cases sales, drive KO's profits.*

- 77 -

\*     We are increasing our 4Q:99 estimate to \$0.30 from \$0.29 and full year 1999 to \$1.29 from \$1.28.

\*     We are raising our 2000 estimate to \$1.54 from \$1.48, and our 5-year EPS growth rate to 13%-14% from 12%.

75.    On 10/22/99, DLJ Securities issued a report on Coke by Carpenter, which was based on and repeated information provided him in the 10/21/99 conference call and in follow-up conversations with Ivester, Stahl or Chestnut. The report forecast 99 EPS of \$1.30, 00 EPS of \$1.52 and 4thQ99 EPS of \$.30 for Coke and stated:

> Global volume trends are exhibiting encouraging signs of reemerging growth.
>
> *3Q is a decisive starting point in setting the stage for future sales, volume and earnings momentum.*
>
>     \*   \*   \*
>
> *[W]e were very encouraged by what is clearly a rebounding global case volume trend, especially in several key markets such as Japan up 9%, Germany up 10% .... At this point, all five of KO's major geographic regions are now registering positive volume results and the financial and demand fall-out from the European recall is clearly subsiding.*
>
>     \*   \*   \*
>
> *[W]orldwide gallon shipments were flat in the third quarter.*

76.    On 10/22/99, Credit Suisse First Boston issued a report on Coke by Romm, which was based on and repeated information provided him in the

10/21/99 conference call and in follow-up conversations with Ivester, Stahl or

Chestnut. The report forecast 99 and 00 EPS of $1.30 and $1.50, respectively, for

Coke and stated:

> KO experienced solid improvements in *Japan [and] Germany* ....

<div align="center">*    *    *</div>

> The company remains comfortable with estimates in the $1.50-$1.60
> range for [2000].

<div align="center">*    *    *</div>

> For the balance of 1999, KO should be able to deliver on our $0.30
> estimate, which brings the full year to $1.30.

77.    On 10/22/99, Salomon Smith Barney issued a report on Coke by

Solomon which was based on and repeated information provided to her in the

10/21/99 conference call and in follow-up conversations with Ivester, Stahl or

Chestnut. The report forecast 4thQ99 EPS of $.31 and 99 and 00 EPS of $1.28 and

$1.50, respectively, for Coke. The report also stated:

> KO reported Q399 results yesterday.... *As expected, concentrate
> shipments (what actually drives the top line) were flat....* [A]n
> improvement over the first half of 1999 ....

78.    On 10/25/99, Prudential Securities issued a report on Coke by

Thompson which was based on and repeated information provided her in the

10/21/99 conference call and in follow-up conversations with Ivester, Stahl or

<div align="center">- 79 -</div>

Chestnut. The report forecast 99 and 00 EPS of $1.30 and $1.55, respectively, for

Coke and stated:

> [W]e believe that not only are volumes improving in Western Europe
> where the company experienced the infamous recall at the beginning
> of the summer, but in addition there is an increasing amount of
> evidence that volumes have at least bottomed or are beginning to
> recover in several markets around the world which have been
> economically impacted.

<div align="center">*  *  *</div>

> *We strongly believe that ... all the bad news is out.*

<div align="center">*  *  *</div>

> *A Discussion Of The Business With Management Suggests To Us That
> The Tide Is Turning.*

79.    On 10/27/99, Merrill Lynch issued a report on Coke by Lane which

was based on and repeated information provided him in the 10/21/99 conference

call and in follow-up conversations with Ivester, Stahl or Chestnut. The report

forecast 4thQ99 EPS of $.31 and 99 and 00 EPS of $1.31 and $1.52 for Coke. The

report also stated:

> Report confirms our thesis that *the worst is behind us* regarding the
> impact of the recent global meltdown on Coke's business and that the
> key underlying fundamental *drivers of the business, particularly
> volumes ... are all improving.*

<div align="center">*  *  *</div>

Strong markets include 10% comparable growth in Germany (Coke's #5 largest market in terms of case volumes) and 9% comparable growth in Japan (#4), Coke's 2 key developed markets outside the U.S....[O]ver 1/3 of Coke's profits outside of North America come from Germany & Japan combined, and these markets have been sluggish lately. *Therefore, the strong performance in the quarter in these markets is very encouraging.*

80.    Following Coke's release of its 3rdQ99 results and its positive presentations to analysts, Coke's stock jumped from $52-9/16 on 10/20/99 to as high as $59-3/8 by 10/29/99, just seven trading days later.

81.    The statements made by defendants during 10/21/99-10/27/99 were materially false and misleading when made. The true facts, which defendants concealed, as detailed in ¶¶128-195, were:

(a)    During the first three quarters of 99, Coke had forced key bottlers to purchase over $400 million of unwanted and unneeded beverage concentrate and, in some cases, went so far as to improperly recognize revenue without even shipping the excessive concentrate, which artificially inflated Coke's reported results but meant Coke's revenues and EPS would be adversely impacted in the near future, and certainly in the first half of 00, when bottlers would have to "deload" this excessive concentrate inventory;

(b)    Coke's actual business trends were disappointing and *discouraging*, not encouraging, but to conceal and cover up the true extent of the

negative impact of these adverse trends on Coke's business, Coke had shipped millions of dollars of unneeded and unwanted beverage concentrate to key bottlers in the 3rdQ99 and thus had inflated Coke's 3rdQ99 revenue, net income and EPS;

(c)    Coke's 3rdQ99 results had not "*set[ ] the stage for positive momentum for*" Coke's business; in fact, Coke's pre-shipment of millions of dollars of unwanted and unnecessary beverage concentrate to key bottlers during 99, including the 3rdQ, had set the stage for a sharp revenue and EPS slowdown for Coke when these bottlers would have to "deload" that excessive inventory by sharply reducing their purchases of beverage concentrate from Coke in the near future;

(d)    Coke was not "*seeing steady improvements*" in Europe following the 99 health scare; in fact, Coke's business in Germany and the Baltic States was not improving, as weak demand for Coke products persisted there, which Coke covered up by forcing those bottlers to accept unnecessary and unneeded beverage concentrate shipments;

(e)    Coke was not "*seeing steady improvements*" in Asia following the 99 health scare; in fact, Coke's business in Japan was not improving, as weak demand for Coke products persisted there, which Coke covered up by forcing those bottlers to accept unnecessary and unneeded beverage concentrate shipments;

- 82 -

(f)    Coke's flat concentrate gallonage shipments during the 3rdQ99 had been achieved only by Coke's shipping hundreds of millions of dollars of unwanted and unneeded beverage concentrate to key Coke bottlers in the U.S. and Western Europe, Germany, the Baltic States, Japan and South Africa and were not the result of "voluntary" efforts by Coke's bottlers to reduce their concentrate inventories;

(g)    By 9/30/99, Coke had accumulated hundreds of millions of dollars of unproductive and over-valued assets in Russia and the Baltic States (bottling assets) and it had improperly classified payments to Japanese bottlers, which assets should have been written down by 9/30/99 and would have to be written down in the near-term, which would adversely impact Coke's net income and EPS in Coke's 4thQ99 and year-end 99;

(h)    Coke's 3rdQ99 revenues, net income and EPS of $5.1 billion, $787 million and $.32 had been falsified and artificially inflated; and

(i)    As a result of the foregoing negative conditions which were adversely impacting Coke's business, the defendants knew, based on then-current information, that Coke's forecasts of 4thQ99 EPS of $.30-$.31, 99 EPS of $1.29-$1.31 and 00 EPS of $1.50-$1.60 were false as they could not and would not be achieved. The bases for the allegations in this paragraph are detailed in ¶¶128-195.

82.    In early 11/99, Coke's top executives told key analysts and members

of the financial press that Coke was going to raise prices on concentrate, at least to

CCE, by a higher amount than ever before.  On 11/4/99, *The Wall Street Journal*

reported:

> Coca-Cola Co. is expected to raise the price of its concentrate sharply
> in the U.S. next year in a bid to improve profitability ... *analysts say*.
>
> Coke could charge as much as 6% more on average *next year* for
> its concentrate, the base ingredient for soft drinks that it sells to
> *bottlers* ....
>
> *    *    *
>
> Mr. Conway said the expected price increase primarily would
> affect Coke's largest bottler, Coca-Cola Enterprises Inc., which is
> responsible *for about 70% of Coke's North American volume. The
> price increase would be the largest to the bottler since it was formed
> in 1986.*

Since Coke had just told analysts that due to increasing case volumes, especially in

its key markets, Coke's beverage concentrate sales were about to accelerate, these

large price increases were irresponsibly bullish, as they signaled an expected sharp

increase in Coke's profitability in late 99 and early 00 by defendants.

83.    On 11/2/99, Brown Brothers Harriman issued a report on Coke by

Burry which was based on and repeated information provided him in

conversations with Ivester, Stahl or Chestnut. The report forecast 99 and 00 EPS of

$1.27 and $1.50, respectively, for Coke and stated:

The Coca-Cola stock has moved up about 20% in recent weeks, rebounding from a three-year low reached following the substantial decline experienced since mid-1998. *The rebound is attributed to ... an announcement by the company's primary bottler, and confirmed by The Coca-Cola Company, that the concentrate producer would accelerate concentrate price increases as bottlers accelerate prices charged retailers.*

*The Coca-Cola Company should reverse its downward earnings per share trend in the fourth quarter of 1999 ... and the coming year should provide above-trendline comparisons given stabilization of formerly collapsing markets ....*

84.    On 11/22/99, Merrill Lynch issued a report on Coke by Lane which was based on and repeated information provided Merrill Lynch in conversations with Ivester, Stahl or Chestnut. The report forecast 99 and 00 EPS of $1.32 and $1.60 and 4thQ99 EPS of $.31 for Coke and stated:

*    *Underlying fundamentals are improving.*

*    *    *

*    Volumes are accelerating.

*    Pricing is getting better.

*    *    *

*    *Bottler concentrate inventories are leaner.*

*    *Operating margins are poised to expand again.*

*    *    *

- 85 -

*Bottler concentrate inventories are leaner. There has been substantial destocking of concentrate inventories among bottlers over the past year as they maximized working capital needs during the recent turbulent times. This bodes well for Coke's concentrate shipments as bottler case volumes re-accelerate.*

85.    On 11/23/99, Lehman Brothers issued a report on Coke by Branca, written after discussions with Ivester, Stahl or Chestnut, which was based on and repeated information provided by them. Ivester, Stahl or Chestnut reviewed this report before it was issued and assured Branca it was accurate. The report forecast 99 EPS of $1.28 and increased the 00 and 01 EPS forecasts for Coke to $1.52 and $1.76, respectively. It also stated:

*        Given prospects for accelerating global volume growth, we are increasing our year 2000 worldwide case volume forecast from 5% to 6%.

*    *    *

*        Based on our expectation for improving worldwide case volume growth, we are increasing our year 2000 EPS forecast from $1.49 to $1.52 (a 19% jump) and lifting our 2001 EPS estimate from $1.69 to 1.76 (another 16% rise).

86.    On 11/23/99, Credit Suisse First Boston issued a report on Coke by Romm, written after discussions with Ivester, Stahl or Chestnut, which was based on and repeated information provided by them. Ivester, Stahl or Chestnut reviewed this report before it was issued and assured Romm it was accurate. The report forecast 99 and 00 EPS of $1.30 and $1.60 for Coke and stated:

*Concentrate increases will benefit KO*

The Coca-Cola Company is expected to raise concentrate prices 5-7% to CCE, the company's domestic anchor bottler. This hike is approximately twice the rate of normal concentrate increases .... With the top line improvement at KO, gross profit margins are likely to benefit ....

87.    On 11/30/99, DLJ Securities issued a report on Coke by Carpenter, written after discussions with Ivester, Stahl or Chestnut, which was based on and repeated information provided by them. Ivester, Stahl or Chestnut reviewed this report before it was issued and assured Carpenter it was accurate. The report forecast 99, 00 and 01 EPS of $1.30, $1.52 and $1.75+, respectively, for Coke and stated:

1)    the first half of 1999 marked a cyclical low point from a worldwide volume growth standpoint ....

*    *    *

4)    the European product recall during the summer of 1999 has effectively subsided ....

5)    KO's earnings growth will re-emerge at +15% rate entering into 2000 and 2001.

*    *    *

At this point, we remain comfortable with our fourth quarter earnings outlook for The Coca-Cola Company.... Our earnings forecast stands at $0.30 per share....

1.    Double-digit sales growth re-emerges!  We project that Coca-Cola will return to double-digit revenue growth in the fourth quarter, marking the first time since the second quarter of 1995!

\*    \*    \*

3.    *Lower Global Bottler Inventories: Importantly for Coca-Cola, we expect gallon shipments to track at an equal pace to that of unit case trends in the fourth quarter. This compares to prior periods in which gallon shipments trailed unit case performance as its worldwide bottling partners maintained low inventory levels. We believe bottler inventories are at sufficient levels and we do not forecast that its bottlers will be working down inventory at the end of the year.*

88.    As a result of the irresponsibly bullish propaganda about Coke disseminated into the marketplace during the Class Period by defendants through these analysts, Coke's stock soared higher, reaching $60+ by 11/17/99 and $69 by 12/3/99. This was a huge increase in Coke's stock price in less than 90 days, which restored over $52 billion in Coke stockholder market capitalization.  This sharp increase in Coke's stock price, by which it very nearly climbed back to its 99 high, is shown below:



**Coca Cola Co.**
**January 4, 1999 - December 6, 1999**
**Daily Share Prices**

89.    The statements made by defendants through analysts during 11/99 were false and misleading when made. The true facts, which defendants concealed, as detailed in ¶¶128-172, were:

(a)    During the first three quarters of 99, Coke had sold key bottlers over $400 million of unwanted and unneeded beverage concentrate, and, in some cases, went so far as to improperly recognize revenue without even shipping the excessive concentrate, which had artificially inflated Coke's reported results but

- 89 -

meant Coke's revenues and EPS would be adversely impacted in the near future, and certainly in the first half of 00, when bottlers would have to work off this excessive concentrate inventory;

(b)    Coke's *underlying fundamentals were not improving*, as its actual business trends were disappointing and *discouraging.* To conceal and cover up the true extent the negative impact these adverse trends were visiting on Coke's bottomline, Coke had shipped millions of dollars of unneeded and unwanted beverage concentrate to key bottlers in the 3rdQ99 and was continuing to do so in the 4thQ99 to conceal Coke's poor operating results;

(c)    Coke's bottlers' concentrate inventories were not "*leaner*" and had not undergone a "*substantial destocking*" in 99 and were not even at proper levels.   In fact, Coke's pre-shipment of millions of dollars of unwanted and unnecessary beverage concentrate to key bottlers during 99, including the 3rdQ and 4thQ99, had instead set the stage for a sharp revenue and EPS slowdown for Coke in 00 when these bottlers would have to work off the excessive inventory by sharply reducing their purchases of beverage concentrate from Coke;

(d)    The adverse impact of the European product recall *had not subsided.*  In fact, Coke's business in Germany and the Baltic States was not improving, as weak demand for Coke products persisted there, which Coke

covered up by forcing these bottlers to accept unnecessary and unneeded beverage concentrate shipments;

(e)    Coke's flat concentrate gallonage shipments during 99 had been achieved only by Coke's shipping hundreds of millions of dollars of unwanted and unneeded beverage concentrate to key Coke bottlers in the U.S. and Western Europe, Germany, the Baltic States, Japan and South Africa and were not the result of "voluntary" efforts by Coke's bottlers to reduce their concentrate inventories; and

(f)    As a result of the foregoing negative conditions which were adversely impacting Coke's business, the defendants knew based on then-current information that Coke's forecasts of 4thQ99 EPS of $.30-$.31, 99 EPS of $1.28-$1.32 and 00 EPS of $1.50-$1.60 were false as they could not and would not be achieved. The bases for the allegations in this paragraph are detailed in ¶¶128-172.

90.    By 12/99, it was evident to Ivester and his cohorts that they could not continue the falsification of Coke's reported results to meet Coke's forecasted levels of revenues and EPS by Coke forcing key bottlers to accept millions of dollars of unneeded, unnecessary and unwanted concentrate during 99 and by imposing a huge concentrate price increase on its bottlers – who were now fiercely complaining to Coke about Coke's abuse of its control over them. It was evident to Ivester that Coke's interest in bottling assets in Russia, the Baltic States and India were grossly

overvalued and that defendants had improperly classified payments to Japanese

bottlers, which assets should have been written down earlier in 99 and would have

to be written down by year end, which would cause Coke to suffer a 4thQ99 loss,

not the EPS of $.30-$.31 that Coke was forecasting to analysts. As a result, it was

evident to Coke's top executives that Coke would have to write off hundreds of

millions in assets in the 4thQ99, resulting in a loss instead of their $.30-$.31 EPS

forecast. In addition, it was also evident that Coke would have to work off the

excessive inventory by sharply reducing concentrate shipments to its anchor

bottlers in 00, which would have a very adverse impact on Coke's sales, revenues,

net income and EPS during at least the first half of 00 – reducing revenues by at

least $600 million and pre-tax profits by at least $400 million.

91.    On 12/5/99, Coke's Board held an emergency secret special meeting,

engineered by Allen and Buffet, at which Ivester was fired – being forced to resign

and retire. Thereafter, without any prior warning, on 12/6/99, Ivester – who was

only 52 years old, had no children and had served as Coke's Chairman and CEO for

just two years – announced he was "*retiring*," to be succeeded by Daft. Coke's press

release quoted Ivester as stating: "After extreme reflection and thought, I have

concluded that it is time for me to move on to the next stage of my life .... During

the past two years ... [t]he Company has weathered the economic storm extremely

well ...." This unexpected resignation shocked analysts and investors. Coke's stock plunged from $68-3/16 on 12/6/99 to $58-3/4 on 12/7/99 – a $25 billion, two-day market cap loss – due to investor concerns that Ivester's retirement indicated there were serious undisclosed problems at Coke. To refute investor and analyst concerns that there were undisclosed problems which were negatively impacting Coke's business, Coke immediately falsely assured analysts that Ivester's voluntary retirement did not indicate that there were any serious undisclosed problems with Coke's business and that Coke did not anticipate any significant change in the way it did business. A Coke spokesman reassured the market on 12/8/99 that Coke's core business strategy would not change and "*[n]othing has changed about the business outlook.*"

92.    In fact, Ivester had been forced out because Coke's business was worsening and a large asset write-down and beverage concentrate deload were looming, which would truncate Coke's financial prospects. Nonetheless, Coke deceptively assured analysts that Coke's 10/99 and 11/99 shipments *were up* – concealing that this was only achieved by their continuing to ship hundreds of millions of dollars of unneeded and unwanted beverage concentrate to Coke's key bottlers in the U.S. and Western Europe, Germany, the Baltic States and Russia, Japan and South Africa, who now had accumulated at least $600 million in

excessive concentrate inventories, and by again falsely representing that Coke's business was improving and that Coke, thus, would meet its 4thQ99 full year 99 and year 00 forecasted results.

93.    On 12/6/99, Lehman Brothers issued a report on Coke by Branca, which was based on and repeated information provided in conversations with Daft, Stahl or Chestnut.  The report continued to forecast 99 and 00 EPS of $1.28 and $1.52, respectively for Coke, and stated:

- Chairman and CEO Doug Ivester has announced plans to retire ....

- *This is clearly a surprise ....*

- The company announced that 4Q99 worldwide volume was running above the 2.5% 3Q99 rate .... *Guidance on ... EPS is, of course, unchanged ....*

- Despite the management maneuvers, we do think that worldwide volume trends are improving and are still comfortable with our $0.30 4Q99 EPS forecast, our $1.52 year 2000 EPS estimate and our expectations for 2001 EPS of $1.76.

94.    On 12/6/99, Credit Suisse First Boston issued a report on Coke by Romm, written after discussions with Daft, Stahl or Chestnut, which was based on and repeated information provided by them.  The report continued to forecast 99 and 00 EPS of $1.30 and $1.60 for Coke and stated:

Ivester's decision was a complete surprise .... *The management change had nothing to do with performance of Coke; we believe the company has turned the corner.*

- 94 -

95.     On 12/6/99, J.P. Morgan issued a report on Coke by Faucher, written

after discussions with Daft, Stahl or Chestnut, which was based on and repeated

information provided by them. The report continued to forecast 99 and 00 EPS of

$1.28 and $1.48 and 4thQ99 EPS of $.30 for Coke. It also stated:

> Coke also announced that volume trends in October and November
> (excluding the Cadbury acquisitions) are running ahead of Q3's pace.

96.     On 12/8/99, *The Wall Street Journal* ran an article on Coke stating:

> Is Douglas Daft adroit enough to put the fizz back into Coke? It's
> going flat quickly. *Job One for Coca-Cola Co.'s next chief will be
> providing reassurance that something isn't seriously amiss with the
> world's largest soft-drink company. The sudden resignation of M.
> Douglas Ivester* as chairman and chief executive officer *on Monday
> created anxiety* that there may be more *bad news to come, such as an
> earnings charge or that Coke is about to undertake a major strategy
> shift*.
>
> *Randy Donaldson, a spokesman for Coke ... says that the core strategy
> of the company won't change.*
>
> \*     \*     \*
>
> *Mr. Donaldson says Coke is still sticking to its annual growth targets
> of 7% to 8% in volume and 15% to 20% earnings per share. "Nothing
> has changed about the business outlook," he says.*

97.     On 12/8/99 or 12/9/99, Coke held an analysts meeting in New York

City. During the meeting, Daft, Stahl and Chestnut reiterated that:

- Ivester had retired voluntarily. His retirement did not signal any
  serious undisclosed business problems at Coke.

- 95 -

- Nothing had changed about Coke's business outlook.

- Coke was experiencing increasing beverage concentrate volumes, as well as concentrate price increases. Thus, Coke was on course to achieve 4thQ99 EPS of $.30-$.31, 99 EPS of $1.28-$1.32, 00 EPS of $1.50-$1.60 and 01 EPS of $1.75+.

98.    On 12/9/99, Prudential Securities issued a report on Coke by Thompson, written after discussions with Daft, Stahl or Chestnut, which was based on and repeated information provided by them. The report forecast 99 and 00 EPS of $1.30 and $1.55 and 4thQ99 EPS of $.30 for Coke and stated:

> We Were Surprised ... By The Early Retirement Of Doug Ivester .... However, while some people have interpreted his leaving as a signal that there is more chaos to come, *we believe that just the opposite is the case. We continue to believe that as a result of the world wide economic recovery and the improvement in the company's distribution system the sluggish volume trends which have been experienced by the company in the recent past will accelerate significantly. We doubt that he would have retired in an environment in which the business was continuing to struggle.*
>
> *    *    *
>
> The Company Is Currently Saying That Fourth Quarter Volume Through The End Of November Was Running Ahead Of The 3% Rate Registered In The Third Quarter. We see no reason why this trend shouldn't carry through the month of December.... *While some investors seem to think that there is another negative fundamental "shoe to fall" at Coca-Cola, we remain convinced that this isn't the case.*

99.    On 1/13/00, PaineWebber issued a report "Initiating Coverage" on Coke by Greenberg. Because this was his first report on Coke, it was issued only

after Greenberg had extensive discussions with Daft, Stahl or Chestnut and was based on and repeated information provided by them. Daft or Stahl reviewed this report before it was issued and assured Greenberg it was accurate. The report forecast 99, 00 and 01 EPS of $1.29, $1.52 and $1.74, respectively, for Coke and stated:

> *    We do not believe the resignation of CEO Doug Ivester will materially disrupt the solid foundation of momentum building at The Coca-Cola Company. We believe the one-two punch will be pricing discipline at home [and] volume growth abroad.... We expect modest system-wide pricing and operating leverage to drive operating income growth of 16%, EPS growth of 19% and return on invested capital growth of 25% in 2000.

<p style="text-align:center">*    *    *</p>

> JAPAN – – *BACK ON TRACK AS ECONOMIC PICTURE IMPROVES.*
>
> Third quarter 1999 volume rebounded sharply, up 10% following a soft third quarter during the 1998 "Asian Contagion"....
>
> GERMANY – – *LOCKED AND LOADED.*
>
> The opportunity here may be overlooked due to the steady "white noise" on the continent since the summer product recall. Retail consolidation demands a highly focused and capable distribution system. We believe the formation of German anchor bottler CCEAG (70% of country volume) enables this as well as opportunities to smooth out per capita consumption at higher levels through more consistent execution.

<p style="text-align:center">*    *    *</p>

Following two sub-par years, we expect operating profits to exceed double digits in 2000 and 2001. *We believe 7% volume growth, better pricing* (especially in the U.S.), and operating leverage should renew the strength of this core fundamental. In so doing, EPS growth should accelerate.

100.    On 1/14/00, Warburg Dillon Read issued a report on Coke by Spillane, written after discussions with Daft, Stahl or Chestnut, which was based on and repeated information provided by them. Daft, Stahl or Chestnut reviewed this report before it was issued and assured Spillane it was accurate. The report forecast 99 EPS of $1.28 and raised the 00 and 01 forecasted EPS for Coke to $1.52 and $1.74, respectively. It also stated:

> We are upgrading KO ... to a Strong Buy .... We believe KO has the business model to assert itself as one of the best "consumer growth" plays. In our view as the company is able to demonstrate its *ability to generate volume and earnings growth during 2000 it should be able to cast aside the negative issues which plagued it last year and focus attention on the growth prospects of its global reach*.

101.    The statements made by defendants and reiterated by analysts during 12/99-1/00 were materially false and misleading when made. The true facts, which defendants concealed, as detailed in ¶¶128-195, were:

    (a)    Ivester had not "retired" voluntarily, but rather, had been forced out and forced to retire due to his inability to turn Coke's business around and restore its EPS growth to double-digit levels;

(b)     During 99, Coke had forced key bottlers to purchase over $600 million of unwanted and unneeded beverage concentrate, and, in some cases, defendants had gone so far as to improperly recognize revenue without even shipping the excessive concentrate which had artificially inflated Coke's reported results but meant Coke's revenues and EPS would be adversely impacted in the near future and certainly in the first half of 00, when bottlers would have to "deload" this excessive concentrate inventory;

(c)     Coke's actual business trends were disappointing and *discouraging*, and its concentrate shipments would not have been actually increasing at the stated rate but for defendants' deliberate shipment of unnecessary and unwanted concentrate inventory, which they were effecting to conceal and cover up the true extent of the negative impact of adverse trends on Coke's business;

(d)     Coke's business outlook had changed for the worse, as Coke's pre-shipment of millions of dollars of unwanted and unnecessary beverage concentrate to key bottlers during 99, including the 3rdQ and 4thQ, had set the stage for a sharp revenue and EPS slowdown for Coke when these bottlers would have to "deload" that excessive inventory in 2000 by sharply reducing their purchases of beverage concentrate from Coke;

(e)     Coke's increasing concentrate gallonage shipments during the 4thQ99 had been achieved only by Coke's shipping hundreds of millions of dollars of unwanted and unneeded beverage concentrate to key bottlers in the U.S. and Western Europe, Germany, the Baltic States, Japan and South Africa;

(f)     Coke had accumulated hundreds of millions of dollars of unproductive and overvalued assets in Russia, the Baltic States and India, and defendants had improperly classified marketing payments to Japanese bottlers related to vending assets as assets, which assets should have been written down and would have to be written down in the near-term, which would adversely impact Coke's net income and EPS in Coke's 4thQ99;

(g)     As a result of the foregoing negative conditions which were then-known to defendants and already adversely impacting Coke's business, defendants knew that Coke's forecasts of 4thQ99 EPS of $.30-$.31, 99 EPS of $1.28-$1.31, 00 EPS of $1.50-$1.60 and 01 EPS of $1.75+ were false as they could not and would not be achieved. The bases for the allegations in this paragraph are detailed in ¶¶128-195.

102.     During mid-1/00, rumors circulated that Coke might take asset write-downs and announce layoffs when it reported its 4thQ99 results in late 1/00. However, based on conversations with Daft, Stahl and Chestnut, analysts continued

to forecast strong volume gains for Coke and 4thQ99 and 99 operating EPS of $.28-$.31 and $1.28-$1.36, 00 EPS of $1.48-$1.54 and 01 EPS of $1.73-$1.75.

103. On 1/17/00, *The Wall Street Journal* ran an article on Coke, stating:

Street Seeks Real Thing on Coke Outlook

Wall Street has a message for CocaCola: Get real.

Douglas Daft, Coke's chairman-to-be, has buoyed his company's beleaguered stock by swiftly putting into place a new management team....

*But some investors and analysts want more than a new image.* If Mr. Daft is serious about changing Coke, they believe, he should lower the company's ambitious annual growth targets of 7% *to 8% in volumes and 15% to 20% in per-share earnings. Those long-term goals they say have become a pipe dream, and only hurt Coke's credibility. Why, for instance, did Mr. Daft say three days into the job that he would stand by those goals?*

\*   \*   \*

Coke also could clear the decks by taking some charges in the fourth quarter, many analysts believe, so that lingering messes don't haunt Mr. Daft's coming reign. "We ... wouldn't be surprised by a move to 'clean house' in Q4 by taking several write-offs," Bill Pecoriello, an analyst with Sanford C. Bernstein & Co. wrote in a report last week.

\*   \*   \*

Says a Coke spokesman: *"The management team is examining every aspect of operations. At this point no decisions have been made and since we don't comment on rumor or speculation it would be inappropriate to comment further."*

- 101 -

104. The statements made by Coke in 1/00 were false and misleading when made. The true facts, which defendants concealed, as detailed in ¶¶128-195, were:

(a)   Coke had accumulated hundreds of millions of dollars of unproductive and overvalued assets in Russia, the Baltic States and India, and Coke had improperly classified marketing payments to Japanese bottlers related to vending assets as assets, which assets defendants knew would have to be written down, which would adversely impact Coke's net income and EPS in Coke's 4thQ99;

(b)   Coke knew that a large beverage concentrate inventory deload was going to be revealed in a few days; and

(c)   Thus, adverse decisions had already been made which would hurt Coke's stock, but they were being concealed.

The bases for the allegations in this paragraph are detailed in ¶¶128-195.

### THE TRUTH IS BELATEDLY DISCLOSED.

105. On 1/25/00, *The Wall Street Journal* reported:

Coke Is Expected to Take Large Charges For the Previous and Current Quarters

Analysts expect Coca-Cola Co., which reports fourth-quarter results tomorrow, to take combined pretax charges of as much as $700 million for that period as well as for the current first quarter, as it clears out poor-performing investments and cuts jobs.

\*   \*   \*

- 102 -

Although Coke long denied any need to write down its Russia assets, analysts have recently been expecting a recognition of the reduced value of its seven company-owned bottling plants. The devaluation of the ruble in August 1998 caused Russian sales to drop as much as 60%. *Mr. Pecoriello predicts the charge for Russia alone will amount to $300 million to $400 million. Coke is also expected to write down assets in India, after consolidating several independent bottlers.*

Mr. Pecoriello said Coke is most likely to take an additional charge for the first quarter of about $150 million for severance costs to reduce its global head count by 2,000 or more. The layoffs, if as big as predicted, would rank among the biggest cuts ever to Coke's work force.

\*     \*     \*

But cost cuts may not be enough to satisfy Wall Street, which is *looking for Coke to increase volume and boost profitability even as sales growth for the soft-drink industry softens. Coke has had trouble hitting its annual targets of 7% to 8% volume growth and 15% to 20%* earnings-per-share growth. Volume growth for 1999 is expected to come in at around 1%.

"Coke is about growth, not about saving your way to success," says Mr. Conway. "The important thing is what the volume, price and margin story will be over the long term."

106.     On 1/26/00, Coke reported its 4thQ99 results in a press release – *a loss of $45 million or $.02 per share – far below the $.30-$.31 EPS forecasts, due, in part, to write-offs of $813 million, including $543 million due to Coke's over-valuation of its interests in bottling assets in Russia and the Baltic States and $196 million for vending assets in Japan.* In Coke's press release, Daft stated: "Despite these accounting write-downs, we remain fully committed to growing our business in

these countries and believe the regions offer tremendous opportunity for per capita growth." *Coke also announced it was firing 6,000 Coke employees – 21% of Coke's global workforce – the largest firings in Coke's history!* These $813 million in write-offs exceeded all of Coke's reported 3rdQ99 net income of $787 million. The extent of these write-offs was enormous; after the write-off of $739 million, the remaining carrying value of the assets was only $297 million. Thus, if Coke is to be believed, 70% of these assets suddenly became worthless in the 4thQ99. Worse yet, Coke also shocked investors by revealing that its 00 results *would be much lower than earlier forecast*, due to Coke deciding to have its key domestic and overseas bottlers, including those described earlier, engage in a huge beverage concentrate "destocking" or "deloading" program to reduce their levels of beverage concentrate inventory from over 40 days', and in some cases 56 days', inventory to less than 33 days. *This was a truly massive reduction – amounting to 25% of worldwide Coke system concentrate inventories – which would cost Coke at least $600 million in revenue and $400 million in pretax income in the first half of 00 alone!*

107.   On 1/27/00, *The Wall Street Journal* reported:

In a massive round of layoffs pushed by an activist board of directors, Coca-Cola Co. said it is slashing 20% of its work force, or 6,000 employees.

*The embattled soft-drink giant said it would take $1.6 billion in one-time charges, far bigger than expected.... Coke also warned that*

*reducing shipments of soft-drink concentrate to bottlers selected by Coke would lower earnings in the first six months of the year.*

*The cuts were a bombshell ....*

*Coke also reported its first earnings loss in at least a decade.* Wall Street, baffled by the unexpected inventory write-down and fearing that Coke inflated its fourth-quarter sales by overselling concentrate, drove down Coke's stock.

\*    \*    \*

*The results included $813 million in charges that reflect Coke's overly ambitious investments in emerging markets.* The write-downs are for bottling assets and the streamlining of manufacturing facilities in *Russia, the Baltics, Japan and some other countries,* Coke said.

*... Wall Street was surprised by a provision for reductions in bottlers' inventories of soft-drink concentrate, the ingredient that Coke sells to its bottlers.*

108.    As a result of the shocking disclosures about the beverage concentrate inventory levels of key Coke bottlers – *which was contrary to everything Coke had said to analysts and investors about its bottlers' beverage concentrate inventory levels during 99 – and the adverse impact of the massive inventory deload or destock on Coke's 00 revenues and EPS, investors savaged Coke's stock.* Coke's stock, which had recovered to as high as $66-7/8 on 1/21/00 and traded as high as $66-1/16 on 1/25/00, fell to $62-3/4 on 1/26/00, $58-7/16 on 1/27/00 and to $55-1/16 by 2/3/00.

109.    During 2/00 and 3/00, Coke's stock continued to perform very poorly, falling steadily as analysts digested Coke's shocking 4thQ99 loss and the revelations of its huge concentrate deload and how negative their implications were for Coke's ongoing business performance, *i.e.*, Coke would not be able to achieve on an ongoing basis volume and EPS growth of 7%-8% and 15+%, respectively. During this period, Coke executives continued to conceal from Coke's auditors and the investment community the truly serious nature and actual negative impact of the problems which were adversely impacting Coke's business, in an attempt to cause analysts to continue to believe that, despite Coke's 1/26/00 disclosures, Coke would, in fact, continue to achieve its historic 8+% and 15%-20% revenue and EPS growth. Daft was quoted in a 1/00 interview as saying "Our world has changed, 2000 is a year of recovery."

110.    Though Coke's 1999 annual report was not filed with the SEC until March 9, 2000, defendants began disseminating it into the market as early as the close of trading on March 3, 2000. Rather than a "year of recovery," as Daft promised in January, Coke's annual report disclosed that the Company was still strapped for cash and contrary to its 10/99 statements that it would be using "excess cash" to repurchase substantial amounts of Coke stock in early 2000, Coke would in fact have to use that cash to absorb the impact of de-loading massive

amounts of concentrate and to finance laying off the 6,000 workers. *Bloomberg* reported on March 7, 2000 that as Coke's stock price "tumbled" on a high volume of trading, "Shares of Coca-Cola Co. dropped to a three-year low on concern the world's largest soft-drink maker won't be able to revive sales after two years of disappointing results." As a result of the detailed disclosures in the annual report, Coke's stock again declined almost 12%, falling from approximately $51 per share at the close of trading on 3/3/00 to as low as $44-13/16 on 3/7/00, as analysts and the investment community became increasingly convinced that Coke would not be able to achieve a return to its historic revenue and EPS growth rates.

111.    On 4/4/00, after the close of trading on the NYSE, Coke held a conference call to brief analysts on Coke's 1stQ 00 results and its 00 prospects – which analysts found to be disappointing and confirmed their increasing skepticism over Coke's ability to achieve the long-term growth goals it had continued to insist it could meet. On 4/5/00, *The Wall Street Journal* reported:

Coke's Forecast for Sales Growth Falls Short of Analyst Estimates

Coca-Cola Co. released expectations for growth in world-wide sales volumes for the first quarter and the year *that fell short of analysts' estimates, raising questions about how quickly the beverage company will be able to come through on a promise to deliver 7% to 8% volume growth over the long term.*

In a five-hour meeting called to outline its strategy and goals to analysts and investors, Coke said it expects world-wide unit-case

- 107 -

volume to increase by about 1.5% for the quarter, excluding growth from its acquisition of brands from British rival Cadbury Schweppes PLC.  Analysts had expected growth of 3% or more without the Cadbury brands....

Analysts had also expected the company to deliver volume growth of 5% to 6% for the year without the Cadbury brands, but the company expects it will achieve that level of growth only with the acquired brands.  Analysts expect those brands to make up one percentage point of growth.

Several analysts reacted to these disappointing results as shown below:

<u>Lehman Brothers, 4/5/00</u>:

*       After the close, management projected comparable 1Q2000 worldwide case volume growth of 1.5%, below the Consensus 3%-4% range – partially reflecting weaker-than-forecast (flat to up 1%) volume in North America and a disappointing (down - 1% to -2%) case volume performance in Greater Europe.

*       ... [M]anagement implied a comparable full-year 2000 case volume gain of 4%-5%, below our forecast and Consensus estimates for a 5%-6% year 2000 increase.

                  *   *   *

*       ... [T]he disappointing volume outlook, combined with recent strength in the share price, suggests the stock is due for a pause.

<u>DLJ Securities, 4/5/00</u>:

The company announced that 10 unit case volume would increase approximately 1.5% on a comparable basis, which falls below our 3-5% projection.  Additionally, guidance of achieving 5-6% full year unit volume growth now includes a 1% contribution from the acquired Cadbury Schweppes brands.  Previously this contribution was not included in the company's 2000 outlook.  Thus, it appears an even

more conservative growth outlook for the business has emerged for this year.

*   *   *

## KEY POINTS FROM THE MEETING

1.    A Lower Coca-Cola's EPS Growth Rate:    Management announced that The Coca-Cola Company would target approximately 15% long term EPS growth versus its old targeted growth range of 15-20%.

Bear Stearns, 4/5/00:

1Q Outlook.  With 1Q volume growth likely to come in just ahead of 3%, the company must accelerate its 2Q, 3Q and 4Q growth to the 6%-7% range.  1Q volume guidance is 1% below expectations.

Brown Brothers Harriman, 4/5/00:

The annual volume and earnings per-share growth targets (7-8% and 15%, respectively) offered by the new top management are unrealistically optimistic.  It remains a mystery why Doug Daft and Jack Stahl, the just-appointed number one and number two executives at The Coca-Cola Company, failed to establish attainable objectives at the start of their leadership tenure.

Credibility Called Into Question With 2000 Volume Downgrade

The current-year volume growth forecast was downgraded from 6-7% to 5-6% including acquired brands.  Elimination of both the positive impact of acquired volume and the negative 1999 effect of product recalls on 2000 shipment comparisons results in an adjusted shipment growth forecast approximating 3% for the current 12-month interval.  This limited upward movement from depressed prior-year shipment levels does not bolster confidence in management's much higher long-term projections.

112.    Coke filed its 10Q for 3rdQ00 on 10/27/00.  According to the 3rdQ

10Q, Coke recorded charges of approximately $94 million in 3rdQ 00 which were

attributed to "costs associated with the Company's Realignment."  This brought

total charges recorded for the first nine months of 00 up to approximately $965

million.  Of this $965 million, Coke attributed approximately $405 million to the

impairment of its Indian bottling assets, and approximately $560 million to the

Realignment.

113.    On 3/5/01 *CNBC News* reported that Coke's President and COO Stahl,

resigned from Coke's management team after 20 years at the Company, citing a

conflict with Daft.  *CNBC* also reported that:

> Street reaction was swift. The stock dipped to its lowest level in more
> than five months by midmorning.

> \*    \*    \*

> While Coke's shares have been going flat for investors, *Pepsico,
> meanwhile, has put on quite a performance over the past year,* trading about
> 5 points off its high, up 73 cents today to $ 45.58.

114.    The *Associated Press* reported on 3/5/01,

> **UBS Warburg analyst Caroline Levy cut her estimates of Coke
> earnings for this year and next and lowered her target price for the
> company's shares from $61 to $52.**

> "We believe Jack Stahl's departure, while potentially clearing the way
> for a superior management structure, sends more distress signals

through the current organization and could further lower morale,"
Levy wrote to clients.

Last week, CS First Boston lowered its per-share earnings estimate on
Coke's shares from $1.68 to $1.58 for 2001.

*"'Our comfort level in their earnings has deteriorated drastically,"*
Carpenter said. Analysts surveyed by First Call / Thomson Financial
expect the company to earn $1.65 per share this year.

115. On 3/7/01, Coke filed its 00 10K, reflecting a further decline in net

income from $3,533 million in 98, and $2,431 million in 99, down to $2,177 in 00,

with EPS declining respectively from $1.43 per share in 98, $.98 per share in 99 to

$.88 per share in 00. It also revealed that Coke's economic profit declined

precipitously in that three year range as well, down from $2,480 million in 98, and

$1,128 million in 99, to $ 861 million in 00.

116. The *Atlanta Journal and Constitution* reported on 3/7/01 that:

[T]he company's luster has faded along with its sales and profitability.
For example, in the company's 2000 annual report, now being sent to
shareholders, *Coca-Cola reported that its operating revenue grew at
a 2.4 percent compound annual rate over the past five years, vs. 7.1
percent over 10 years.*

*As for operating income, it declined at a compound annual rate of 1.7
percent over the past five years*, compared with an increase of 6.6
percent over the last 10 years.

The risk for investors is that Coca-Cola won't be able to deliver on its
sales and profits goals in the near future, particularly with turmoil in
management ranks, Schumann said.

\*  \*  \*

Tuesday, Coca-Cola finished at $ 49.80, down 40 cents. *It's the first time it has traded below $ 50 since Sept. 21.*

*So far this year, Coca-Cola is the second worst performer in the Dow Jones industrial average.*

*Coca-Cola is 46th from the bottom in the Standard & Poors 500-stock index.*

117.    On 3/30/01, Coke stock dropped to a 52-week low of $ 43.76 when

CCE (Coke's largest bottler, in which it maintains a 40% equity interest) issued a

negative earnings warning.    Upon the news, Sanford Bernstein analyst Bill

Pecoriello stated,

> "Why the profit miss at CCE?" Pecoriello asked rhetorically. "Look no further than Coke (Coca-Cola Co.). ... We believe the combination of an empty marketing calendar in Q1 and profit pressures from reduced Coke marketing support are the real issues here." While CCE bottles and distributes the products, Coca-Cola is primarily responsible for providing the core ingredients and marketing the various brands.

118.    In 4/01, Coke lowered its 01 sales growth projections from a previously

reported 6% – 7% down to 5% – 6% and its per share earnings estimates down from

15% to 11% – 12%.

119.    Then, in a 5/15/01 news release, Coke issued another profit warning,

lowering its operating profit expectation from $2.6 billion to $2.46-$2.5 billion for

01. In a 5/16/01 explanatory conference call, Coke attributed part of the profit

warning to decreased volume expectations in North America. Coke also cut its North American growth forecast in half from 2%-3% to 1%-2% for the balance of 2001 based largely on 1stQ 01 performance.

120.    On 7/19/01, Coke reported its 2ndQ 01 results, and though earnings were slightly higher than the prior year, at $1.1 billion, or $.45 a share, compared to $926 million, or $.37 a share in 2ndQ 00, Coke also revealed that the higher net earnings were due to lower advertising expenditures and that 2ndQ 01 revenue had actually fallen 4% to $5.29 billion, compared to $5.48 billion in the second quarter last year. Upon this news, Coke's stock price fell $.91, closing at $46.22 per share. According to the *Atlanta Constitution*'s report on July 19, 2001, these lower revenues caused analysts to doubt Coke's ability to hit its annual goal of 5%-6% growth.

121.    Finally, on 7/23/01, Coke announced that it would appoint Brian Dyson, a veteran former Coke executive, as vice chairman and COO of Coke to assume oversight of Coke's day-to-day operations from Daft. The *Wall Street Journal* added that Dyson will strengthen operations under Daft as the Company's stock continues in a slump and sales growth remains short of goals. Upon this announcement, Daft stated, "I love operations, but can't get into the detail myself." According to the *Wall Street Journal*, Dyson's appointment "is meant to give Mr. Daft some breathing room to develop and pick a successor from his management team

... while reducing the risk that one or more might leave at a crucial time." Coke's stock closed at $44.48 on 7/23/01, down $1.63 from the previous day.

## COKE'S FALSE AND MISLEADING FINANCIAL STATEMENTS

122.   Coke's financial statements and related disclosures for at least the 3rdQ, 4thQ and the year ended 99, if not earlier, were materially false and misleading because:

(a)   Coke artificially inflated its revenues and EPS for at least the 3rdQ, 4thQ and the year ended 99, by failing to accurately and fully disclose the impact of its excessive shipments of concentrate to bottlers which caused its operating revenues and EPS to be materially higher than they would have otherwise been during the Class Period and most particularly the 3rdQ and 4thQ of 99, as discussed in ¶¶128-172;

(b)   Coke prematurely and improperly recorded revenue on shipments of syrup and concentrate at the very end of quarters, when the product was not ordered by customers, not shipped until future quarters or not physically shipped at all, as discussed in ¶¶173-175;

(c)   Coke failed to timely record impairment of certain assets associated with the Company's and its bottlers' bottling and manufacturing operations in Russia, the Baltic States, the Caribbean, the Middle East, the Far East

and North America during the 3rdQ99 and in India during the 4thQ99 and the year

ended 99, as discussed in ¶¶176-88; and

> (d)    Coke improperly capitalized payments funneled to its bottlers

to help defray the bottler's operating costs.  To mask the negative impact these

payments had on its own financial statements, Coke improperly classified the

payments as assets in order to amortize the expense over many years, instead of

recognizing the expense immediately as required by Generally Accepted

Accounting Principles ("GAAP"), as discussed in ¶¶189-95.

123.    These practices artificially inflated Coke's 3rdQ99, 4thQ99 and year

ended 12/31/99 results, making Coke's operating results for those periods neither

indicative of Coke's underlying business nor indicative of the business trends

investors could expect based on those results.  Coke's failure to disclose these

practices was a violation of GAAP and SEC rules.

## A.    Coke Manipulated Its Financial Results Through Excessive Shipments of Concentrate

### 1.    SEC and GAAP Financial Reporting Requirements

124.    GAAP are those principles recognized by the accounting profession as

the conventions, rules and procedures necessary to define accepted accounting

practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states

that financial statements filed with the SEC which are not prepared in compliance

with GAAP are presumed to be misleading and inaccurate, despite footnote or

other disclosure.  Regulation S-X requires that interim financial statements must

also comply with GAAP, with the exception that interim financial statements need

not include disclosure which would be duplicative of disclosures accompanying

annual financial statements.  17 C.F.R. §210.10-01(a).

125.    The SEC requires that, as to annual and interim financial statements

filed with the SEC, registrants include a management's discussion and analysis

section which provides information with respect to the results of operations and

"also shall provide such other information that the registrant believes to be

necessary to an understanding of its financial condition, changes in financial

condition and results of operations."  *See* Regulation S-K, 17 C.F.R. §229.303(a).

126.    Regulation S-K states that as to annual results, this management's

discussion and analysis section shall:

> (i) Describe any unusual or infrequent events or transactions or
> any significant economic changes that materially affected the amount
> of reported income from continuing operations and, in each case,
> indicate the extent to which income was so affected.  In addition,
> describe any other significant components of revenues or expenses
> that, in the registrant's judgment, should be described in order to
> understand the registrant's results of operations.

> (ii) Describe any known trends or uncertainties that have had or
> that the registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenues or income from
> continuing operations.  If the registrant knows of events that will cause

a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §229.303(a)(3).  As to interim financial statements, the discussion shall

include the following:

> 4.  The registrant's discussion of material changes in results of operations shall identify any significant elements of the registrant's income or loss from continuing operations which do not arise from or are not necessarily representative of the registrant's ongoing business.

17 C.F.R. §229.303 (Instructions to Paragraph (b) of Item 303).

127.    GAAP, as set forth in FASB Statement of Concepts No. 1, ¶¶34 and 42, states that:

> Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions.  The information should be comprehensible to those who have a reasonable understanding of business and economic activities and are willing to study the information with reasonable diligence.

> \*   \*   \*

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

For this reason, financial reporting includes not only financial statements and the notes thereon, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASB Statement of Concepts No. 1, ¶7.

### 2. Coke Loaded Its Bottlers With Excessive Inventory of Concentrate

128. During 99, Coke was shipping excessive amounts of concentrate to bottlers to inflate its own financial results, as detailed below and in ¶¶4-12, 18. Defendants shipped excess concentrate to the Coke bottlers who had the facilities to store it, as well as those bottlers who had the highest volume sales. In 99, Coke loaded over $600 million in excessive inventory of concentrate on the bottlers in the following geographic regions and in the following approximate amounts:

- $233 million on the 15 bottlers in Japan identified in ¶159, according to an internal Coke report entitled "Month of December CCJC Sales By Bottler (In Standard Units)";

- $168 million on bottlers in Coke's Greater Europe Region (excluding CCE). This region is comprised of the Western and Eastern European regimes including: Germany, Belgium, France, U.K., Austria, Poland, Hungary, Russia and Greece. The major bottler in Germany is Coca-Cola Erfrischungsgetränke ("CCEAG");

- $184 million on CCE and bottlers in Coke's North America Region including approximately $86 million on CCE. The North American Region includes the United States and Canada, with Coca-Cola Bottling Company Consolidated and Herb Coca-Cola being the second and third largest bottlers during the Class Period;

- $63 million on bottlers in Coke's South Africa Region. This region consisted of 6 local bottlers: Amalgamated Beverages (ABI), Coca-Cola SABCO (SABCO), Peninsula Beverages (PenBev), TJC Holdings, East London, and Mpumalanga. The three major bottlers in this region (ABI, SABCO and PenBev) accounted for approximately 90% of total production with ABI accounting for approximately 60% of the total production.

129.   It was evident to defendants that significant levels of this "loaded concentrate" could not be used by the bottlers and would be returned. In fact, in 99, many of Coke's contracts with bottlers were changed to include a special contract term whereby excess concentrate shipped to the bottlers worldwide could be returned to the concentrate manufacturing plants.   In some cases, because concentrate was a perishable product, in order to cause bottlers to accept unwanted concentrate at the end of 4thQ99, Coke had to assure several of its bottlers that Coke would replace or give credit for any excess concentrate the bottler accepted that could not be used before its six-month shelf life expired.   In other cases, in order to cause bottlers to accept excessive amounts of concentrate, Coke promised the bottlers that, in the event the concentrate could not be used, the bottler would not be obligated to pay Coke, as Coke would make arrangements to help the bottler unload the excess concentrate by delivering it to other bottlers. The allegations in this paragraph are based upon, *inter alia*, information that was obtained from former Coke employees and former employees of its bottlers, including a former

- 119 -

Coke quality assurance executive, a former CCE accounting executive, a former executive at Coca-Cola Consolidated, and a former Coke finance manager.

130.    According to a former CCE accounting executive, Coke sent CCE's Atlanta division a letter each quarter detailing the exact amount of concentrate that division would be forced to accept before the end of the quarter. The letters granted CCE special return terms whereby CCE had no obligation to keep the shipments and, at times, indicating price reduction "incentives." The division's acceptance of the unordered concentrate inventory was not considered optional. The allegations in this paragraph are also supported, *inter alia*, by information obtained from a former Coke Account Coordinator.

131.    According to a former Coke director of quality assurance, Coke's 1999 concentrate loading was "extraordinary," as Coke was loading "extreme" amounts of syrup at the end of 1999 while the Company's overall business suffered as a result of the scare in Belgium and an employment discrimination lawsuit. The concentrate loading for 1999 was discussed regularly at internal monthly status meetings – held both before and during the Class Period – and attended by, among others, Coke USA Fountain COO Jack Wilson and Coke USA Fountain Vice President of Manufacturing Tom Blackstock. Coke USA is one of Coke's twenty-three divisions worldwide. In 1999, Coke's target was to sell approximately 400

million gallons of fountain syrup.    Using sales forecasts generated by the

approximately 400 individual account managers, Coke determined the exact

amount of excess syrup Coke needed to ship to meet its annual target. In order to

meet this target, an extra 30-day supply of syrup was shipped at year end to

fountain customers.

132.    Moreover, according to this same former Coke director of quality

assurance, the shipment of an extra 30-day supply of syrup to Martin-Brower

Company, a subsidiary of Reyes Holding LLC, and McDonalds, at the end of 99,

amounted to approximately $5.4 million of additional syrup being loaded into

McDonalds during the fourth quarter of 99.    Coke booked this $5.4 million as

revenue and created an account receivable, *despite the fact that McDonalds was

not required to pay for the syrup until and unless it was used.*

133.    According to a former internal control auditor at Herb Coca-Cola (an

independent Coke bottler in Chicago), in September/October 99 Herb Coca-Cola,

received between 286,000 and 344,000 gallons of excess concentrate and 294,000

gallons of excess syrup. The Indianapolis facility of Herb Coca-Cola normally kept

a two-week supply of concentrate, but as a result of this concentrate loading, it had

accumulated approximately a six-week supply by the end of 99. The same facility

typically kept a two-to-three week supply of syrup, but at the end of 99 it had an

- 121 -

8 to 10 week supply. *Because this was much more product than Herb Coca-Cola needed or could handle, it was forced to clear nine trucks from its parking garage to make space to accommodate the excess concentrate and syrup supplies.* While this bottler normally would purchase concentrate every two weeks, according to the former internal control auditor, as a result of this excess inventory, Herb Coca-Cola did not purchase any additional Coke concentrate for several months, as it still had excess inventory until at least February 2000.

134.    GAAP, as set forth in FASB Statement of Standards ("SFAS") No. 48, sets forth the criteria for recognizing revenue when the buyer of the product has the right to return the product. Specifically SFAS No. 48 precludes revenue recognition if the buyer is not obligated to pay the seller until the product is sold, or the seller has a continuing obligation to assist the buyer in bringing about the resale of the product. SFAS 48, ¶6, states:

> 6.    If an enterprise sells its product but gives the buyer the right to return the product, *revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met*:
>
>> a.    The seller's price to the buyer is substantially fixed or determinable at the date of sale.
>>
>> b.    *The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.*

    c.      The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

    d.      The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

    e.      *The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.*

    f.      The amount of future returns can be reasonably estimated (¶8).

(Emphasis added.)

135.    In this case, neither criterion b. nor e. was met because certain bottlers were not obligated to pay for the concentrate if they could not use it, and Coke had a future obligation to find another customer to take the product if the original bottler could not use it. The allegations in this paragraph are based upon, *inter alia*, information that was obtained from a former Herb Coca-Cola quality assurance executive, and a former executive at Coca-Cola Consolidated.

136.    Coke was able to load excess concentrate on its bottlers as the bottlers had little ability to resist Coke due to Coke's ownership interests in many of the bottlers as well as their reliance on Coke for all of their supplies of concentrate. In fact, when Coke ultimately admitted that its 2000 results would be adversely affected by inventory adjustments by its bottlers, it characterized the adjustments

as a decision made by Coke (rather than the bottlers) to reduce bottlers' inventories.

The allegations in this paragraph are based upon, *inter alia*, information that was

obtained from two former Coke vice presidents; a 1/26/00 Deutsche Bank Alex

Brown analyst report by Scott Wilkins and James G. Moorman; a 1/27/00 CSFB

analyst report by Martin Romm and Frederick Lee entitled "KO. Announced Major

Organizational Restructuring,"; a 1/27/00 Lehman Brothers analyst report, a

1/27/00 Warburg Dillon Reed analyst report, a 4/5/00 Brown Brothers Harriman

& Co. analyst report by Roy D. Barry entitled "Anchor Bottler Group: Selling

Climax Could End Valuation Downgrade"; and a 1/26/00 Coca-Cola Company

conference call on reorganization and 1999 results.

137.  By the end of the 3rdQ99, if not earlier, Coke's bottlers were

experiencing growth in inventories much greater than their growth in sales, and

Coke's excessive concentrate shipping had reached the point where bottlers had

become so overstocked that many were becoming increasingly resistant to excess

shipments of concentrate from Coke.  CCE, for example, was experiencing year-

over-year increases in inventory much greater than its increase in sales:

**Coca Cola Enterprises**
Year to Year Inventory/Revenue Growth

The allegations in this paragraph are based upon, *inter alia,* information that was obtained from a 3/30/00 Prudential Securities analyst report by G. Thompson; a 5/16/00 DLJ Securities analyst report by Skip Carpenter entitled "CCE's Profit Trouble to Impact KO"; a 4/5/00 ABN AMRO Inc. analyst report by Kristi King Etchberger; a 4/16/00 UBS Warburg analyst report by Caroline S. Levy entitled "Stock Could Weaken on CCE's News"; and the Company's government mandated SEC filings on Form 10Q for each of the first three quarters during 99 and Form 10-K for 99.

138. The bottlers were increasingly resistant to accepting more Coke concentrate for the simple reason that they could not accept any more product without seriously undermining their own respective financial situations. One bottler even characterized Coke's treatment of the bottlers as Coke "raping the bottlers." Thus, defendants knew that the excessive shipments would have to be curtailed and that the current quarter's results were not indicative of the actual trends in Coke's business and that, as a result of the Company's practices in all four quarters of 99, Coke's 00 results would be adversely affected.

139. And, in fact, Coke's 00 results were very disappointing due to what it later called a reduction of bottler inventory or a "deload" of bottler concentrate inventory, as addressed in ¶¶106-112. Essentially, Coke's bottlers needed to reduce their product purchases in order to work through the excessive concentrate shipped to them by Coke in 99. While Coke characterized the inventory adjustment as its own voluntary decision, evidencing the control that Coke had over the bottlers, the truth was that the inventory adjustment was required due to the inability of bottlers to continue to accept excessive shipments of concentrate. Coke was in essence robbing 00 results to report favorable interim and year-end 99 results in violation of GAAP, causing the reported 99 revenues and pretax earnings to be inflated by $600 million and $400 million respectively, and the results to be misleading. The

allegations in the preceding two paragraphs are based upon, *inter alia*, information obtained from two former Coke vice presidents, information obtained from a 3/6/00 *Fortune* magazine article by Patricia Sellers entitled "The Big Spill"; a 3/1/00 Merrill Lynch Bulletin; a 3/20/00 J.P. Morgan analyst report by John Foucher; a 4/4/00 DLJ Securities analyst report by Skip Carpenter entitled "Taming Uncertainty"; and the Company's government mandated SEC filings.

### 3.    Defendants Deceptively Disguise Their Improper Loading Practices as "Y2K Preparation" At Results Meetings

140.    As discussed herein, Coke was shipping excessive amounts of concentrate to bottlers to inflate its own results during 99. This practice of excessive concentrate loading was regularly discussed and decided upon at Coke's monthly meetings called "Results Meetings" which occurred after the close of every month. High level Coke executives attended the Results Meetings. The Results Meetings were also attended by Coke's Financial Analysts from the Corporate Services department, who were assigned to monitor a particular region of the world, such as Asia, North America or South America. When he was Coke's controller, Chestnut ran the Results Meetings until he was promoted to CFO. Gary Fayard, a former partner at Ernst & Young ("E&Y") (Coke's auditors), then became controller and ran the Results Meetings until 12/1/99, when he was promoted to CFO. Connie McDaniel took over directing the Results Meetings when she succeeded

Fayard on 12/1/99. During a Results Meeting in 99, high level Coke executives

hatched a deceptive plan to conceal their decision to "stuff channels" (*i.e.*, load

concentrate) in late 99 by cloaking the excessive shipments as a necessary **Y2K**

**preparation**." The above allegations are based on information obtained from, *inter*

*alia*, a former executive of Coca-Cola Consolidated, and a former senior Coke

operation consultant. According to a former Coke purchasing manager, this plan

was communicated to other members of Coke's management at the end of 99 in a

departmental meeting during which Y2K preparations were discussed and outlined

in a PowerPoint presentation. According to two former Coke Vice Presidents and

a former Coke Finance Manager, although Coke insisted that its bottlers take more

concentrate under the guise of preparing for Y2K, defendants knew this was simply

a ploy to increase volume concentrate sales.

141.   In mid-September, 1999, a former Coke Finance Manager learned of the

concentrate loading program when she walked in on a meeting between CFO for

Concentrate Manufacturing Lamar Chesney ("Chesney") and Supply Chain Analyst

for Concentrate Manufacturing Sarah Edwards ("Edwards") and heard Chesney say

that the "party line" would be that Coke was going to manage its customers'

inventory, and with Y2K approaching, it would make sense. According to this

former finance employee, Coke was using Y2K as a pretense in a story they spun to increase customer inventories in order to compensate for slowing case sales.

142.    According to this same former employee, there were further discussions about the loading plan at regular monthly financial review meetings. At the end of the October meeting (at which results for 9/99 were discussed), one attendee asked a question about the concentrate load-in and how returns would be handled if bottlers became saddled with more concentrate than they could use. McDaniel responded that Coke would have an agreement with bottlers addressing how much concentrate could be returned, as well as when and how Coke would give the bottlers credit for purchases of any unused excess. At the close of the meeting, Edwards, McDaniel and Fayard jokingly referenced the load-in plan as Coke's measure to help manage customer inventories. Instead, it was an obvious pretext employed by Coke to increase case sales in order to meet financial projections.

143.    Between the first week of October and the first week of December, 1999, the same former employee was present for several other conversations and meetings between Chesney and Edwards. Edwards was working on the load-in plan, on her computer during this period, creating a spreadsheet to designate which regions and/or bottlers would be sent what volume of extra product, which was

done by forecasting sales of extra concentrate to individual bottlers based on what bottlers normally purchased and then determining what type of volume an extra month of inventory or other increments would be.

144.   According to the same former employee, the plan was arranged for the end of 12/99, with the pretense being that Coke wanted its bottlers to have the extra inventory just before Y2K.  The load-in was not incremental, but rather done by determining approximately what amount of extra product would be pushed out into the bottlers, as the quarter-end neared.  According to the former employee, Coke wanted to be ready to execute, and the ultimate amount of the load-in was directly linked to extra sales Coke needed to make its numbers for 99.

145.   According to the same former employee, a document was created in December pertaining to Coke's special-payment terms and return-for-credit terms concerning the excess load-in plan sales, indicating the inventory that would be shipped, what the payment terms were, and return-for-credit terms. The document was a general template – a guideline to be sent to bottlers describing the additional concentrate they would receive and the terms associated with the purchase. Extended-payment terms were described that would allow bottlers additional time to pay for the additional inventory, and the return-for-credit terms described how much the bottlers could return and under what conditions.

146. The document also described extended dating. According to the former employee, while bottlers might typically pay within 30 days, Coke extended terms allowing 60 days (or possibly more) for payment associated with the extra product accepted as part of the plan. Bottlers had a certain time to elect whether to pay for the excess inventory or to return it for credit. Returns were limited to the product shipped in late 12/99. The purpose of these special terms was to eliminate any risk for the bottlers as an incentive to take on maximum amounts of extra concentrate and that the existence of special terms showed that the real purpose of the concentrate loading was to meet revenue projections, not the given explanation of "Y2K preparation."

147. According to another former senior Coke finance department executive, *if the real concern was Y2K, Coke would have increased shipments of all ingredients necessary to make the finished product, rather than simply the high margin ingredients such as concentrate* (and especially the coffee concentrate used in the Georgia-brand coffee drink that was quite popular in Japan). According to the same former executive, Coke also allowed bottlers to increase the "days on hand" that concentrate could permissibly remain unused, to accommodate the increase in concentrate inventories at bottler facilities that Coke was effecting through the load-in plan.

### 4.    Coke Overloads Japan With Excessive Concentrate

148.    Another example of Coke's overloading practices concerned Coke's relationship with the bottlers in Japan, on whom Coke loaded excessive concentrate throughout the Class Period.  This loading generally occurred in the last weeks of a financial reporting period, allowing Coke to "make its numbers" at the eleventh hour, but only by reporting higher sales volume than would have been possible without the loading.  This added to the bottlers' backlog of concentrate, setting the stage for an inevitable downturn when this deception finally caught up with defendants.  The allegations in this paragraph are based upon information obtained from, *inter alia*, four former senior Coke executives with extensive experience in Japan.

149.    According to a former executive in the finance department of Coca-Cola Japan Co. Ltd. ("CCJC"), Coke's practice of managing earnings through systematic increases in concentrate loading of its bottler inventories was likened to an addiction.  The former employee explained that the concentrate loading necessarily increased year after year in the late 90s in order for Coke to achieve its high growth projections for Wall Street following the Goizueta and Ivester years of recognizing the sales of bottlers as operating income. For example, if in one quarter Coke's income was inflated by $50 million achieved through loading of bottler

inventories, the next quarter Coke would have to load even more – perhaps an additional 50% – in order to achieve $75 million in inflated income and to show a growth rate commensurate with earnings projections. For this reason, Coke's loading in 4thQ99 was larger in dollar value and volume than prior periods, so Coke could achieve its lofty FY99 projections. According to the former employee, the executives at Coke "knew exactly how much they needed to load" in order to meet revenue targets. The executive said the only strategy at Coke was meeting EPS targets and that Coke executives were fixated on it. The allegations in this paragraph are also based upon, *inter alia*, information obtained from two former Coke vice presidents with extensive experience in Japan.

150. As discussed above, throughout the course of 99, Coke's Board of Directors was becoming increasingly unhappy with the performance of Ivester and his management team. As a result, defendants were under enormous pressure to "meet their numbers" in 4thQ99.

151. According to three former senior Coke executives with extensive experience in Japan, Daft and CFO Chestnut instructed Steve Jones, Deputy Division President of CCJC, and another Senior CCJC executive, to generate additional revenue through concentrate loading in December of 1999. In turn, Jones and the other CCJC executive, instructed the two senior Japanese executives, Roi

Suzuki, Executive Vice President of CCJC, and Masahiko Uotani, Senior Vice President of CCJC, to carry out a plan to collect more than $200 million in incremental revenue in exchange for payment of unusual incentives.

152.    According to another former Coke Japan executive vice president who left the company due to concerns over Coke's concentrate loading practices, Coke's concentrate loading efforts were most extreme with respect to the Georgia Coffee product, CCJC's highest grossing product.  This executive prepared an internal report in order to highlight and identify the impropriety of using concentrate loading to inflate Coke's sales numbers.  The executive then made a presentation to Daft using this report to show how the unsustainable growth in concentrate loading would ultimately be revealed and could ruin the Company.  Daft reacted angrily to this presentation, throwing the report at the executive and telling the executive to figure out a way to make the numbers work.  The executive made a similar presentation to Ivester.

153.    According to this former executive within Coke's Japanese operations, the effect of the loading scheme was enhanced through the use of a misleading system for keeping track of the total number of days within an accounting period. CCJC used a "4-4-5" system in which each quarter was considered to have two four-week months and one five-week month.  This system did not account for actual

business days within a quarter, and in some quarters this system led to misleadingly enhanced quarterly results.

154. According to two former Coke vice presidents with extensive experience in Japan and internal CCJC documents, in order to achieve sales targets and inflate Coke's revenues, defendants caused bottlers to take "additional" concentrate by providing a cash incentive. In 12/99, Coke allotted approximately ¥720 million to be given to Japanese bottlers for this purpose. This ¥720 million cash pay-off was essentially leveraged into more than ¥20 billion in additional, yet fictitious, revenue for the month. This translates into approximately $200 million – or more than 25% of Coke's net income for 4Q99 before write-offs. A meeting of approximately 15 Coke executives was held in Japan in mid-12/99 (with approximately two weeks left in the quarter), to discuss how to allocate this ¥720 million in incentive money among the Japanese bottlers, the instructions the executives had received from Atlanta, and how to get bottlers to accept enough "additional" concentrate (despite the bottlers' already bloated inventories) so that defendants could achieve Coke's sales targets for Japan. As a result of the 12/99 meeting in Japan, the Coke executives contacted the bottlers and offered them incentive money to record incremental non-existent sales in FY99, which the bottlers agreed to do. In this manner, Coke was able to meet its Japan sales targets.

155.   In fact, internal Coke documents reveal that during the Class Period, CCJC's finance department constructed and delivered to Coke an internal planning report entitled "CCJC sales by bottler (in standard units)" that listed projected concentrate sales for each of the Japanese bottlers for 12/99, by volume and revenue and compared it to the corresponding month in the prior year. The volume of concentrate sales to bottlers noted on this report was broken down into three columns: "Natural," "Additional," and "Total" sales. "Total" sales were equal to the Company's sales targets, *i.e.*, what defendants had led the market and the investing public to expect. "Natural" sales, on the other hand, consisted of the amount of concentrate that the bottlers actually would be able to use under the existing market trends, *i.e.*, what Coke could expect bottlers to buy without any pressure from the Company to load concentrate. "Additional" sales consisted of the shortfall – the difference between what Coke had to sell to meet the market's expectations ("total" sales) and what bottlers would buy without loading pressure ("natural" sales). Thus, "additional" sales equaled the amount of concentrate that bottlers did not need to buy but that Coke needed to sell – the amount that Coke needed to load. On this report, these "additional" sales were very significant, substantially exceeding "natural sales," and they could not be achieved based on then-existing "natural" demand. The report indicates that defendants' loading practices caused

- 136 -

bottlers in Japan to accept an extra month's worth of concentrate on top of their already bloated inventory levels. Coke's senior executives at Atlanta headquarters would decide what the "additional" sales needed to be for each region in order for the Company to meet the market's expectations. The "CCJC sales by bottler (in standard units)" report was prepared by the finance group in Japan. It was distributed to the senior management team in Japan in order to document instructions the finance group had received from Daft, Chestnut and Fayard – in Atlanta. The allegations in this paragraph are also based upon, *inter alia,* information obtained from two former Coke vice presidents with extensive experience in Japan.

156.    According to these same former Coke executives, the concentrate loading plan was carried out primarily by Mr. Suzuki and Mr. Uotani. From December 10, 1999 to the end of the year, Mr. Uotani contacted bottler presidents about loading in concentrate.

157.    According to these same former Coke executives, Mr. Uotani contacted Mr. Keiji Takanashi, President of Tokyo Coca-Cola Bottling Company, on or about December 10, 1999. As a result of the discussion, Mr. Uotani agreed to pay Mr. Takanashi ¥60 million in incentives, and Mr. Takanashi agreed to pay an additional ¥2.8 billion (about $25 million) for 16,453 units of *additional* concentrate. The

amount Mr. Takanashi would have purchased normally that December was only 9,804 units; thus, Tokyo Coca-Cola Bottling Co. loaded in 168% more concentrate than normal. Similarly, in Osaka, Mr. Uotani used marketing allowances to induce the president of Kinki Coca-Cola Bottling Co., Mr. Ikeda, to load in excess concentrate.

158.    According to these same former Coke executives, Roi Suzuki had discussions with Mr. Kubo, the President of Coca-Cola West Japan ("CCWJ"), of which CCJC was a 5% owner. (Mr. Suzuki was also a member of the Board of Directors of CCWJ at the time.)  On or about December 12, 1999, Mr. Suzuki convinced Mr. Kubo to accept ¥123.3 million as incentive to purchase additional concentrate of 24,087 units, representing ¥4.11 billion (about $40 million) in incremental revenue for Coke. Normally, CCWJ would have purchased only 15,368 units of concentrate in December, so the additional purchases, leading to 39,455 total concentrate units, represented an increase of more than 156%.

159.    According to these same former Coke executives, Mr. Uotani and Mr. Suzuki carried out this process with a high degree of success throughout the month. They held regular meetings to discuss the progress in the board room on the fifth floor of the CCJC building in Tokyo, and regular reports were sent to Daft and other key executives in Atlanta. The process ended with an additional 140,044 units

of concentrate being loaded into 15 different bottlers in Japan, resulting in additional revenue of more than ¥26 billion, or more than $200 million. The following graph and chart show the effect of Coke's concentrate loading in Japan in December of 1999:



December Concentrate Volume - Japan

| Bottler | December Plan Units | Loaded Concentrate Units | Incremental Revenue From Loading (¥1,000,000) |
|---|---|---|---|
| Hokkaido | 6902 | 6561 | 1120 |
| Michinoku | 4934 | 4126 | 704 |
| Sendai | 4807 | 5968 | 1018 |
| Tone | 9047 | 13249 | 2261 |
| Mikuni | 10611 | 18207 | 3107 |
| Tokyo | 9804 | 16453 | 2808 |
| Fuji | 9867 | 15759 | 2689 |
| Okinawa | 1653 | 2057 | 351 |
| Hokuriku/ Nagano | 4101 | 5098 | 870 |
| Chukyo | 7886 | 6801 | 1160 |
| Mikasa | 2031 | 2524 | 431 |

| Bottler | December Plan Units | Loaded Concentrate Units | Incremental Revenue From Loading (¥1,000,000) |
|---|---|---|---|
| Kinki | 15192 | 18876 | 3221 |
| Shikoku | 3710 | 5034 | 859 |
| CCWJ | 15368 | 24087 | 4110 |
| Minami/ Kyushu | 5981 | 10246 | 1748 |
| **Total** | **111894** | **155046** | **¥26,457,000,000 (about $200 million)** |

The allegations in the preceding three paragraphs are based on, *inter alia*, information that was obtained from Coke's internal documents and former Coke executives with extensive experience in Japan.

160.   These "additional" sales were significant.  In fact, the internal Coke document entitled "Month of December CCJC sales by bottler (in standard units)" shows that the "additional" sales needed in 12/99 were larger than the "natural"

sales for that month. The aggregate "additional" sales for 12/99 were 155,046 units, while the "natural" sales for that same period were only 111,894 units. Thus, in 12/99 alone, Coke loaded more than an extra month's worth of concentrate on its Japanese bottlers on top of their already bloated inventory levels. Whereas bottlers typically maintained an inventory of 30 days, the December 1999 loading caused them to have an inventory that was 56 days on top of the 30-day standard reserve. The allegations in this paragraph are also based upon, *inter alia*, information obtained from two former Coke vice presidents with extensive experience in Japan.

161.    Documents like the one entitled "Month of December CCJC sales by bottler (in standard units)" were prepared by the finance group in Japan for Coke's senior management team in Japan to document instructions received from Daft in Atlanta and the divisions progress against those instructions. Coke's headquarters would decide what "additional" sales were needed for each region in order for the Company to meet Wall Street expectations. These instructions explained how Japan could meet the concentrate shipment and revenue targets set by Atlanta, because the amount of concentrate purchased by bottlers goes straight to the Company's top line (revenue). The allegations in this paragraph are also based upon, *inter alia*, information obtained from two former Coke Vice Presidents with extensive experience in Japan.

162. A former Coke senior finance department executive described that while Coke's excess sales to bottlers might appear to be legitimate transactions, negotiated at arms length between independent parties, Coke knew the bottlers were already overstocked, and it was defendants' intent to artificially inflate income and manage earnings that caused Coke to push this excess product onto bottlers. The cash incentives were offered by Coke to bottlers as incentives to take on incremental inventory and to assist Coke in meeting its financial targets. According to this executive, the amounts of these payments were more than enough to compensate the bottlers for taking on extra inventory.

163. According to the same former senior Coke finance department executive, CCJC maintained a spreadsheet that tracked the sales of concentrate to each Japanese bottler by brand of Coke products. The amount of excess loading – beyond bottler orders – to maintain status quo levels of inventory was measured in both days and dollars. When bottlers were loaded with extra inventory, their "days on hand" level would increase (i.e., the number of days current concentrate inventories could meet production demand). Increasing levels of bottler inventories was a tool that could be used by Coke management to grow revenue without bearing any direct relationship to ultimate manufacturing dates or case

sales. Thus, Coke's representations that increasing consumer demand caused revenue growth during the Class Period were both fictitious and misleading.

164.    According to three former senior Coke executives with extensive experience in Japan, loading concentrate produced a great increase in Coke's reported revenue. So that defendants could also show an increase in Coke's unit case sales volume (volume being important for executive compensation among other things), Daft had Hall, Suzuki, and Uotani lead an effort to have the Japanese bottlers load retailers with as many cases of product as possible in exchange for incentive payments of ¥225 million. This effort gave Daft the opportunity to report those sales as incremental "Unit Case" volume – a standard measure based on twenty-four 8 oz. servings. Use of the measure requires complicated conversion formulae from physical cases to arrive at a final number because physical packages are different all over the world, and the calculation is easily manipulated.

165.    A former senior Coke finance department executive questioned whether the level of case sales reported by Japanese bottlers actually occurred at all. At one point, the former employee calculated that case sales reported by bottlers for the final day of certain quarters exceeded the capacity of all bottler trucks.

166.    This former senior finance department executive called Coke's internal audit department, requesting that Japanese reports of case sales be audited for

accuracy, expressing concerns to the internal auditors that Coke was misrepresenting case sales because it accepted and republished information from Japanese bottlers which, in the former employee's view, was fabricated. The former employee believed that someone (or some group of people) within CCJC was instructing the bottlers to report false and highly inflated case sales.

167.    According to two vice presidents with extensive experience in Japan, Wall Street analysts were particularly interested in the Company's numbers for concentrate volume and case sales. Because the case sales figure was one of the key criteria on which analysts focused to judge Coke's performance, meeting the case sales target was very important to defendants. Therefore, in addition to discussing the concentrate volume targets set forth in the "Month of December CCJC sales by bottler (in standard units)" document, the mid-12/99 meeting of Coke executives in Japan also addressed the corresponding case sales that would be required to meet Wall Street's expectations, using another document entitled "1999 Sales Volume Target By Bottler – Unit 445," dated 12/13/99. This document was prepared on December 7, 1999 by Mr. H. Sekiguchi of Marketing Operations (the department headed by Uotani that was responsible for bottler activity and communication), and the finance department at CCJC, and it detailed the current volume trends and the additional volume in unit cases that was needed to hit the

new targets, as well as planned incentive payments. The "Sales Volume Target" document measures volume in unit cases, showing how many additional cases each bottler had to accept above its normal levels – an excess of over 2 million cases – in order for Coke to meet its growth target of 5.9% for the year. Under the column labeled "Remarks," this document further discussed the "Add. Cost" to Coke (*i.e.*, what Coke paid the bottlers to accept these additional cases), which totaled ¥225 million, or more than $2 million.

168.   According to these same former executives, in mid-12/99, Uotani again contacted Takanashi of Tokyo Coca-Cola Bottling Company. He convinced Takanashi to accept an additional ¥25 million in exchange for loading on retailers an incremental 300,000 unit cases of products.

169.   According to these same former Coke executives, the process continued for all bottlers until an additional 2,098,000 unit cases were loaded on retailers and ¥225 million was paid in incentives to the Japanese bottlers. A progress report compiled by Mr. John Elwood, former Vice President, Executive Assistant to Japan Division President, entitled "Unit Case Sales Volume('000) Japan Division, Month and Week: December '99 – Week 4" says "A Y2K PET and Georgia Dealer Loader is now underway to build dealer stocks," confirming that bottlers were loading up retailers with as much product as possible to be able to report incremental sales.

170.    According to these same former Coke executives, Coke's reported sales were inconsistent with the Nielsen Monthly Audit for December 1999 (the "Nielsen Report"). Nielsen, an independent company, is widely recognized as the authority on consumer products, share and volume data. Coke was well aware of the contents of the Nielsen Report because Coke specifically commissioned Nielsen to prepare this report.

171.    For 12/99, Coke reported sales volume growth of 9.73% in Japan, while the Nielsen Report showed a volume increase for Coke of only 4.4% for that same period. The Nielsen Report covers the major retail channels and excludes the vending channel. However, in a document entitled "Summary Sales by Package – Unit Case" that Coke generated for 12/99, can sales, which constitute most of the vending volume, were down 4.61%. Because retail and vending each constitute approximately half of Coke's business in Japan, a decline in vending of 4.61% and an increase in retail of only 4.4% demonstrates that Coke's 12/99 results in Japan were flat, with no growth, rather than showing the extraordinary growth of 9.73% that Coke was reporting.

172.    According to a former senior Coke finance department executive, concentrate-loading campaigns were directed by senior management in the U.S. to load in 4thQ99. The witness described an "RFP" (Request for Proposal) procedure

used by Coke's corporate office to manage transactions associated with these extra inventory sales. According to the former employee, the RFP was an internal approval document prepared by division management and sent to Coke executives, specifying the amounts of concentrate and terms the division proposed as a basis to negotiate these excess sales to bottlers in exchange for "marketing funds." CFO James Chestnut maintained signature authority on these RFP's, and once signed, a division proceeded with corporate authority to fix the terms of the load-in with bottlers within the division's territory. These load-in transactions were the result of decisions at the highest levels of the company: Coke's CFO, Controller and Chairman were responsible for making the loading decisions and approving the terms.

### B.    Coke's Improper Recognition of Revenue Using a "Ship-in-Place" Scheme

173.    In order to prematurely and improperly recognize revenue at quarter-end and year-end during the Class Period, defendants employed a scheme whereby they recorded revenue on transactions when concentrate or syrup was neither ordered by the distributor nor shipped in the quarter the revenue was recognized, if at all. This practice was most prevalent with Coke's large volume customers and distributors such as McDonalds, Burger King and Sysco. For instance, to boost sagging results in Japan in 1999, Daft called Steve Jones the Deputy Division

President for Japan ("DDP-Japan") and told him to load volume in high-impact channels. In turn, the DDP-Japan called Uotani, the Senior Vice President of CCJC, and instructed him to convince Japanese bottlers or distributors to accept additional, unordered concentrate and toll products. Several meetings were held in which documents were circulated that described the normal flow of product volume versus the much higher arbitrary target volume and the necessary loading volume to cover the shortfall. Included in the discussion was how much additional marketing and incentive money would potentially be needed and made available to cause the customers to take incremental inventory. Often, because McDonalds was such a big customer in Japan, the DDP-Japan logically looked to the McDonalds distributors to accept more volume. However, to the extent his department was unsuccessful in persuading McDonalds' distributor Fuji Eko to accept excess product, the DDP-Japan would order his staff to record revenue anyway by manipulating the computer system to record a sale of concentrate to these distributors without actually shipping it. This was done even though no product was shipped and despite the fact that the distributors expressly told CCJC that they did not want any excess product at that time. The allegations in this paragraph are based upon, *inter alia*, information obtained from a former Coke vice

president with extensive experience in Japan, a former quality assurance executive for Coca-Cola USA, and a former Coke Finance Manager.

174.    Notwithstanding the fact that it was clearly improper and in violation of GAAP to recognize revenues on such transactions when bottlers had not even ordered product or had expressly told Coke they did not want it, it was also improper to record revenue before the product was delivered.[2] The SEC's Auditing and Enforcement Release ("AAER") No. 108 specifies that revenue may not be recognized unless all the following conditions, among others, are met:

(1)    *The risks of ownership must have passed to the buyer;*

(2)    *The customer must have made a fixed commitment to purchase the goods, preferably reflected in written documentation;*

(3)    *The buyer, not the seller, must request that the transaction be on a bill and hold basis.* The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;

(4)    *There must be a fixed schedule for delivery of the goods.* The date for delivery must be reasonable and must be consistent with the buyer's business purposes (*e.g.,* storage periods are customary in the industry);

(5)    The seller must not have retained any specific performance obligations such that the earning process is not complete;

_____

[2]    GAAP as described by FASB Statement of Concepts No. 5 provides the basic requirements for revenue to be recognized: (1) revenue must have been earned; and (2) revenue must be realizable (collectible).  *See* FASB Con No. 5, ¶83.

(6)    The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

(7)    The equipment must be complete and ready for shipment.

SEC AAER No. 108 (emphasis added).

175.    Coke should not have recognized revenue on transactions for concentrate that was neither ordered nor delivered because such transactions did not satisfy criteria (1), (2), (3) or (4) of the SEC's AAER No. 108 above.

### C.    Coke's Failure to Properly Account for Impaired Assets

176.    By the end of the 3rdQ99, the individual defendants knew that Coke's operations in Japan, Eastern Europe, Turkey, India and Russia were performing very poorly and that the Company's investment in those locations was not recoverable. This was not Coke's first indication of problems in these areas since these areas had been problematic for several quarters by the 3rdQ99 as discussed below.    Nevertheless, in order to avoid causing the Company's somewhat disappointing earnings to be even worse, the defendants did not record a timely and adequate loss to account for the impairment of the assets in those locations.

177.    GAAP, as set forth in FASB Statement of Concepts ("Concepts") No. 5, requires that an entity record a loss when it becomes apparent that an asset has been impaired. *See* Concepts No. 5, ¶87. According to GAAP, as set forth in SFAS

No. 121, Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of, an entity shall review long-lived assets and certain identifiable intangibles to be held and used for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *See* SFAS No. 121, ¶4. Based on the factors described in the following paragraphs, it is clear that such a review of Coke's bottling assets in Russia and India during 3rd99 and 4thQ99, respectively, if not earlier, would have required an impairment loss to be recorded.

178.    Ultimately, in the 4thQ99, when Coke's results were audited by the Company's outside accountants, Coke was forced to accrue a charge for $813 million, $543 million of which related to Coke's impaired assets in bottling and manufacturing in Russia, the Mideast and Far East and North America. The $813 million charge exceeded the entire $787 million that Coke reported in net income in the 3rdQ99.

179.    In taking these substantial writeoff charges, Coke admitted that its bottling and manufacturing assets in Russia and the Far East were impaired, and accordingly, there can be no disputing the fact of asset impairment and the need to write off a substantial portion of these assets. Moreover, defendants knew that these writeoffs should have been taken at least a quarter earlier than they were

ultimately taken, since the negative economic environment that necessitated the writeoffs was of a long standing nature, and these adverse conditions pre-existed by many quarters the ultimate writeoffs that were take in 4thQ99. Indeed, there was no change in environment at any time during 4thQ99 that would have necessitated these charges, and as described below, defendants were aware of these adverse conditions and the need to write down these assets at least as early as 3rdQ99.

180.    Based on factors existing as of 9/30/99, an impairment analysis would have shown that Coke's Russian bottling assets were impaired by that date if not earlier and the belated write-off of $543 million in impaired assets in Russia should have been recorded by the 3rdQ ended 9/30/99, at the latest. The following factors clearly indicate that the Russian bottling assets were not recoverable:[3]

- Russia's economic crisis deepened significantly during 98 causing an almost immediate decline in the sale of beverages in that country. As a result, Pepsi recorded a $218 million charge related to the deterioration of its business in Russia during the fourth quarter of 98. Cadbury Schweppes also recorded a fourth quarter 98 charge of £68 million (or approximately $100 million) stemming from the effects of the collapse of the Ruble on Cadbury Russia.

---

[3]    SFAS No. 121 ¶5 (a-e) lists "examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset" is questionable: a significant *change in use*, a significant adverse *change in business climate,* a demonstrated continuing loss or a *significant decrease in market value.*

- Coke's sales in Russia decreased 60% between 8/98 and 9/30/99.

- The Baltic States sales of Coke were adversely affected by the collapse of the Ruble which occurred in 98.

- Coke had more than 300 Coke staff which had been made redundant since 8/98.

- Coke had already abandoned two large bottling factories in Russia prior to the end of the 3rdQ99.

- Coke was in the process of laying off 29% (38 out of 130) of its office staff in Russia as of 9/30/99.

181.  A former high level business area manager for Coke's Russian operations has also confirmed that by 2ndQ99, well before the start of the Class Period, Coke was aware that its Russian bottling assets had been impaired as a result of at least two serious financial blows that substantially and negatively impacted the value of those assets. Due to the adverse economic conditions in Russia during this time period, including the devaluation of the Ruble, the cost of production for Coke's bottling assets in Russia increased by four-fold almost overnight. Significantly, the Russian financial collapse and devaluation of the Ruble occurred in August 1998. At the same time that Coke's Russian bottling operations were suffering under this dramatically increased cost structure, demand for Coke's product in Russia decreased by approximately 60%. People who can't buy food or clothing don't buy Coke. The combined effect of the drop in demand

and the increase in the cost of production caused a substantial decline in the recoverability, and therefore an impairment, of Coke's Russian bottling assets.

182.   Coke was also well aware that its bottling assets in Russia had become impaired and needed to be written down, because as early as October 1998, Coke had already witnessed a more than 50% decline in the value of the Russian bottling assets stemming from the devaluation of the Ruble.  As reported on February 9, 1999 in *The Wall Street Journal Europe*, Inchcape, PLC, a British trading group and one of Coke's largest bottlers in Russia, had decided to exit the soft-drink business in 1998.  In early August 1998, Inchcape announced that Coke had agreed to buy its Russian bottling business for $187 million.  However, by October 1998, following the collapse of the Russian economy and the devaluation of the Ruble, the sales price Coke was to pay for Inchcape's Russian bottling operations had dropped dramatically to just $87 million – a $100 million devaluation of those assets as a result of the rapidly deteriorating business environment in Russia.  Despite this intimate knowledge of the collapsing Russian economy, Coke improperly delayed for more than a year the writing down of its bottling assets in Russia.

183.   Similarly, the need for Coke to have taken appropriate and timely write-offs of its Russian bottling assets by at least 3rdQ99 is also evidenced by the fact that Coke's competitors in Russia, who were operating under the same negative

- 154 -

economic conditions, wrote down the value of their Russian bottling assets fully a year before Coke did. Pepsi recorded a $218 million charge related to the deterioration of its business in Russia during the fourth quarter of 1998. Cadbury Schweppes similarly recorded a fourth quarter 1998 charge of approximately $100 million stemming from the effects of the collapse of the Ruble on Cadbury's Russian operations. Coke was subject to these same negative economic forces, and by September 1999 Coke had already reduced by a third the staff at its two Russian offices in response to these negative economic conditions. However, Coke improperly delayed writing off the excess book-value of its Russian assets until a year after its competitors had already done so.

184. A former senior Coke finance department executive stated that she understood Coke waited to take this write-off charge until the Company could report increased revenues that would help offset the write-off. A well-placed former group account manager in Coke's concentrate manufacturing operations also confirmed that Coke could have written down its Russian assets three months earlier than it ultimately did. Similarly, a former operations finance manager assigned to Coke's Moscow offices during the period in question confirmed that Coke was aware before the start of the Class Period that its Russian assets were impaired, but that Coke waited to write down those assets until 4thQ99.

185.    Significantly, the huge reduction in the value of Coke's Russian bottling assets did not materialize suddenly in 4thQ99. Rather, these assets had been overvalued on Coke's books for an extended period of time. Indeed, after the write-off of $543 million, the remaining carrying value of the assets was only $140 million. If Coke were to be believed, 80% of these assets suddenly became worthless or unrecoverable in the 4thQ99 – but this is clearly not the case, as the conditions necessitating the writeoff had been in existence for more than a year.

186.    Coke ultimately also recorded an additional $405 million charge to write down its assets in India in the 1stQ 00. Coke's belated write-off of $405 million in impaired assets in India should have been recorded in the 4thQ ended 12/31/99, if not earlier, based on the following factors existing as of 12/31/99 and earlier:

- Coca-Cola India continued to report losses from operations in the Indian territories by 6/99, which were reeling under some of the territories' worse performances ever by late 99.

- Coke management was keenly aware of the problems in India by the Fall of 99. In 8/99, Ivester began to implement a plan to shake up Coca-Cola India management. As reported by *The Economic Times of India* on 8/19/99, in a first ever visit of a Coke CEO to India, Ivester traveled to India to meet with Coca-Cola India management. Accompanying Ivester on this trip to India was the soon to be appointed new CEO of Coca-Cola India, Doug Jackson.

- Shortly after Ivester's 8/99 visit to India, Donald W. Short, Coca-Cola India's CEO, and his senior staff were replaced. As reported by *The*

*Economic Times of India* on 10/23/99, these top level changes were part of structural changes being made in Coca-Cola India stemming from a review of the Indian operations and concerns over the lack of cost control. Further necessitating these structural changes, and as reported on 10/23/99 in the *India Business Insight*, the anticipated growth in performance of Coca-Cola India had failed to materialize during 1998-99.

- By the end of 3rdQ99, Coke began a massive restructuring effort in India in an attempt to control Coca-Cola India's poor performance.

- On 12/19/99, the *India Business Insight* ran an article on Coca-Cola India pointing out that both Coke and Pepsi were unable to reduce prices in India and, as a consequence, "parts of the state-of-the-art bottling plants in the soft drinks industry are idling."

- By 10/99, Coke had announced plans to introduce an early retirement scheme in all its India plants that eventually affected 1200 excess staff. In 1/00, Coke announced the layoff of another 600 persons in India.

187.   The extent of the Indian write-offs was enormous. After the $405 million charge, the remaining carrying value of the assets was only $300 million. Thus, if Coke is to be believed, about 60% of these assets suddenly became worthless or unrecoverable in 1stQ00.

188.   The allegations regarding Coke's failure to properly and promptly write down its impaired assets as required by GAAP and as set forth above in this subsection, are based upon, *inter alia*, information obtained from: (1) knowledgeable former Coke executives, including, but not limited to, a former top-level executive within Coke's finance department, a former operations finance manager assigned

to Coke's Moscow offices, a former group account manager in Coke's concentrate manufacturing operations, and a former high level business area manager for Coke's Russian operations, (2) a review of Coke's government mandated SEC filings, including Coke's post-Class-Period public disclosures regarding the need for and extent of writeoffs to properly account for these impaired assets as described above, and (3) numerous news articles and other public reports regarding these matters, including but not limited to AFX News (Extel News Limited), 9/30/99, Interfax Russian News (Interfax News Agency), 10/6/99, Japan Economic Newswire (Kyodo News Service), 11/1/99, Baltic News Service, 9/13/99, Financial Times (London), 2/25/99, The Boston Globe, 2/2/99, Financial Times Global News Wire, 12/26/99, Financial Times Global News Wire, 8/19/99, Financial Times Global News Wire, 10/23/99, Financial Times Global News Wire, 10/26/99, Financial Times Global News Wire, 10/30/99, The Associated Press State & Local Wire, 10/21/99, Financial Times Global News Wire, 10/19/99, and Wall Street Journal Europe 2/9/99.

### D.    Coke's Improper Classification of Payments to Bottlers as Purported Vending Assets

189.    To help report a favorable profit margin, Coke increased its revenue figure by pricing and selling its concentrate to bottlers at a premium.  To cause its bottlers to pay the high concentrate price however, it was necessary for Coke to

"give back" some of the premium to bottlers in the form of "support payments" which it should have recorded as an operating expense on Coke's income statement. As discussed below, however Coke improperly capitalized some of these payments, instead of expensing them as current period charges.

190. Ultimately, for the 4thQ99, during the time in which Coke's results were being audited by E&Y, Coke was forced to take a charge to write-off $196 million worth of assets, of which the major portion related to the write-off of vending machines and vending assets in Japan. Several factors, however, indicate the charges should have been recorded, at the very latest, one quarter sooner. Beginning in at least 1994, if not earlier, Coke funneled payments to its bottlers in order to offset the high price Coke was charging for product, or to help defray its bottlers' operating expenses. To mask the negative impact these payments had on Coke's own financial statements, defendants improperly classified some of these payments in Coke's financial statements as assets in order to amortize the expense over many years, instead of immediately recognizing the payments for what they in essence really were – a refund or subsidy for a portion of the high price the bottlers paid for product or an ordinary marketing support payment that should have been expensed as incurred. In Japan alone, these expenses ranged from $20 million to $70 million each year from at least 94 through 99. The allegations in the

preceding two paragraphs are based upon, *inter alia*, information obtained from a former quality assurance executive at Coca-Cola USA, and two former Coke vice presidents with extensive experience in Japan.

191.    Coke made such payments to the bottlers under a program called Bottler's Incentive Investment Plan ("BIIP"). Under BIIP, Coke's expenditures were labeled as support to purportedly help its bottlers purchase vending machines and refrigerated displays, which are typically depreciable assets. However, defendants knew these payments were, in essence, simply subsidies or ordinary marketing support expenses that should have been expensed immediately in conformance with GAAP (*see* FASB Concepts No. 6 and AICPA Statement of Position ("SOP") 93-7) rather than improperly capitalized as fixed assets or depreciated over several years for at least the following reasons, among others:

(a)    Coke often had no idea whether or not its bottlers actually used the BIIP funds for vending machines, and it often did not care. It was well known within Coke management that in practice, under the BIIP program throughout 94 to 98, bottlers were not required to spend the funds on vending assets. Internally at Coke, defendants understood that payments to bottlers under the BIIP program were *not* "tied to tangible, measurable and specific criteria." In Japan, for example, Coke management knew that the funds were merely a way of helping out the

bottler, irrespective of what the money was spent on. Further, Coke knew that arbitrarily labeling the funds "payment for vending equipment" was a farce as, in many cases, the availability of BIIP funds to particular bottlers did not have a significant impact on the bottlers' decision to buy vending machines one way or another. For instance, it was common knowledge at Coke that in Japan, Japanese bottlers had no choice but to purchase vending machines regardless of whether or not Coke provided BIIP funds because the vending channel was the primary way Japanese consumers purchased product. This simple reality was driven by the prevalence of vending machines in Japan, which account for more than 50% of all soft drink sales in Japan. Japan has more vending machines than the entire rest of the world. There are approximately 930,000 Coke vending machines in Japan, more than two times as many as its closest competitor there.

(b)    Coke neither owned nor controlled any vending machines purchased and owned by its bottlers. Notwithstanding the fact that, in practice, BIIP funds could often be used in any manner the bottler chose, to the extent that a bottler may have actually used the funds to purchase vending machines, *the machines actually belonged to and were the property of the bottlers*. GAAP, specifically Concepts No. 6 ("SFAC No. 6") states that an asset cannot simultaneously be an asset of more than one entity. Further, GAAP also specifies

- 161 -

that, in order for Coke to have an asset, it needed to *control* the future benefit

conveyed by the asset, and that the ability to receive such future benefit must be

conferred by legal right:

> *Assets*
>
> 25.    Assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events.

<div align="center">*    *    *</div>

> *Control by a Particular Entity*
>
> 183.    Paragraph 25 defines assets in relation to specific entities. *Every asset is an asset of some entity; moreover, no asset can simultaneously be an asset of more than one entity,* although a particular physical thing or other agent that provides future economic benefit may provide separate benefits to two or more entities at the same time (paragraph 185). *To have an asset, an entity must control future economic benefit to the extent that it can benefit from the asset and generally can deny or regulate access to that benefit by others,* for example, by permitting access only at a price.
>
> 184.    Thus, an asset of an entity is the future economic benefit that the entity can control and thus can, within limits set by the nature of the benefit or the entity's right to it, use as it pleases. *The entity having an asset is the one that can exchange it, use it to produce goods or services, exact a price for others' use of it, use it to settle liabilities, hold it, or perhaps distribute it to owners.*

<div align="center">*    *    *</div>

### Control and legal rights

186.   As some of the preceding discussion indicates, *an entity's ability to obtain the future economic benefit of an asset commonly stems from legal rights. Those rights share the common feature of conferring ability to obtain future economic benefits,* but they vary in other ways. For example, ownership, a contract to use, and a contract to receive cash confer different rights.

Concepts No. 6 (emphasis added).  Coke knew that the BIIP payments did not qualify as assets on its financial statements because Coke knew that it did not have ownership, legal right to, or control, as defined in SFAC No. 6 above, over the bottlers' vending assets. Further, it is clear that capitalization of another company's assets is not allowed under GAAP, even if Coke had a minority interest in such a company, because no asset can simultaneously be an asset of more than one company under SFAC No. 6 above.

(c)   Notwithstanding the fact that Coke did not own its bottlers' vending machine assets, to the extent the bottler may have purchased some vending machines using BIIP funds, Coke often had no idea where such purported equipment was physically located, whether or not it was actually being used, was in usable condition, or was ever even placed into service.  Coke had no system in place to track the location of the vending machines owned by its bottlers (which are regularly moved from location to location). Consequently, Coke could not account for over 70% of all vending machines worldwide.  GAAP, as set forth in SFAS No.

121, ¶¶4, 5, requires that an entity record a loss when it becomes apparent that an asset has been impaired. Notwithstanding the fact that Coke's capitalization of its bottlers vending assets was improper in the first place, because Coke could not ascertain whether many of the vending assets of its bottlers were still viable, being used, or even whether they physically existed, it would have had to record a charge to recognize the loss impairment by 3rdQ99, if not earlier. The allegations in this paragraph are based upon, *inter alia*, information obtained from two former Coke vice presidents with extensive experience in Japan, and a former Coke team leader.

192.    Ultimately, when the balance of the improperly capitalized payments labeled vending equipment in Coke's accounting records became too large to hide, E&Y, the Company's auditors, took note and were very uncomfortable with Coke's practice of capitalizing these BIIP expenditures. E&Y informed defendants that the Company needed to change this method of accounting. Defendants, however, strongly resisted the auditors, and in 12/98 sought to placate them by:

(a)    proposing changes to the BIIP program whereby Coke would no longer capitalize the payments to bottlers unless Coke had at least minority ownership interest in the bottler (Coke incorrectly hoped this would create an argument that it had some sort of quasi interest in the asset), and Coke would

require supporting documents and other criteria surrounding the purchase of vending assets; and

(b) agreeing to create and disseminate a new written Company accounting directive indicating that funds given to bottlers could not be capitalized unless they were expressly used by the bottler for vending assets.

193.   Accordingly, in 12/98, with great fanfare, Coke renamed the BIIP program the Capability and Asset Performance Program ("CAPPr") and created and disseminated a new internal Coke accounting directive called "Accounting in-charge rule no. 1998-28" ("AIC - 1998-28"). However, in practice, these changes made little difference in Coke's accounting practices and did not keep Coke from continuing to improperly capitalize payments made to its bottlers in 99. In fact, one high level Coke executive in Japan regularly waived these new preconditions to receiving CAPPr money from Coke in 99. The allegations in the preceding two paragraphs are based upon, *inter alia*, information obtained from a former senior finance executive for Coke, two former Coke vice presidents with extensive experience in Japan, and a former Coke team leader.

194.   Eventually, during its 99 quarterly reviews and year-end audit, E&Y finally understood Coke's accounting charade and, fed up with Coke's improper accounting for these payments, insisted that Coke write off as much as $196 million

of the balance of the purported payments for vending assets it capitalized from 94 through 99, for at least the following reasons:

(a)    Coke did not really own or control the assets purchased with BIIP/CAPPr funds – the bottlers did; and

(b)    Coke could not provide adequate documentation to allow E&Y to actually verify whether large portions of the vending assets Coke recorded on its own books under the BIIP/CAPPr payments were actually purchased, owned, were in service, or even where the assets were physically located. In short, Coke was unable to account for approximately 70% of all vending machines and was unable to prove to E&Y that many of the assets in question even physically existed or belonged to Coke. The allegations in this paragraph are based upon, *inter alia*, information obtained from two former Coke vice presidents with extensive experience in Japan, and a former Coke team leader.

195.    By arbitrarily classifying and cloaking these payments as depreciable assets in its financial statements and improperly amortizing the cost over several years, instead of as incurred, Coke violated GAAP and understated its expenses and inflated its assets by as much as $196 million in 3rdQ99.

196.    Due to these accounting improprieties described in ¶¶128-195, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities

for accountability to prospective investors and to the public in general (FASB Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to

investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts No. 2, ¶¶95, 97).

197.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## STATUTORY SAFE HARBOR

198.    The statutory safe harbor provided for forward-looking statements ("FLS") does not apply to any of the false statements pleaded in this Complaint. The safe harbor has no application to Coke's false financial statements. None of the specific oral FLS were identified as "forward-looking statements" when made; it was not stated that actual results "could differ materially from those projected"; and meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the FLS did not accompany those FLS. The defendants are liable for the false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of Coke who knew that the FLS was false.

- 169 -

None of the historic or present-tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

199.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class (the "Class") of all persons, excluding defendants, who purchased Coke stock between 10/21/99 and 3/6/00, inclusive, (the "Class Period").

200.    Class members are so numerous that joinder of them is impracticable. As of February 21, 2000, there were 2,472,450,605 shares of Coke common stock outstanding, held by thousands of holders of record. Coke is listed and actively traded on the NYSE. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe there are many thousands of Class members who purchased Coke stock at artificially inflated prices during the Class Period. Record owners and

other members of the Class may be identified from records maintained by Coke and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

201.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)    whether defendants violated the federal securities laws;

(b)    whether defendants' Class Period statements omitted and/or misrepresented material facts;

(c)    whether defendants participated in and pursued the common course of conduct complained of herein;

(d)    whether the market price of Coke stock was artificially inflated throughout the Class Period;

(e)    whether defendants knew or recklessly disregarded that their statements were false; and

(f)    whether the Class sustained damages and, if so, the appropriate measure.

202.    Plaintiffs' claims are typical of the claims of the other members of the Class.

203.    Plaintiffs have no interests that are contrary to or in conflict with those of the Class, and they will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in class and securities litigation.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.    Joinder of all Class members is impracticable.    Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

### CLAIM FOR RELIEF

205.    Plaintiffs hereby incorporate the allegations set forth in ¶¶1-204 above, as though stated here in full.

206.    Defendants violated §10(b) and Rule 10b-5 by:

    (a)    Employing devices, schemes and artifices to defraud;

    (b)    Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   (c) Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Coke stock.

  207. Class members were damaged. In reliance on the integrity of the market, they paid artificially inflated prices for Coke stock.

  208. The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

  209. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Coke stock. Plaintiffs and the Class would not have purchased Coke stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## PRAYER

WHEREFORE, plaintiffs pray for judgment as follows: declaring this action

to be a proper class action; awarding damages, including interest; and such other

relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  June 2, 2003          CHITWOOD & HARLEY

*Martin D. Chitwood*

Martin D. Chitwood
Georgia Bar No. 124950
Craig G. Harley
Georgia Bar No. 326813
David A. Bain
Georgia Bar No. 032449
M. Krissi Temple
Georgia Bar No. 687020
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA  30309
Tel:  404/873-3900
Fax:  404/876-4476

MILBERG WEISS BERSHAD
HYNES & LERACH LLP

William S. Lerach
Steven W. Pepich
Scott H. Saham
Mary K. Blasy
David A. Thorpe
401 B Street, Suite 1700
San Diego, CA 92101
Tel: 619/231-1058
Fax: 619/231-7423

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
Katherine Blanck Radsan
1100 Connecticut Avenue, N.W.
Suite 730
Washington, DC 20036
Tel: 202/822-6762
Fax: 202/828-8528

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
Sandra Stein
1845 Walnut Street, 25th Floor
Philadelphia, PA 19103
Tel: 215/988-9546
Fax: 215/988-9885

Co-Lead Counsel for Plaintiffs

G:\Cases-SD\Coke\AmdConsolidated.cpt

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the

foregoing "AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR

VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934" upon counsel

for Defendants as indicated below:

**BY HAND DELIVERY TO:**

M. Robert Thornton
Dan McDevitt
KING & SPALDING
191 Peachtree Street
Atlanta, Georgia 30303

**BY U.S. FIRST CLASS MAIL TO:**

Joel M. Neuman
THE COCA-COLA COMPANY
Post Office Drawer 1734
Atlanta, Georgia 30301

**BY FEDERAL EXPRESS TO:**

Ronald Olson
Marc Dworsky
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560

This 2nd day of June, 2003.

CHITWOOD & HARLEY, LLP

David A. Bain
Georgia Bar No. 032449
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: 404/873-3900
Fax: 404/876-4476

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8569 / April 18, 2005

SECURITIES EXCHANGE ACT OF 1934
Release No. 51565 / April 18, 2005

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 2232 / April 18, 2005

ADMINISTRATIVE PROCEEDING
File No. 3-11902

| | |
|---|---|
| In the Matter of<br><br>The Coca-Cola Company,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") as to The Coca-Cola Company ("Coca-Cola" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.



**FILED**

NOV 1 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that:[1]

### RESPONDENT

1.     Coca-Cola is a Delaware corporation headquartered in Atlanta, Georgia. Coca-Cola's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the symbol KO. Coca-Cola is the largest manufacturer, distributor and marketer of nonalcoholic beverage concentrates and syrups in the world. Coca-Cola's reported net operating revenues for the past ten years have ranged between $16 billion and $22 billion.

2.     Coca-Cola offered and sold securities in registered offerings during 1997, 1999 and 2000. Specifically, Coca-Cola conducted securities offerings pursuant to employee benefit plans and S-8 Registration Statements filed with the Commission in May 1997, May 1999 and April 2000, which incorporated by reference certain Forms 10-K, 10-Q and 8-K filed by Coca-Cola during this period.

### RELEVANT ENTITY

3.     The Coca-Cola (Japan) Company, Ltd. ("CCJC") is a Japanese corporation and wholly-owned subsidiary of Coca-Cola. CCJC is engaged in the marketing, manufacture and distribution of Coca-Cola beverage concentrate in Japan. Historically, CCJC is one of Coca-Cola's two or three greatest sources of net operating revenue and, on a per gallon of concentrate sold basis, CCJC is the most profitable operating division of Coca-Cola throughout the world.

### COCA-COLA HAD AN ESTABLISHED HISTORY
### OF MEETING OR EXCEEDING EARNINGS EXPECTATIONS

4.     From 1990 through 1996, Coca-Cola consistently met or exceeded earnings expectations while achieving a compound annual earnings per share growth rate of 18.3 percent – more than twice the average growth rate of the S&P 500. Coca-Cola's superior earnings performance resulted in its common stock trading at a price to earnings multiple ("P/E Ratio") of 38.1 by the end of 1996, as compared to the S&P 500's P/E Ratio of 20.8.

5.     In the mid-1990s, Coca-Cola began experiencing increased competition and more difficult economic environments. Nevertheless, Coca-Cola publicly maintained between 1996 and 1999 that it expected its earnings per share to continue to grow between 15 percent and 20 percent annually.

---

[1] The findings herein are made pursuant to Coca-Cola's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

## COCA-COLA "GALLON PUSHED" IN JAPAN TO MEET
## BUSINESS PLAN TARGETS AND EARNINGS EXPECTATIONS

6.     At or near the end of each reporting period between 1997 and 1999, Coca-Cola, through its officers and employees implemented a "channel stuffing" practice in Japan known as "gallon pushing." In connection with this practice, CCJC asked bottlers in Japan to make additional purchases of concentrate for the purpose of generating revenue to meet both annual business plan and earnings targets. The income generated by gallon pushing in Japan was the difference between Coca-Cola meeting or missing analysts' consensus or modified consensus earnings estimates for 8 out of 12 quarters from 1997 through 1999.

7.     To accomplish gallon pushing's purpose, at or near the end of reporting periods CCJC offered extended credit terms to bottlers, as described below, to induce them to purchase quantities of concentrate the bottlers otherwise would not have purchased until a following period. The quantities of concentrate CCJC sold to its bottlers in connection with a gallon push were in excess of the bottlers' forecasted demand; the bottlers nevertheless purchased the concentrate to preserve their relationships with Coca-Cola.

8.     Concentrate sales by CCJC to its bottlers typically track and correspond to anticipated and actual bottler sales of finished products to retailers. Increases in the inventory level of concentrate held by bottlers often anticipate increases in sales of finished products. As a result of gallon pushing, however, concentrate inventory levels at CCJC's bottlers increased more than 60 percent from the start of 1997 through the close of 1999. During this same time, bottler sales of finished products to retailers only increased approximately 11 percent.

9.     Coca-Cola estimated its bottlers' inventory levels, forecasted purchasing demand, and was aware that quarter-end gallon pushing likely could not continue at existing levels and likely would cause a corresponding reduction in sales in a future period. At no point between 1997 and 1999, however, did Coca-Cola publicly disclose to shareholders the existence of gallon pushing, the impact of gallon pushing on its current income, or the likely impact of gallon pushing on its future income.

## COCA-COLA GALLON PUSHED
## ITS MOST PROFITABLE PRODUCTS

10.    In connection with gallon pushes, bottlers primarily purchased only two products: Georgia Coffee, a canned flavored coffee beverage, and branded Coca-Cola ("Coke"). Georgia Coffee and Coke were typically two of the highest sales volume products for CCJC to its bottlers. Additionally, of Coca-Cola's major products, Georgia Coffee and Coke were two of the highest profit-margin per gallon products CCJC could include in a gallon push. From Coca-Cola and CCJC's perspective, therefore, in order to generate sales sufficient to meet the additional income targets, it was most efficient to push the bottlers to purchase additional gallons of Georgia Coffee and Coke.

11.    For CCJC's bottlers, however, sales of Georgia Coffee and Coke to retailers were actually *declining* from 1997 through 1999. Hence, Coca-Cola, through CCJC, was inducing its bottlers to purchase quantities of concentrate that were in excess of forecasted sales demand for the current quarter.

12.    Gallon pushing for the purpose of meeting earnings expectations occurred at no Coca-Cola operating division other than CCJC. As CCJC was Coca-Cola's single most profitable division throughout the world on a per gallon of concentrate sold basis, it was by far the most efficient location from which to push additional inventory for the purpose of managing earnings.

### CCJC IMPLEMENTED GALLON PUSHING THROUGH THE USE OF EXTENDED CREDIT TERMS

13.    To encourage bottlers to purchase additional concentrate, CCJC extended more favorable credit terms than usual to bottlers, typically increasing payment terms from eight to twenty-eight or thirty days. No rights of return on gallons sold pursuant to gallon pushing were offered to bottlers, and no concentrate sold pursuant to gallon pushing was returned to CCJC or Coca-Cola. All concentrate sold pursuant to gallon pushing was paid for by the bottlers.

14.    CCJC's extension of credit terms required the express approval of certain of Coca-Cola's officers and employees in Atlanta. In order to obtain approval for credit extensions, CCJC's finance department was required to submit formal Requests for Authorization which identified both the approximate amount of gallons of concentrate to be sold with the extended credit terms and the approximate amount of revenue to be generated by the additional sales.

15.    After receiving approved Requests for Authorization back from Atlanta, CCJC's finance department then contacted its bottlers' finance departments, offering the more favorable credit terms and requesting that the bottlers purchase specific quantities of concentrate above the amounts that the bottlers already had planned to purchase to meet forecasted demand for the period. In contrast to sales made in connection with a gallon push, routine concentrate sales involved CCJC's sales and marketing departments corresponding with the bottlers' purchasing departments.

### COCA-COLA'S RECURRING USE OF GALLON PUSHING TO MEET ITS BUSINESS PLAN TARGETS AND EARNINGS ESTIMATES

16.    Gallon pushing shifted concentrate purchases that bottlers would have made in a future period into the then current period. As a result, the previous period's gallon push caused bottlers to start the next quarter with more inventory than they anticipated needing to meet forecasted demand and caused CCJC to start the future period with a sales "deficit." In order to avoid selling less concentrate in the future period as a result of the previous period's gallon push, and having to lower income targets, Coca-Cola instead

would engage in another gallon push, again shifting future sales and income to the present period.

17.     CCJC's gallon pushing practice was incorporated into its annual business plans – not simply for the purpose of increasing sales and meeting Coca-Cola's *future* earnings targets, but also to prevent a decrease in concentrate sales and corresponding decrease in earnings in the *present* period. Gallon pushing therefore became a recurrent component of CCJC's annual business plan as Coca-Cola refused to allow CCJC to suffer the sales and income declines resulting from a prior gallon push.

18.     The chart below shows the estimated volume of gallons pushed and revenue generated thereby for each quarter from 1997 through 1999. In order to meet annual business plan targets and consolidated earnings estimates CCJC continually had to push more and more gallons of concentrate on the bottlers. At the end of the fourth quarter of 1999, nearly one out of every two gallons of concentrate held in inventory by CCJC's bottlers had been sold in connection with a gallon push.

| Reporting Period | Bottler Ending Inventory (in gallons) | Gallons Pushed | Revenue Recognized from Gallon Push |
|---|---|---|---|
| Q1 1997 | 15,571,000 | 3,317,000 | $46,201,000 |
| Q2 1997 | 18,408,000 | 4,380,000 | $64,850,000 |
| Q3 1997 | 17,569,000 | 3,012,000 | $62,949,000 |
| Q4 1997 | 20,016,000 | 8,090,000 | $131,541,000 |
| Q1 1998 | 15,180,000 | 1,000,000 | $17,061,000 |
| Q2 1998 | 20,363,000 | 7,117,000 | $98,253,000 |
| Q3 1998 | 17,526,000 | 5,171,000 | $79,807,000 |
| Q4 1998 | 21,800,000 | 9,659,000 | $181,331,000 |
| Q1 1999 | 17,053,000 | 4,180,000 | $67,644,000 |
| Q2 1999 | 23,544,000 | 8,181,000 | $126,131,000 |
| Q3 1999 | 18,833,000 | 7,105,000 | $128,519,000 |
| Q4 1999 | 22,017,000 | 10,116,000 | $208,900,000 |

## GALLON PUSHING INCREASED BOTTLER INVENTORY LEVELS BEYOND WHAT WAS NECESSARY TO MEET FORECASTED DEMAND FOR THE PERIOD

19.     For year end 1996 through year end 1999, bottler sales of finished products to retailers in Japan increased approximately 11 percent in the aggregate amount. As sales of finished products by bottlers drive the sale of concentrate by CCJC, inventory levels at CCJC's bottlers should have increased approximately by a corresponding amount during this same time period. Gallon pushing, however, caused bottler inventory levels to increase 62 percent during this time period – a rate approximately six times greater than the increase in bottler sales to retailers. Hence, gallon pushing resulted in Japanese bottlers carrying significantly higher levels of inventory than was necessary to meet forecasted demand in the current quarter.

20.     The concentrate inventory versus sales of finished products disparity was even greater with respect to Georgia Coffee and Coke. Given that sales by bottlers to retailers of Georgia Coffee and Coke were in fact declining between 1997 and 1999, inventory levels of Georgia Coffee and Coke should have declined as well. Yet, it was gallon pushed sales of Georgia Coffee and Coke concentrate alone that were causing the bottlers' overall inventory levels to rise six times faster than their overall sales of finished products to retailers.

## COCA-COLA'S GALLON PUSHING PUT FUTURE INCOME AT RISK

21.     CCJC forecasted and tracked its actual results against its annual business plan throughout the year in monthly "rolling estimates." In addition to containing balance sheet and income statement information, CCJC's rolling estimates included concentrate sales to bottlers, bottlers' sales to retailers, and estimated bottlers' inventory levels.

22.     CCJC's rolling estimates also included summary sections explaining any substantial variances within the rolling estimate as compared to the preexisting annual business plan. These variance summaries typically indicated that in the first and second month of reporting periods between 1997 and 1999, gallon sales of concentrate and the corresponding income generated by these concentrate sales were lower than expected as a result of gallon pushing in the prior period. The rolling estimates further illustrated that gallon pushing during the third and final month of a reporting period was necessary for CCJC to return to the sales and income targets contained within its annual business plan.

23.     The monthly rolling estimate analyses submitted by CCJC illustrate that gallon pushing during one reporting period negatively impacted the concentrate sales and income that would be generated in the following reporting period.

24.     CCJC also generated internal bottler inventory reports and bottler sales reports, typically broken down into "major brand" categories. The bottler inventory reports indicated that bottlers were carrying inventory levels of Georgia Coffee and Coke that, even considering their higher sales volume as compared to other products, were in excess of all other products. The bottler sales reports further indicated that although Georgia Coffee and Coke were two of the highest volume products for bottlers, overall bottler sales of Georgia Coffee and Coke were in fact decreasing compared to prior periods.

25.     Moreover, since gallon pushing was designed to address earnings shortfalls rather than actual forecasted demand for the current quarter, gallon pushing increased bottler inventories of Georgia Coffee and Coke beyond what bottlers required to satisfy demand for the period.

26.     During 1999, bottler inventory levels had increased to the point that gallon pushing could no longer be implemented at desired levels. In May 1999, a request from Coca-Cola was made to CCJC for a specific amount of income to be generated to assist Coca-Cola in eliminating a consolidated earnings shortfall for the second quarter. CCJC declined the request because CCJC had already incorporated and planned a gallon push as part of

meeting its annual business plan and thought that it was impractical for bottlers to purchase even more concentrate to address Coca-Cola's anticipated earnings shortfall.

27.    During the fourth quarter of 1999, CCJC conducted its largest gallon push – generating revenue in excess of $208 million. This fourth quarter 1999 gallon push contributed roughly $0.02 to Coca-Cola's consolidated earnings and, absent one time items, enabled Coca-Cola to meet its modified earnings expectations. While in the process of implementing this gallon push, employees of CCJC's finance department contacted officers and employees of Coca-Cola and informed them that gallon pushing had reached its maximum limit and was not sustainable at existing levels. Coca-Cola's future inability to gallon push at existing levels necessitated that gallon pushing either significantly decrease in scope or cease entirely – either of which would result in a substantial decrease in revenue and income flowing to Coca-Cola from CCJC.

28.    At no time between 1997 and 1999 did Coca-Cola disclose any information from which investors could determine the existence of gallon pushing, the impact of such gallon pushing on current income, or the likely impact of gallon pushing on future income.

## COCA-COLA ISSUED A FORM 8-K
## CONTAINING FALSE AND MISLEADING STATEMENTS

29.    On January 26, 2000, Coca-Cola filed a Form 8-K with the Commission which disclosed, among other things, a worldwide concentrate inventory reduction planned to occur during the first half of the year 2000. The inventory reduction was to be accomplished by Coca-Cola's operating divisions, specifically including CCJC, ceasing to sell concentrate to bottlers until bottlers naturally reduced their inventory to purported "optimum" levels. The impact on Coca-Cola's earnings for the first and second quarter of 2000 was estimated to be between $0.11 and $0.13 per share.

30.    In describing the inventory reduction, Coca-Cola stated that: (a) "[t]hroughout the past several months, [Coca-Cola had] worked with bottlers around the world to determine the optimum level of bottler inventory;" (b) the management of Coca-Cola and its bottlers, specifically including bottlers in Japan, had jointly determined "that opportunities exist to reduce concentrate inventory carried by bottlers;" and (c) certain bottlers throughout the world, specifically including those in Japan, had "indicated that they intend to reduce their inventory levels during the first half of the year 2000."

31.    These statements are false and misleading as a review of inventory levels in the context of determining an optimum level for bottlers had not occurred throughout the past several months. Such a review did not take place until, at the earliest, January 2000 – immediately after the fourth quarter 1999 gallon push had occurred and CCJC finance employees had informed Coca-Cola that gallon pushing could not continue at existing levels. Moreover, Coca-Cola did not identify a single bottler that, prior to the Form 8-K being filed, was aware of any planned inventory reduction.

32. The Form 8-K further is misleading in that, despite its language describing the inventory reduction as a joint proactive efficiency measure between Coca-Cola and its bottlers, the inventory reduction was in fact solely a Coca-Cola initiative. In addition, the Form 8-K did not disclose that of the estimated $0.11 to $0.13 impact to earnings for the Company as a whole, more than $0.05 would be attributable to an anticipated reduction of sales for Japan. CCJC's portion of the estimated gross profit impact was more than five times greater than that of any other operating division in the world.

## COCA-COLA'S VIOLATIONS OF SECTIONS 17(A)(2) AND 17(A)(3) OF THE SECURITIES ACT

33. Sections 17(a)(2) and 17(a)(3) of the Securities Act prohibit making untrue statements of fact and misleading omissions of facts in the offer or sale of a security. Section 17(a)(2) specifically proscribes obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Section 17(a)(3) specifically proscribes engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." To constitute a violation of Sections 17(a)(2) and 17(a)(3), the alleged untrue statements or omitted facts must be material. Information is deemed material upon a showing of a substantial likelihood that the misrepresented or omitted facts would have assumed significance in the investment deliberations of a reasonable investor. Basic, Inc. v. Levinson, 485 U.S. 224 (1988). Establishing violations of Sections 17(a)(2) and 17(a)(3) does not require a showing of scienter; negligence is sufficient. Aaron v. SEC, 446 U.S. 680 (1980); SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997).

34. As set forth above, Coca-Cola's Forms 10-K and 10-Q for the reporting periods between 1997 and 1999, certain of which were incorporated by reference in Coca-Cola's S-8 Registration Statements filed with the Commission, were misleading in that they failed to disclose within Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), or anywhere else within such filings, the existence of gallon pushing, the impact on Coca-Cola's current income of gallon pushing, and the likely impact of gallon pushing on its future income. In addition to the substantial likelihood that in making a decision regarding an investment in Coca-Cola, a reasonable investor, or potential investor, would have wanted to know of the existence and purpose of gallon pushing as an end of period sales practice, gallon pushing was further material in that in 8 out of 12 reporting periods from 1997 to 1999 and 6 out of 8 reporting periods from 1998 to 1999, it provided the income necessary for Coca-Cola to meet its modified earnings expectations.

35. The investing public and analysts following Coca-Cola could not discern this information from the public disclosures made by the Company. Based on the conduct described above, Coca-Cola violated Sections 17(a)(2) and 17(a)(3) of the Securities Act with respect to its Forms 10-K and 10-Q filed with the Commission between 1997 and 1999 and incorporated by reference into its S-8 Registration Statements filed with the Commission between 1997 and 2000.

36.     As set forth above, Coca-Cola's January 26, 2000, Form 8-K filed with the Commission contained false statements concerning the existence of a several month long optimum inventory study conducted as a joint effort between Coca-Cola and its bottlers. Additionally, the Form 8-K was misleading by omission as it failed to disclose the impact of past gallon pushing practices in Japan in the context of the planned inventory reduction. There is a substantial likelihood that the false statements surrounding the inventory reduction and misleading omissions regarding gallon pushing within the Form 8-K would have assumed significance in the investment deliberations of a reasonable investor.  Based on the conduct described above, Coca-Cola violated Sections 17(a)(2) and 17(a)(3) of the Securities Act with respect to its January 26, 2000 Form 8-K filed with the Commission and incorporated by reference into its S-8 Registration Statements filed between 1997 and 2000.

## COCA-COLA'S REPORTING VIOLATIONS: SECTION 13(a) OF THE EXCHANGE ACT AND RULES 12b-20, 13a-1, 13a-11, AND 13a-13 THEREUNDER

37.     Section 13(a) of the Exchange Act requires issuers such as Coca-Cola to file periodic reports with the Commission containing such information as the Commission prescribes by rule. Exchange Act Rules 13a-1, 13a-11, and 13a-13 require, respectively, issuers to file Forms 10-K, 8-K, and 10-Q. Under Exchange Act Rule 12b-20, the reports must contain, in addition to disclosures expressly required by statute and rules, such other information as is necessary to ensure that the statements made are not, under the circumstances, materially misleading.  The obligation to file reports includes the requirement that the reports be true and correct.  United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991). The reporting provisions are violated if false and misleading reports are filed.  SEC v. Falstaff Brewing Corp., 629 F.2d 62, 67 (D.C. Cir. 1980). Scienter is not an element of a Section 13(a) violation.  SEC v. Savoy Indus., Inc., 587 F.2d 1149,1167 (D.C. Cir. 1978).

38.     As set forth above, Coca-Cola's Forms 10-K and 10-Q for the reporting periods between 1997 and 1999 were materially misleading because they failed to disclose the existence of gallon pushing, the impact of gallon pushing on current earnings, and the likely impact of gallon pushing on future earnings.

39.     Additionally, Regulation S-K Item 303 requires registrants to disclose in the MD&A sections of required periodic filings "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material ... unfavorable impact on net sales or revenues or income from continuing operations."  The failure to comply with Regulation S-K constitutes a violation under Section 13(a) of the Exchange Act.

40.     Contrary to the requirements of Regulation S-K, Coca-Cola failed to disclose the material impact of gallon pushing on current and future income within its required MD&A sections.

41.     As set forth above, Coca-Cola's Form 8-K filed with the Commission on January 26, 2000 was materially false and misleading.

42.     Based on the conduct described above, Coca-Cola violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

### REMEDIAL EFFORTS

43.     In determining to accept the Offer, the Commission considered the following remedial efforts that the Respondent initiated prior to and during the Commission staff's investigation:

    a.      Coca-Cola has established an Ethics & Compliance Office to administer its Code of Business Conduct and ensure, among other things, that the Respondent conducts its business in compliance with the Code of Business Conduct and with various laws;

    b.      Coca-Cola has established a Disclosure Committee to assist its Chief Executive Officer and Chief Financial Officer in fulfilling their responsibility for oversight of the accuracy and timeliness of the disclosures made by Coca-Cola;

    c.      Coca-Cola now requires that its divisions certify quarterly that they have not changed or extended payment terms for any bottler or customer and have not granted any special or unusual credit terms or incentives to any bottler or customer, unless they received approval for such terms; and

    d.      Coca-Cola's Audit Committee employs independent counsel experienced in securities laws disclosure issues and will continue to employ such experienced legal counsel chosen by the Audit Committee. Such counsel shall advise the Audit Committee as to implementation of the undertakings in this Order.

### UNDERTAKINGS

44.     Respondent has undertaken to:

    a.      Permanently maintain the aforementioned remedial efforts or the functional equivalents thereof, except as may be approved by the Commission;

    b.      Require the Audit Committee, within 90 days of the date of this Order, to review with management of Respondent the process by which the MD&A sections of periodic reports filed by Respondent with the Commission are prepared and material information about the business and prospects, including but not limited to, trend information and known events and uncertainties that may have a material impact on liquidity or future financial performance, is identified for discussion in the MD&A sections of such reports, and to approve a set of criteria to be used by the Disclosure Committee and management to reasonably assure that appropriate

-10-

items are identified and discussed. The Audit Committee will meet periodically, at least annually, with the Chair of the Disclosure Committee to review such criteria, and will review and discuss with the Chief Financial Officer the proposed MD&A section of each periodic report to be filed with the Commission;

c.       Require the Disclosure Committee to: (i) use the aforementioned criteria to identify items that might need to be disclosed within the MD&A section of Respondent's periodic reports filed with the Commission; and (ii) use the aforementioned criteria to evaluate those items and recommend whether, and to what extent, disclosure is appropriate with respect to each item. The Chair of the Disclosure Committee will also report to the Audit Committee, on a quarterly basis, any recommended departures from the aforementioned criteria and the rationale supporting each such recommendation;

d.       Adhere to the guidance articulated in SEC Staff Accounting Bulletin No. 101 on disclosures that are required with respect to the recognition of revenue;

e.       Maintain for ten (10) years documentation sufficient to show for every of its Forms 8-K filed with the Commission, the preparers of each Form 8-K and those persons who reviewed and approved each Form 8-K; and

f.       Provide a written report, within 120 days of the date of this Order, to the Commission staff that details the Respondent's implementation of the undertakings articulated herein.

45.    In determining whether to accept the Offer, the Commission has considered the remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions specified in Respondent Coca-Cola's Offer.

### ACCORDINGLY, IT IS HEREBY ORDERED:

Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Coca-Cola cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

By the Commission.

Jonathan G. Katz
Secretary

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ COLUMBIA

Carpenters Health & Welfare Fund, et al.

## SUBPOENA IN A CIVIL CASE

**V.**

The Coca-Cola Company, et al.

CASE NUMBER: [1]  1:00-CV-2838-WBH (N.D. Ga.)

TO:  K. Chris Todd
     Kellogg, Huber, Hansen, Todd, Evans & Figel P.L.L.C.
     Sumner Square, 1615 M Street, N.W. Suite 400
     Washington, D.C. 20036

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE | DATE AND TIME |
|---|---|
| Lerach Coughlin Stoia Geller Rudman & Robbins LLP<br>1100 Connecticut Ave., N.W., Suite 730, Washington, D.C. 20036 | November 6, 2006<br>10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _[signature]_          /Attorney for Plaintiffs | October 2, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Scott Saham, Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900, San Diego, CA  92101  619/231-1058

**FILED**

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

**NOV 14 2006**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

AO 88 (Rev. 1/94) Subpoena in a Civil Case - SDNY WEB 4/99

---

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
|      |       |

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
|                        |                   |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
|                        |       |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)    (A)    A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)    Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)    (A)    On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance,

(ii)    requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)    subjects a person to undue burden.

(B)    If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)    requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)    requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A
## (K. CHRIS TODD)

### I.    DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.    The term "document" is co-extensive with, or has the same meaning as, the term "document" as used in Fed. R. Civ. P. 34, and the term "writings," as used in Fed. R. Evid. 1001, including, but not limited to, any electronically stored documents, preliminary versions, drafts or revisions.

2.    "Coke" or the "Company" refers to defendant The Coca-Cola Company, any of its subsidiaries, divisions, group or affiliates (foreign and domestic), predecessors, successors and any present and former officers, directors, employees, agents or members of the Board of Directors of Coke, its attorneys, accountants, advisors and all other persons acting or purporting to act on its behalf.

3.    "Individual Defendants" refers to M. Douglas Ivester, Jack L. Stahl, James E. Chestnut, Douglas Daft, and their agents, attorneys, advisors, accountants and all other persons acting or purporting to act on their behalf.

4.    "Defendants" refers to Coke and the Individual Defendants.

5.    "You" or "your(s)" refers to K. Chris Todd.

- 1 -

6.  "Person" or "persons" refers to natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and all other entities.

7.  "Communicate" or "communication" refers to every manner or means of disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries or otherwise), whether orally, electronically, by document, telecopier, mail, personal delivery or otherwise.

8.  "Concerning" means relating to, referring to, describing, evidencing, regarding or constituting.

9.  "Refer" or "relate" or "referring" or "relating" means all documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, without limitation, all documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

## II.   INSTRUCTIONS

1.  In responding to these requests, you shall produce all responsive documents which are in your possession, custody or control or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions, or

affiliates (foreign and domestic), or any of your respective directors, officers, managing agents, agents, employees, attorneys, accountants, or other representatives. A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.    In responding to these requests, you shall produce all responsive documents available at the time of production and you shall supplement your responses as required by Rule 26(e) of the Federal Rules of Civil Procedure.

3.    Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by plaintiffs *original* documents as they are kept in the usual course of business, or you shall organize and label them to correspond with the categories in these requests.  For electronic data, it shall be produced in its electronic form in the same format in which it is maintained by you, including all associated metadata.

4.    If any responsive document was, but is no longer in your possession or subject to your control, state whether it is: (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each instance identify the name and address of its current or last known custodian, and the circumstances surrounding such disposition.

- 3 -

5.    If any document responsive to these requests is withheld under a claim of privilege or upon any other ground, as to each such document, identify the privilege being asserted and provide the following information in sufficient detail to permit the court to rule on your claim:

(a)    the date, author, primary addressee and secondary addressee or persons copied, including the relationship of those persons to the client and/or author of the document;

(b)    a brief description sufficient to identify the type, subject matter and purpose of the document;

(c)    all persons to whom its contents have been disclosed; and

(d)    the party who is asserting the privilege.

6.    If a portion of any document responsive to these requests is withheld under claim of privilege pursuant to Instruction 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.    You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions 5 and 6 above) regardless of whether you consider the entire document to be relevant or responsive to the requests.

- 4 -

8. The singular shall include the plural, and the disjunctive shall include the conjunctive, and *vice versa*.

9. "And" shall include the term "or," and the term "or" shall include the term "and," such that each document request calls for the production of the greatest number of documents.

## III.   RELEVANT TIME PERIOD

All requests herein refer to the period from January 1, 1998 to the date of production (the "relevant period"), unless otherwise specifically indicated, and shall include all documents and information that relate to such period, even though prepared or published outside of the relevant period.

## IV.   DOCUMENT REQUESTS

REQUEST NO. 1:

All transcripts of testimony of Tamera Minick-Scokalo provided to the Securities and Exchange Commission, United States Department of Justice or any other entity, including exhibits thereto.

REQUEST NO. 2:

All reports or presentations or other documents generated or received by Tamera Minick-Scokalo during her employment at Coke.

# KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036-3206

## FACSIMILE TRANSMISSION

| | | | |
|---|---|---|---|
| TO: | Scott Saham, Esquire | FAX NO.: | (619) 231-7423 |
| FROM: | K. Chris Todd | CLIENT NO.: | 04131 |

PHONE:     (202) 326-7905

DATE:      October 17, 2006

RE:     *Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Co., et al.*
Case No.: 1:00-CV-2838-WBH (N.D. Ga.)

FILED

NOV 1 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3209

(202) 326-7900
FACSIMILE:
(202) 326-7999

October 17, 2006

REC'D OCT 2 0 2006

### *Via Facsimile and First Class Mail*

Scott Saham, Esquire
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
1100 Connecticut Avenue, NW
Suite 730
Washington, DC 20036

Re:  Carpenters Health & Welfare Fund, *et al. v.* The Coca-Cola Co., *et al.*,
     Case No. 1:00-CV-2838-WBH (N.D. Ga.)

Dear Mr. Saham:

I hereby object, pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), to the subpoena *duces tecum* served on me on October 5, 2006 ("the Subpoena"). As you know, I am not a party to the above-captioned action. As addressed more specifically herein, I am unaware of the existence of anything called for by Request No. 1. As for Request No. 2, anything that might be covered by that request—and this response is not a concession that anything does exist—those documents would be protected by the attorney-client privilege. My relationship and this law firm's relationship with Tamara Minick-Scokalo has always been as counsel to her. All communications with her have been pursuant to the attorney-client relationship. Thus, all communications with her are strictly confidential.

As to the specific requests in the subpoena, my response is as follows:

### Request No. 1

All transcripts of testimony of Tamera [*sic*] Minick-Scokalo provided to the Securities and Exchange Commission, United States Department of Justice or any other entity, including exhibits thereto.

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Scott Saham
October 17, 2006
Page two

Response to Request No. 1

There are no responsive documents within my possession, custody, or control.

Request No. 2

All reports or presentations or other documents generated or received by Tamera [*sic*] Minick-Scokalo during her employment at Coke.

Response to Request No. 2

I object to Request No. 2 on the ground that if such documents existed, I cannot respond to this Request without relying on and disclosing privileged and confidential information provided to me by my client, Ms. Minick-Scokalo. Identifying the existence of any possible documents in my possession as both responsive to this Request would necessarily require that I rely on and reveal privileged and confidential information about the possible existence, genesis, purpose, content, and import of those documents, thereby violating the attorney-client privilege.

I further object to this Request on the ground that it is inappropriate and incompatible with the confidentiality of the attorney-client relationship to request documents from me in my capacity as Ms. Minick-Scokalo's attorney. A request for documents generated or received by Ms. Minick-Scokalo in the course of her employment with Coke should be made directly to her.

Very truly yours,

K. Chris Todd



**LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS** LLP

SAN DIEGO · SAN FRANCISCO
LOS ANGELES · NEW YORK · BOCA RATON
WASHINGTON, DC · HOUSTON
PHILADELPHIA · SEATTLE

Ted Minahan
tedm@lerachlaw.com

October 26, 2006

K. Chris Todd
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
Sumner Square
1615 M. Street, N.W., Suite 400
Washington, D.C. 20036-3209

> Re:   *Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Company, et al.*
>       Case No. 1:00-CV-2838-WBH (N.D.Ga.

Dear Mr. Todd:

I write in response to our discussion yesterday regarding the subpoena served upon you on October 5, 2006 in the above-entitled matter. As we discussed, and in conjunction with your October 17, 2006 letter, I reviewed the case law regarding your assertion that producing documents that were provided to you by your client are covered by the attorney-client privilege. After review of the applicable case law, the attorney-client privilege does not reach so far. Plaintiffs are solely seeking those documents that do not have an underlying privilege, *i.e.*, documents generated or received by Ms. Minick-Scokalo during the course of employment at The Coca-Cola Company ("Coke"). The fact that these documents were subsequently provided to you does not make them attorney-client privileged. *See Banks v. Office of the Senate Sergeant-at-Arms*, 236 F.R.D. 16, 21 (D.D.C. 2006) ("[T]here are several documents that consist of letters, facsimiles, or e-mails forwarding documents from SSA employees to counsel. While the fact of the transmittal might be attorney-client privileged, such transmittal does not shield from discovery the forwarded documents. The forwarded documents are only privileged if they would have been privileged in the hands of the SSA."); *Tri-State Hosp. Supply Corp. v. United States*, No. 00-1463(HHK/JMF), 2005 U.S. Dist. LEXIS 33156, at *11 (D.D.C. Dec. 16, 2005) ("While the fact of the transmittal might be an attorney-client privileged communication, that does not in itself shield from discovery the documents forwarded with that letter or facsimile. The forwarded documents are only privileged if they would have been privileged in the hands of the client."); *Fisher v. United States*, 425 U.S. 391, 403-04 (1976) ("This Court and the lower courts have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by client in order to obtain more informed legal advice.").

Furthermore, though your October 17, 2006 letter fails to object on the basis that such a production would violate your rights under the Fifth Amendment of the United States Constitution, I must note the Fifth Amendment is not implicated here. Unlike in *United States*

NOV 14 2006
NANCY M. MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

K. Chris Todd
October 26, 2006
Page 2

*v. Hubbell*, 530 U.S. 27, 30-31 (2000), there are no facts to suggest that you would incriminate yourself in producing documents responsive to Request No. 2 to plaintiffs' subpoena. *See United States v. Marra*, No. 05-2509(JCL), 2005 U.S. Dist. LEXIS 23411, at *21 (D.N.J. Oct. 5, 2005) (Fifth Amendment did not apply where the custodian of records was not the subject of the government investigation); *Bear Stearns & Co. v. Wyler*, 182 F. Supp. 2d 679, 683 (N.D. Ill. 2002) (Fifth Amendment did not apply where witness could not explain any danger of incrimination); *United States v. Arizechi*, No. 06-CV-528, 2006 U.S. Dist. LEXIS 41012, at *6 (D.N.J. June 20, 2006) ("A corporate custodian, however, cannot refuse to produce the requested records because it would be a personally incriminating act."); *see also United States v. Ponds*, 454 F.3d 313, 323 (D.C. Cir. 2006) ("Therefore, to determine whether an act of production implicates the Fifth Amendment, the court looks only at the communicative aspects of the act of production itself and to whether those tacit averments as to the existence and location of the documents add anything significant 'to the sum total of the Government's information.'").

Given this case law, if you are still asserting these documents are privileged, you must provide plaintiffs with a privilege log. *See* Fed. R. Civ. P. 45(d)(2).

I do not wish to seek court intervention in this matter. Accordingly, I request you speak to your client and that she search for and produce these documents. This would be the most efficient manner to handle the issue. If, however, your client does not wish to provide these documents to plaintiffs voluntarily, and you stand by your privilege objections, I am left with no other recourse but to seek relief from the court. If I do not hear back from you by next Tuesday, October 31, 2006, I have no other alternative but to proceed down this course.

Should you have any questions, I can be reached at (619) 231-1058.

Sincerely,

Ted Minahan

TM:cl

S:\CasesSD\Coke\Corres\Minahan-Todd 10-26.doc

345    61-M

# KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036-3206

## FACSIMILE TRANSMISSION

**TO:**     Ted Minahan, Esq.          **FAX NO:**     619-231-7423

**FROM:**     K. Chris Todd

**PHONE:**     202-326-7985

**DATE:**     November 1, 2006

**MESSAGE:**

Ted – Please call me tomorrow.

- Chris

## TOTAL NUMBER OF PAGES:     6     (INCLUDING THIS SHEET)

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL US IMMEDIATELY
OR CONTACT CONNIE ZEENDER.

PHONE NO: (202) 367-7730

FAX NO: (202) 326-7999

*THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFIDENTIAL ATTORNEY INFORMATION
INTENDED ONLY FOR THE USE OF THE ADDRESSEE. PERSONS RESPONSIBLE FOR DELIVERING THIS COMMUNICATION TO THE
INTENDED RECIPIENT ARE HEREBY NOTIFIED NOT TO READ THE ATTACHED AND THAT ANY DISSEMINATION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE
NOTIFY US IMMEDIATELY BY TELEPHONE, AND PLEASE RETURN THE ORIGINAL MESSAGE TO US AT OUR LETTERHEAD ADDRESS
VIA THE U.S. POSTAL SERVICE.*

FILED

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3209

(202) 326-7900
FACSIMILE:
(202) 326-7999

November 1, 2006

Via Facsimile and U.S. Mail

Ted Minahan, Esq.
Lerach Coughlin Stoia Geller
  Rudman & Robbins, LLP
655 W. Broadway
Suite 1900
San Diego, CA  92101

Re:   *Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Co., et al.*
      Case No.: 1:00-CV-2838-WBH (N.D. Ga.)

Dear Mr. Minahan:

I have received your letter of October 26, 2006 (a copy of which is attached for
easy reference).  As an initial matter, I will again state here what I repeatedly told you in
our October 25 telephone conversation, namely that I am not conceding that I have any
documents responsive to the request described in your subpoena, and that any discussion
of such documents was, and remains, purely hypothetical.  Your letter states that, "I
reviewed the case law regarding your assertion that producing documents *that were
provided to you by your client* are covered by the attorney-client privilege." (Emphasis
added.)  To the extent that this statement implies I informed you or conceded that there
were in fact such documents, it is incorrect.  Indeed one of the points that I emphasized in
our conversation was that as counsel to Ms. Minick-Scokalo, I cannot communicate to
you the fact that any documents may have been provided to me by her during the course
of our attorney-client relationship.  This would in my view be a violation of the attorney-
client privilege.  As you yourself quote from *Tri-State Hospital Supply Corp. v. United
States*: "[T]he fact of the transmittal [of subpoenaed documents from client to attorney]
might be attorney-client privileged."  2005 U.S. Dist. LEXIS 33156, at *11 (D.D.C. Dec.
16, 2005).

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.

Ted Minahan, Esq.
November 1, 2006
Page 2

     I have reviewed the cases cited in your letter, and I am not persuaded that they, or other relevant cases, support your contention that the attorney-client privilege would not prevent me from producing any documents that might, hypothetically, be in my possession. First, as the cases you cite make clear, "when the client himself would be privileged from production of the document, either as a party at common law . . . or as exempt from self-incrimination, the attorney having possession of the document is not bound to produce." *Fisher v. United States*, 425 U.S. 391, 404 (U.S. 1976) (internal quotation marks omitted); *see also Banks v. Office of the Senate Sergeant-at-Arms*, 236 F.R.D. 16, 21 (D.D.C. 2006) ("forwarded documents are privileged if they would have been privileged in the hands of the client."). My reading of these cases is that the attorney-client privilege protects documents provided by a client to her attorney *unless and until* a court can be satisfied that those documents would not be privileged in the hands of the client.

     You are no doubt aware that the media has reported that the United States Attorney's Office in Atlanta has opened an investigation into whether Coca-Cola engaged in practices very similar to those alleged in the complaint in the above-referenced matter. It is entirely possible, therefore, that Ms. Minick-Scokalo would have a Fifth Amendment right to refuse to produce the documents you seek. Absent conclusive evidence that she could refuse to produce the documents on that ground (or on the basis of some other privilege), I could not produce those documents myself, assuming I possessed them, without violating the attorney-client privilege.

     Second, as I indicated in my letter of October 17, 2006, even if there exist some circumstances in which an attorney may produce specific, named documents in response to a subpoena, those circumstances do not exist in this case. Producing documents in response to the broad requests contained in your subpoena would violate the attorney-client privilege because it would require me to identify particular documents as responsive to those requests. "[T]he act of producing a record can be 'testimonial' in that the producer impliedly makes three 'statements': he affirms the existence of the thing sought, his possession of it, and his belief that the thing produced is that which he or she was called upon to produce." *Parker v. Baltimore & O. R. Co.*, 555 F. Supp. 1177, 1179 (D.D.C. 1983). For me to so-"testify" by producing documents in response to your subpoena that those documents were "generated or received by [my client] during her employment at Coke" would reveal information that, if I did have any such documents, would have been told me in confidence by Ms. Minick-Scokalo.

     In closing, I repeat my admonition that a lawyer should never, in my view, be placed in this circumstance when there are alternatives to obtaining the documents. In this case you have not attempted to subpoena Ms. Minick-Scokalo, nor, apparently, have you subpoenaed the Coca-Cola Company for the documents. You apparently have a

Ted Minahan, Esq.
November 1, 2006
Page 3

good faith basis for believing such documents exist, and I respectfully urge you to
exhaust all other avenues for obtaining those documents before making any further
efforts to enforce a subpoena on a potential witness's lawyer.

Sincerely,

K. Chris Todd

Attachment



**LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS** LLP

<div align="right">
SAN DIEGO • SAN FRANCISCO
LOS ANGELES • NEW YORK • BOCA RATON
WASHINGTON, DC • HOUSTON
PHILADELPHIA • SEATTLE
</div>

Ted Minahan
tedm@lerachlaw.com

October 26, 2006

K. Chris Todd
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
Sumner Square
1615 M. Street, N.W., Suite 400
Washington, D.C. 20036-3209

     Re:    *Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Company, et al.*
            Case No. 1:00-CV-2838-WBH (N.D.Ga.

Dear Mr. Todd:

     I write in response to our discussion yesterday regarding the subpoena served upon you on October 5, 2006 in the above-entitled matter. As we discussed, and in conjunction with your October 17, 2006 letter, I reviewed the case law regarding your assertion that producing documents that were provided to you by your client are covered by the attorney-client privilege. After review of the applicable case law, the attorney-client privilege does not reach so far. Plaintiffs are solely seeking those documents that do not have an underlying privilege, *i.e.*, documents generated or received by Ms. Minick-Scokalo during the course of employment at The Coca-Cola Company ("Coke"). The fact that these documents were subsequently provided to you does not make them attorney-client privileged. *See Banks v. Office of the Senate Sergeant-at-Arms*, 236 F.R.D. 16, 21 (D.D.C. 2006) ("[T]here are several documents that consist of letters, facsimiles, or e-mails forwarding documents from SSA employees to counsel. While the fact of the transmittal might be attorney-client privileged, such transmittal does not shield from discovery the forwarded documents. The forwarded documents are only privileged if they would have been privileged in the hands of the SSA."); *Tri-State Hosp. Supply Corp. v. United States*, No. 00-1463(HHK/JMF), 2005 U.S. Dist. LEXIS 33156, at *11 (D.D.C. Dec. 16, 2005) ("While the fact of the transmittal might be an attorney-client privileged communication, that does not in itself shield from discovery the documents forwarded with that letter or facsimile. The forwarded documents are only privileged if they would have been privileged in the hands of the client."); *Fisher v. United States*, 425 U.S. 391, 403-04 (1976) ("This Court and the lower courts have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by client in order to obtain more informed legal advice.").

     Furthermore, though your October 17, 2006 letter fails to object on the basis that such a production would violate your rights under the Fifth Amendment of the United States Constitution, I must note the Fifth Amendment is not implicated here. Unlike in *United States*

Oct-26-06   10:17am   From-                                      T-212  P.003/003  F-068



K. Chris Todd
October 26, 2006
Page 2

*v. Hubbell*, 530 U.S. 27, 30-31 (2000), there are no facts to suggest that you would incriminate yourself in producing documents responsive to Request No. 2 to plaintiffs' subpoena. *See United States v. Marra*, No. 05-2509(JCL), 2005 U.S. Dist. LEXIS 23411, at *21 (D.N.J. Oct. 5, 2005) (Fifth Amendment did not apply where the custodian of records was not the subject of the government investigation); *Bear Stearns & Co. v. Wyler*, 182 F. Supp. 2d 679, 683 (N.D. Ill. 2002) (Fifth Amendment did not apply where witness could not explain any danger of incrimination); *United States v. Arizechi*, No. 06-CV-528, 2006 U.S. Dist. LEXIS 41012, at *6 (D.N.J. June 20, 2006) ("A corporate custodian, however, cannot refuse to produce the requested records because it would be a personally incriminating act."); *see also United States v. Ponds*, 454 F.3d 313, 323 (D.C. Cir. 2006) ("Therefore, to determine whether an act of production implicates the Fifth Amendment, the court looks only at the communicative aspects of the act of production itself and to whether those tacit averments as to the existence and location of the documents add anything significant 'to the sum total of the Government's information.'").

Given this case law, if you are still asserting these documents are privileged, you must provide plaintiffs with a privilege log. *See* Fed. R. Civ. P. 45(d)(2).

I do not wish to seek court intervention in this matter. Accordingly, I request you speak to your client and that she search for and produce these documents. This would be the most efficient manner to handle the issue. If, however, your client does not wish to provide these documents to plaintiffs voluntarily, and you stand by your privilege objections, I am left with no other recourse but to seek relief from the court. If I do not hear back from you by next Tuesday, October 31, 2006, I have no other alternative but to proceed down this course.

Should you have any questions, I can be reached at (619) 231-1058.

Sincerely,

Ted Minahan

TM:cl

S:\Cases\SD\Coke\Corres\Minahan-Todd 10-26.doc



LERACH
COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

SAN DIEGO · SAN FRANCISCO
LOS ANGELES · NEW YORK · BOCA RATON
WASHINGTON, DC · HOUSTON
PHILADELPHIA · SEATTLE

Ted Minahan
tedm@lerachlaw.com

November 2, 2006

VIA FACSIMILE & OVERNIGHT DELIVERY

K. Chris Todd
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
Sumner Square
1615 M. Street, N.W., Suite 400
Washington, D.C. 20036-3209

Re:  *Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Company, et al.*
     Case No. 1:00-CV-2838-WBH (N.D. Ga.)

Dear Mr. Todd:

I write regarding our conversation today. As we discussed, we attempted to resolve this matter without court intervention. We could not, however, reach a resolution. As I informed you, I have no other option but to file a motion to compel. I intend to file next Monday, November 6, 2006.

Sincerely,

Ted Minahan

TM:cl

S:\CasesSD\Coke\Corres\Minahan-Todd-11-2.doc

FILED

NOV 1 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

655 West Broadway, Suite 1900 · San Diego, California 92101-3301 · 619.231.1058 · Fax 619.231.7423 · www.lerachlaw.com

345    61-M

```
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>ko8k418x99-1.txt
<DESCRIPTION>PRESS RELEASE OF THE COLA COMPANY ISSUED APRIL 18, 2005
<TEXT>
```

EXHIBIT 99.1

THE COCA-COLA COMPANY
news
release

FOR IMMEDIATE RELEASE                        Contact: Ben Deutsch
                                                      (404) 676-2683

THE COCA-COLA COMPANY COMMENTS ON SEC SETTLEMENT

ATLANTA, April 18, 2005 -- Neville Isdell, chairman and chief executive
officer of The Coca-Cola Company, today issued the following statement:

"We are pleased that today's settlement with the Securities and Exchange
Commission, and the decision by the Department of Justice to close its
investigation, mark an end to the U.S. government inquiries initiated in 2003."

Attached is a communication from Mr. Isdell that was distributed to the
Company's employees today:

===============================
EXECUTIVE OFFICE MEMORANDUM
===============================

From:    EOM on 04/18/2005 11:09 AM

To:      All Employees Worldwide

Subject: Conclusion of SEC and DOJ Investigations


Atlanta, Georgia          No. 05-28          April 18, 2005


TO:               ALL EMPLOYEES WORLDWIDE

Earlier today, the U.S. Securities and Exchange Commission (SEC) announced a
settlement with our Company that brings to an end the investigation initiated in
2003 into allegations raised by a former employee. Under the settlement, we have
agreed to maintain certain measures that the Company implemented prior to or
during the last two years and to undertake additional remedial actions in the
areas of corporate compliance and disclosure. The settlement does not include a
monetary fine or penalty. In addition, the Company was also informed that the
Department of Justice has decided to close its investigation.

The settlement agreement provides that we neither admit nor deny the factual
findings made by the SEC. Accordingly, out of respect for our agreement, we will
not comment on specific allegations. I can say, however, that we are pleased
that

- more -

```
<PAGE>
```

Page 2 of 2

FILED

NOV 1 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

this settlement, and the decision by the Department of Justice to close its
investigation, mark an end to the U.S. government inquiries initiated in 2003.
Further, I am gratified that the SEC has acknowledged the fact that the Company
cooperated with its investigation, which was the primary directive provided by
management and the Board throughout this process.

We continue to expect all of our operations around the world to adhere to the
highest ethical standards. The measures identified in this settlement and those
we have taken over the past few years are an important step forward in ensuring
our systems continually improve. That is an obligation we all share that
requires constant vigilance.

                    NEVILLE ISDELL


This message is intended for employees of The Coca-Cola Company.

To see recent EOMs, visit @KO at Announcements.


                              # # #


&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on November 13, 2006, declarant served the DECLARATION OF TED MINAHAN IN SUPPORT OF PLAINTIFFS CARPENTERS HEALTH AND WELFARE FUND OF PHILADELPHIA AND VICINITY AND LOCAL 144 NURSING HOME PENSION FUND'S MOTION TO COMPEL DOCUMENT PRODUCTION FROM K. CHRIS TODD by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of November, 2006, at San Diego, California.

CINDI J. LAMBERT



COKE (LEAD)

Service List - 11/10/2006   (200-357-1)

Page 1 of 1

### Counsel For Defendant(s)

M. Robert Thornton
Jeffrey Cashdan
Stephen Devereaux
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
  404/572-4600
  404/572-5100 (Fax)

Ronald L. Olson
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
  213/683-9100
  213/687-3702 (Fax)

### Counsel For Plaintiff(s)

Martin D. Chitwood
Chitwood Harley Harnes LLP
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
  404/873-3900
  404/876-4476 (Fax)

Daniel M. Shanley
DeCarlo & Connor
533 South Fremont Avenue, 9th Floor
Los Angeles, CA 90071-1706
  213/488-4100
  213/488-4180 (Fax)

William S. Lerach
Steven W. Pepich
Scott H. Saham
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)

Michael J. VanOverbeke
Thomas C. Michaud
Michael E. Moco
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
  313/578-1200
  313/578-1201 (Fax)

### Courtesy Copy

Sandra Stein
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103
  215/988-4546
  215/988-9885 (Fax)

C. Chris Todd
Kellogg Huber Hansen Todd Evans
  & Figel PLLC
1615 M Street N.W., Suite 400
Washington DC 20036

Nancy M. Juda
Roger Adelman
Lerach Coughlin Stoia Geller Rudman
  & Robbins LLP
1100 Connecticut Ave, N.W. Suite 730
Washington D.C. 20036
  202/822-6762
  202/828-8528 (fax)