UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ———————————————— x | |
| CARPENTERS HEALTH & WELFARE FUND, et al., | CASE NO.          1:06MC00508 |
| : | JUDGE:            John D. Bates |
| : | DECK TYPE:     Miscellaneous |
| Plaintiffs, | : |
| : | (Case No. 1:00-CV-2838-WBH (N.D. Ga.)) |
| vs. | : |
| : | |
| THE COCA-COLA COMPANY, et al., | : |
| : | |
| Defendants. | : |
| ———————————————— x | |

PLAINTIFFS CARPENTERS HEALTH AND WELFARE FUND OF PHILADELPHIA
AND VICINITY AND LOCAL 144 NURSING HOME PENSION FUND'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL DOCUMENT
PRODUCTION FROM K. CHRIS TODD

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    RELEVANT BACKGROUND ..............................................................................3

III.   THE ONLY RELEVANT GOVERNMENT INVESTIGATIONS WERE
       CLOSED IN APRIL 2005 .....................................................................................4

IV.    *BRASWELL V. UNITED STATES* AND *IN RE SEALED CASE* ..........................5

       A.     The Documents Sought by Plaintiffs Are Corporate Records ................6

       B.     Minick-Scokalo Is the Legal Custodian of the Corporate Records Sought
              by Plaintiffs .............................................................................................8

V.     CONCLUSION .....................................................................................................9

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Bellis v. United States,*
    417 U.S. 85 (1974)...............................................................................................2, 8

*Braswell v. United States,*
    487 U.S. 99 (1988)......................................................................................1, 2, 3, 5, 6

*Dreier v. United States,*
    221 U.S. 394 (1911)...............................................................................................2, 8

*Fisher v. United States,*
    425 U.S. 391 (1976)...................................................................................................5

*In re Sealed Case,*
    950 F.2d 736 (D.C. Cir. 1991) ........................................................................1, 6, 7, 8

*United States v. Doe,*
    465 U.S. 605 (1984)...................................................................................................5

*United States v. Wujkowski,*
    929 F.2d 981 (4th Cir. 1991) .....................................................................................6

*Wilson v. United States,*
    221 U.S. 361 (1911)...............................................................................................6, 7

## I.     INTRODUCTION

In accordance with the Court's January 22, 2007 Order, plaintiffs submit the following additional briefing on plaintiffs' motion to compel.  First, the relevant governmental investigations into the conduct at issue in this case were closed as of April 2005.  In a filing with the SEC dated April 18, 2005, The Coca-Cola Company ("Coke" or the "Company") confirmed that both the SEC investigation and the Department of Justice investigation relating to the events at issue in this case have been closed.  The SEC investigation was settled and resulted in the issuance of a Cease and Desist order relating to the conduct at issue.  Ex. A.  The DOJ investigation was closed without any indictments being issued.  Ex. B.  *See also* Ex. C (stating that the "Company received a letter Monday from the Justice Department saying it was terminating its probe").

Second, *Braswell v. United States*, 487 U.S. 99 (1988) rejects the chief basis for K. Chris Todd's refusal to produce documents called for by the subpoena and is dispositive of whether Ms. Minick-Skokalo would have a Fifth Amendment privilege affording her the right to refuse production of the documents sought by plaintiffs.  *Braswell* unequivocally provides that a custodian of corporate records may not resist a subpoena for such records on Fifth Amendment grounds – the very same grounds now asserted by Todd.  *Id.* at 113.  *In re Sealed Case*, 950 F.2d 736 (D.C. Cir. 1991) also supports plaintiffs' argument that the documents at issue are corporate records not subject to the protections of the Fifth Amendment.

Todd mistakenly argues that plaintiffs could not lawfully obtain documents directly from Minick-Skokalo – if she still retained them and had she been within the Court's subpoena power.  Specifically, Todd asserts that Minick-Skokalo "would have a Fifth Amendment right to refuse to produce responsive documents in her possession," and because of this right, the documents may

similarly not be obtained from Todd, her former attorney, who represented her prior to the closure of

the above referenced investigations.  K. Chris Todd's Opposition to Plaintiffs' Motion to Compel

Document Production ("Todd Opp.") at 5.   However, *Braswell* makes clear that a corporate

custodian has no standing to assert a Fifth Amendment privilege over subpoenaed corporate records,

as those records are deemed to be the property of the corporation.  487 U.S. at 113 ("'one in control

of the records of an artificial organization undertakes an obligation with respect to those records

foreclosing any exercise of his privilege'")[1].  The *Braswell* court further noted that "'[b]y virtue of

the fact that they were the documents of the corporation in his custody, and not his private papers, he

was under the obligation to produce them when called for by proper process.'"  *Id*. at 107, citing

*Dreier v. United States*, 221 U.S. 394, 400 (1911).  The Fifth Amendment protection against self-

incrimination may not be invoked by corporations; rather, it is an individual right that operates to

protect only private records and testimony.  *See, e.g., Bellis v. United States*, 417 U.S. 85 (1974).

Here, the documents sought are undoubtedly corporate records, and Minick-Scokalo is legally the

custodian of the documents.  As such, Minick-Scokalo would have no Fifth-Amendment basis to

refuse to produce the documents, regardless of whether a distinction is drawn between the act of

producing responsive documents and the content of these documents.  Either way, *Braswell* flatly

rejects her ability to invoke the Fifth Amendment.

Plaintiffs' reply brief argued that Minick-Scokalo would have no basis to invoke the

protections of the Fifth Amendment because Todd has not identified any support for his assertion

that the act of producing responsive documents, or the content of the documents themselves, would

---

[1]       Unless otherwise indicated, all citations have been omitted and emphasis has been added.

somehow incriminate her.  Plaintiffs Carpenters Health and Welfare Fund of Philadelphia and

Vicinity and Local 144 Nursing Home Pension Fund's Reply Memorandum in Support of Motion to

Compel Document Production from K. Chris Todd ("Plaintiffs' Reply") at 6-11.  Notwithstanding,

even assuming Todd's assertion is true, *Braswell* wholly prevents any attempt by Minick-Skokalo to

invoke the Fifth Amendment as to the corporate records sought by plaintiffs, and is therefore not a

legitimate basis for Todd to refuse production of the documents.

## II.    RELEVANT BACKGROUND

On November 13, 2006, plaintiffs filed this motion to compel seeking documents in the

possession of Minick-Skokalo's former attorney, Todd, as Ms. Minick-Skokalo, who resides in

Switzerland, had indicated she no longer possesses a copy of this crucial evidence.  Plaintiffs sought

to compel documents created by her during the course of her employment with The Coca-Cola

Company during 1998 and 1999.  Namely, plaintiffs seek three reports prepared by her that identify

the problems associated with Coke's "loading" or "channel stuffing" its "Georgia Coffee" product in

Japan.  These reports demonstrate how the unsustainable growth in concentrate loading would

ultimately be revealed and could undermine Coke's business.  In the 1998 through 1999 time period,

she presented the reports in the course of her duties at Coke to her Division President, Michael Hall,

and to Douglas Daft, President of Coke's Middle Far East Group, who later became Coke's CEO.

On December 1, 2006, Todd filed his opposition to plaintiffs' motion, and asserted that he

should not have to produce any of Minick-Skokalo's documents in his possession because (1)

plaintiffs could not directly obtain the documents from Minick-Skokalo as she would have a Fifth

Amendment right to refuse production, and (2) production of the documents would violate the

attorney-client privilege.  Todd Opp. at 4-5.  Plaintiffs filed their reply brief on December 11, 2006,

3

and argued that Todd has not advanced any support for his belief that Minick-Scokalo would have a Fifth Amendment right over the documents at issue, and that the attorney-client privilege is not implicated by Todd's production of Minick-Scokalo's documents.

On January 22, 2007, the Court issued an Order requesting (1) "any further information about the status of any relevant government investigation, including any investigation into the practices alleged in the amended complaint," and (2) the "relevance, if any, of *Braswell v. United States*, 487 U.S. 99 (1988), and *In re Sealed Case (Gov't Records)*, 950 F.2d 736 (D.C. Cir. 1991), to plaintiffs' motion to compel."  Plaintiffs proceed to address these points.

## III.    THE ONLY RELEVANT GOVERNMENT INVESTIGATIONS WERE CLOSED IN APRIL 2005

The only governmental investigations into the conduct at issue in this case were closed as of April 2005.  In a filing with the Securities and Exchange Commission ("SEC") dated April 18, 2005 Coke confirmed that both the SEC investigation and the Department of Justice ("DOJ") investigation relating to the events at issue in this case had been closed.  The SEC investigation was settled and resulted in the issuance of a Cease and Desist Order relating to the conduct at issue.  Ex. A.  The DOJ investigation was closed without any indictments being issued.  Ex. B.  Specifically, on April 18, 2005, Coke filed a Form 8-K with the SEC that stated "it had reached settlement with the Securities and Exchange Commission ('SEC') in connection with the investigation initiated by the SEC in 2003.  The Company also confirmed that, in view of the SEC settlement, ***the Department of Justice had decided to close the investigation it initiated in 2003***."  Ex. B at 2.  Thus no governmental investigations are still pending regarding the conduct at issue.

IV.     *BRASWELL V. UNITED STATES* **AND** *IN RE SEALED CASE*

The Supreme Court in *Braswell* held that a custodian of corporate records cannot invoke the Fifth Amendment to defeat production of corporate records, even if the act of producing the records might prove personally incriminating.  The holding of *Braswell* is directly applicable to the instant motion, and is controlling authority over whether Minick-Scokalo would have the ability to object to production of the documents on Fifth Amendment grounds.

In *Braswell*, a corporate officer argued that the act of producing corporate records has independent testimonial significance that "would incriminate him in violation of his Fifth Amendment privilege against self-incrimination."  487 U.S. at 101.  The Supreme Court squarely rejected this argument, and cited a long line of "collective entity" cases in which the Court has routinely found that corporate or business records are not "private papers" protected by the Fifth Amendment.  *Id*. at 105-108.  The Court stated:

> From [1944] forward, the Court has consistently recognized that the custodian of corporate . . . records holds those documents in a representative rather than a personal capacity. . . .  Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation.  Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation – which of course possesses no such privilege.

*Id*. at 111.  The collective entity cases cited by the Court squarely resolved that the content of corporate records, even if incriminating individually for the custodian *or* for the corporation, cannot be withheld on the basis of the Fifth Amendment.  *Id.* at 102 ("There is no question but that the **contents** of [] subpoenaed business records are not privileged."), citing *United States v. Doe*, 465 U.S. 605 (1984); *Fisher v. United States*, 425 U.S. 391 (1976).  *Braswell* operates to extend this principle to the act of production, and similarly determines that corporate records cannot be withheld on Fifth Amendment grounds even if the act of production by a custodian is individually

incriminating.  After *Braswell*, the law is simply that "a corporate custodian is not entitled to resist a subpoena on the ground that his act of production will be personally incriminating."  487 U.S. at 117.

Here, Todd asserts the exact argument rejected by the Supreme Court in *Braswell*: "the **act** of producing responsive documents has communicative and testimonial aspects that could subject [] Ms. Minick-Scokalo to criminal investigation and prosecution."  Todd Opp. at 6 (emphasis in original).  There can be no question but that in the wake of *Braswell*, Minick-Scokalo has no Fifth Amendment protection provided (1) the documents at issue are corporate records, and (2) she is the custodian of these records.

### A.    The Documents Sought by Plaintiffs Are Corporate Records

The Federal Circuit addressed the distinction between personal and corporate records in *Sealed Case*, 950 F.2d 736.  There, the Federal Circuit noted that "courts employ a functional test" in determining whether a document belongs in the corporate or the personal category, and found that:

> Under this approach, a pocket calendar kept by a business executive for her personal convenience, and to which not even her secretary had daily access, may qualify as a personal record, while a desk calendar maintained jointly by the executive and her secretary, kept open on the executive's desk, would more likely qualify as a corporate record.

*Id*. at 740.  A functional test also considers "the nature of the documents and the capacity in which they are held," in addition to the purpose and use of the document.  *Wilson v. United States*, 221 U.S. 361, 380 (1911); *United States v. Wujkowski*, 929 F.2d 981, 984 (4th Cir. 1991).  When applied to the documents now sought by plaintiffs, a functional test clearly reveals that the documents are, in fact, corporate records.

Significantly, the documents plaintiffs seek to obtain from Minick-Scokalo were created in the regular course of her business duties while employed by The Coca-Cola Company. Plaintiffs' request asked for "[a]ll reports or presentations or other documents generated or received by Tamera Minick-Scokalo during her employment at Coke." Plaintiffs Carpenters Health and Welfare Fund of Philadelphia and Vicinity and Local 144 Nursing Home Pension Fund's Motion to Compel Document Production from K. Chris Todd and Memorandum in Support Thereof ("Plaintiffs' Mem.") at 4. During 1998 and 1999, Minick-Scokalo was a mid-level marketing executive at Coke Japan that was responsible for preparing, among other things, a detailed internal report that outlined the impropriety of Coke's concentrate loading practices. This report was presented to her Division President, Michael Hall, and to Douglas Daft, President of Coke's Middle Far East Group, who later became Coke's CEO. It is readily apparent that this report is a corporate record under the functional test. The report was created by Minick-Scokalo during the 1998 through 1999 timeframe pursuant to her professional duties at Coke Japan, presented to her superiors in accordance with her responsibilities, and was held by her in a business capacity. There is nothing about this report that may be considered personal or private, as the report relates wholly to Coke's business operations in Japan. In short, the records sought by plaintiffs far surpass the desk calendar found to be a corporate record in *Sealed Case*, 950 F.2d 736. Notably, as pointed out in plaintiffs' reply brief, nowhere does Todd dispute that the documents sought are corporate records. Plaintiffs' Reply at 1. Upon consideration of "the nature of the documents and the capacity in which they are held," there can be no question but that the documents sought by plaintiffs are corporate records. *Wilson*, 221 U.S. at 380.

The Federal Circuit in *Sealed Case*, 950 F.2d at 738 remanded the case to the district court, reasoning that "the court should see the documents as to which the characterization [corporate or private] is genuinely in contention." There, the documents at issue were much broader in scope and more personal in nature than those at issue here, and included "'calendars, calendar pads, daybooks, appointment books, [and] diaries.'" *Id*. at 737. Given that (1) Todd does not dispute that the documents in question here are corporate records, and (2) that an application of the functional test clearly reveals the documents to be corporate records, there is no analogous need for the Court to review Minick-Skokalo's documents and determine whether in fact they are corporate records. Plaintiffs have described the documents with sufficient particularity as to readily enable the Court to classify the documents as corporate records without inspection. Nevertheless, plaintiffs have no objection should the Court deem it necessary to review the documents at issue *in camera*.

**B.** **Minick-Skokalo Is the Legal Custodian of the Corporate Records Sought by Plaintiffs**

Minick-Skokalo created the documents at issue, and has constructive possession of them through her former attorney. Minick-Skokalo maintained these documents throughout her employment with Coke as corporate records, and she is therefore the legal custodian. As the Supreme Court found in *Dreier*, "'[b]y virtue of the fact that they were the documents of the corporation in his custody, and not his private papers, he was under the obligation to produce them when called for by proper process.'" 221 U.S. at 400. The Fifth Amendment protection against self-incrimination may not be invoked by corporations; rather, it is an individual right that operates to protect only private records and testimony. *See, e.g.*, *Bellis*, 417 U.S. 85. Here, Minick-Skokalo is in custody of the corporate records sought by plaintiffs through her attorney Mr. Todd. Because the records are no longer directly obtainable from Ms. Minick-Skokalo, or Coke, as both have indicated

that they no longer possess them, Mr. Todd has the only remaining copies of this crucial evidence.

Thus, he must produce these Coke business records, which were created six years prior to the

initiation of his attorney-client relationship with Ms. Minick-Scokalo.

## V.     CONCLUSION

For the foregoing reasons, plaintiffs' motion to compel documents should be granted.

DATED:  January 29, 2007                    Respectfully submitted,

                                            LAW OFFICES OF ROGER ADELMAN


                                             s/ ROGER ADELMAN
                                            ROGER ADELMAN
                                            (Bar No. 056358)

                                            1100 Connecticut Ave., N.W. Suite 730
                                            Washington, D.C. 20036
                                            Telephone: 202/822-6762
                                            Fax:  202/828-8528

                                            LERACH COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            NANCY M. JUDA
                                            (Bar No. 445487)
                                            1100 Connecticut Ave., N.W. Suite 730
                                            Washington, D.C. 20036
                                            Telephone: 202/822-6762
                                            Fax:  202/828-8528

                                            LERACH COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            STEVEN W. PEPICH
                                            DANIEL S. DROSMAN
                                            SCOTT H. SAHAM
                                            TED MINAHAN
                                            GAVIN M. BOWIE
                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DENNIS J. HERMAN
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
Sandra Stein
1845 Walnut Street, 25th Floor
Philadelphia, PA  19103
Telephone:  215/988-9546
Fax:  215/988-9885

CHITWOOD HARLEY HARNES LLP
MARTIN D. CHITWOOD
Georgia Bar No. 124950
STUART J. GUBER
Georgia State Bar No. 141879
JAMES M. EVANGELISTA
Georgia State Bar No. 707807
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA  30309
Telephone:  404/873-3900
404/876-4476 (fax)

Co-Lead Counsel for Plaintiffs

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
Michael J. VanOverbeke
Thomas C. Michuad
Michael E. Moco
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
Fax:  313/578-1201

Additional Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2007, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.


                                        s/ ROGER ADELMAN
                                        ROGER ADELMAN
                                        (Bar No. 056358)

                                        LAW OFFICES OF ROGER ADELMAN
                                        1100 Connecticut Ave., N.W. Suite 730
                                        Washington, D.C. 20036
                                        Telephone: 202/822-6762
                                        Fax:  202/828-8528
                                        E-mail:  Adelmarm@erols.com

# Mailing Information for a Case 1:06-mc-00508-JDB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  Adelmarm@erols.com

- **Steven F. Benz**
  sbenz@khhte.com

- **Nancy M. Juda**
  nancyj@lerachlaw.com

- **Geoffrey M. Klineberg**
  gklineberg@khhte.com

- **James M. Webster**
  jwebster@khhte.com dengstrom@khhte.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**James A. Caputo**
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
655 W. Broadway
Suite 1900
San Diego, CA 92101

**Scott H. Saham**
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
655 W. Broadway
Suite 1900
San Diego, CA 92101

# EXHIBIT A

EXHIBIT
67

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8569 / April 18, 2005

SECURITIES EXCHANGE ACT OF 1934
Release No. 51565 / April 18, 2005

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 2232 / April 18, 2005

ADMINISTRATIVE PROCEEDING
File No. 3-11902

| | |
|---|---|
| In the Matter of<br><br>The Coca-Cola Company,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") as to The Coca-Cola Company ("Coca-Cola" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds that:[1]

### RESPONDENT

1.      Coca-Cola is a Delaware corporation headquartered in Atlanta, Georgia. Coca-Cola's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the symbol KO. Coca-Cola is the largest manufacturer, distributor and marketer of nonalcoholic beverage concentrates and syrups in the world. Coca-Cola's reported net operating revenues for the past ten years have ranged between $16 billion and $22 billion.

2.      Coca-Cola offered and sold securities in registered offerings during 1997, 1999 and 2000. Specifically, Coca-Cola conducted securities offerings pursuant to employee benefit plans and S-8 Registration Statements filed with the Commission in May 1997, May 1999 and April 2000, which incorporated by reference certain Forms 10-K, 10-Q and 8-K filed by Coca-Cola during this period.

### RELEVANT ENTITY

3.      The Coca-Cola (Japan) Company, Ltd. ("CCJC") is a Japanese corporation and wholly-owned subsidiary of Coca-Cola. CCJC is engaged in the marketing, manufacture and distribution of Coca-Cola beverage concentrate in Japan. Historically, CCJC is one of Coca-Cola's two or three greatest sources of net operating revenue and, on a per gallon of concentrate sold basis, CCJC is the most profitable operating division of Coca-Cola throughout the world.

### COCA-COLA HAD AN ESTABLISHED HISTORY
### OF MEETING OR EXCEEDING EARNINGS EXPECTATIONS

4.      From 1990 through 1996, Coca-Cola consistently met or exceeded earnings expectations while achieving a compound annual earnings per share growth rate of 18.3 percent – more than twice the average growth rate of the S&P 500. Coca-Cola's superior earnings performance resulted in its common stock trading at a price to earnings multiple ("P/E Ratio") of 38.1 by the end of 1996, as compared to the S&P 500's P/E Ratio of 20.8.

5.      In the mid-1990s, Coca-Cola began experiencing increased competition and more difficult economic environments. Nevertheless, Coca-Cola publicly maintained between 1996 and 1999 that it expected its earnings per share to continue to grow between 15 percent and 20 percent annually.

---

[1] The findings herein are made pursuant to Coca-Cola's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

## COCA-COLA "GALLON PUSHED" IN JAPAN TO MEET
## BUSINESS PLAN TARGETS AND EARNINGS EXPECTATIONS

6.    At or near the end of each reporting period between 1997 and 1999, Coca-Cola, through its officers and employees implemented a "channel stuffing" practice in Japan known as "gallon pushing." In connection with this practice, CCJC asked bottlers in Japan to make additional purchases of concentrate for the purpose of generating revenue to meet both annual business plan and earnings targets. The income generated by gallon pushing in Japan was the difference between Coca-Cola meeting or missing analysts' consensus or modified consensus earnings estimates for 8 out of 12 quarters from 1997 through 1999.

7.    To accomplish gallon pushing's purpose, at or near the end of reporting periods CCJC offered extended credit terms to bottlers, as described below, to induce them to purchase quantities of concentrate the bottlers otherwise would not have purchased until a following period. The quantities of concentrate CCJC sold to its bottlers in connection with a gallon push were in excess of the bottlers' forecasted demand; the bottlers nevertheless purchased the concentrate to preserve their relationships with Coca-Cola.

8.    Concentrate sales by CCJC to its bottlers typically track and correspond to anticipated and actual bottler sales of finished products to retailers. Increases in the inventory level of concentrate held by bottlers often anticipate increases in sales of finished products. As a result of gallon pushing, concentrate inventory levels at CCJC's bottlers increased more than 60 percent from the start of 1997 through the close of 1999. During this same time, bottler sales of finished products to retailers only increased approximately 11 percent.

9.    Coca-Cola estimated its bottlers' inventory levels, forecasted purchasing demand, and was aware that quarter-end gallon pushing likely could not continue at existing levels and likely would cause a corresponding reduction in sales in a future period. At no point between 1997 and 1999, however, did Coca-Cola publicly disclose to shareholders the existence of gallon pushing, the impact of gallon pushing on its current income, or the likely impact of gallon pushing on its future income.

## COCA-COLA GALLON PUSHED
## ITS MOST PROFITABLE PRODUCTS

10.    In connection with gallon pushes, bottlers primarily purchased only two products: Georgia Coffee, a canned flavored coffee beverage, and branded Coca-Cola ("Coke"). Georgia Coffee and Coke were typically two of the highest sales volume products for CCJC to its bottlers. Additionally, of Coca-Cola's major products, Georgia Coffee and Coke were two of the highest profit-margin per gallon products CCJC could include in a gallon push. From Coca-Cola and CCJC's perspective, therefore, in order to generate sales sufficient to meet the additional income targets, it was most efficient to push the bottlers to purchase additional gallons of Georgia Coffee and Coke.

11.    For CCJC's bottlers, however, sales of Georgia Coffee and Coke to retailers were actually _declining_ from 1997 through 1999. Hence, Coca-Cola, through CCJC, was inducing its bottlers to purchase quantities of concentrate that were in excess of forecasted sales demand for the current quarter.

12.    Gallon pushing for the purpose of meeting earnings expectations occurred at no Coca-Cola operating division other than CCJC. As CCJC was Coca-Cola's single most profitable division throughout the world on a per gallon of concentrate sold basis, it was by far the most efficient location from which to push additional inventory for the purpose of managing earnings.

## CCJC IMPLEMENTED GALLON PUSHING THROUGH THE USE OF EXTENDED CREDIT TERMS

13.    To encourage bottlers to purchase additional concentrate, CCJC extended more favorable credit terms than usual to bottlers, typically increasing payment terms from eight to twenty-eight or thirty days. No rights of return on gallons sold pursuant to gallon pushing were offered to bottlers, and no concentrate sold pursuant to gallon pushing was returned to CCJC or Coca-Cola. All concentrate sold pursuant to gallon pushing was paid for by the bottlers.

14.    CCJC's extension of credit terms required the express approval of certain of Coca-Cola's officers and employees in Atlanta. In order to obtain approval for credit extensions, CCJC's finance department was required to submit formal Requests for Authorization which identified both the approximate amount of gallons of concentrate to be sold with the extended credit terms and the approximate amount of revenue to be generated by the additional sales.

15.    After receiving approved Requests for Authorization back from Atlanta, CCJC's finance department then contacted its bottlers' finance departments, offering the more favorable credit terms and requesting that the bottlers purchase specific quantities of concentrate above the amounts that the bottlers already had planned to purchase to meet forecasted demand for the period. In contrast to sales made in connection with a gallon push, routine concentrate sales involved CCJC's sales and marketing departments corresponding with the bottlers' purchasing departments.

## COCA-COLA'S RECURRING USE OF GALLON PUSHING TO MEET ITS BUSINESS PLAN TARGETS AND EARNINGS ESTIMATES

16.    Gallon pushing shifted concentrate purchases that bottlers would have made in a future period into the then current period. As a result, the previous period's gallon push caused bottlers to start the next quarter with more inventory than they anticipated needing to meet forecasted demand and caused CCJC to start the future period with a sales "deficit." In order to avoid selling less concentrate in the future period as a result of the previous period's gallon push, and having to lower income targets, Coca-Cola instead

would engage in another gallon push, again shifting future sales and income to the present period.

17.     CCJC's gallon pushing practice was incorporated into its annual business plans – not simply for the purpose of increasing sales and meeting Coca-Cola's *future* earnings targets, but also to prevent a decrease in concentrate sales and corresponding decrease in earnings in the *present* period. Gallon pushing therefore became a recurrent component of CCJC's annual business plan as Coca-Cola refused to allow CCJC to suffer the sales and income declines resulting from a prior gallon push.

18.     The chart below shows the estimated volume of gallons pushed and revenue generated thereby for each quarter from 1997 through 1999. In order to meet annual business plan targets and consolidated earnings estimates CCJC continually had to push more and more gallons of concentrate on the bottlers. At the end of the fourth quarter of 1999, nearly one out of every two gallons of concentrate held in inventory by CCJC's bottlers had been sold in connection with a gallon push.

| Reporting Period | Bottlers ending inventory (in gallons) | Gallons pushed | Revenue Generated from Gallon Push |
|---|---|---|---|
| Q1 1997 | 15,571,000 | 3,317,000 | $46,201,000 |
| Q2 1997 | 18,408,000 | 4,380,000 | $64,850,000 |
| Q3 1997 | 17,569,000 | 3,012,000 | $62,949,000 |
| Q4 1997 | 20,016,000 | 8,090,000 | $131,541,000 |
| Q1 1998 | 15,180,000 | 1,000,000 | $17,061,000 |
| Q2 1998 | 20,363,000 | 7,117,000 | $98,253,000 |
| Q3 1998 | 17,526,000 | 5,171,000 | $79,807,000 |
| Q4 1998 | 21,800,000 | 9,659,000 | $181,331,000 |
| Q1 1999 | 17,053,000 | 4,180,000 | $67,644,000 |
| Q2 1999 | 23,544,000 | 8,181,000 | $126,131,000 |
| Q3 1999 | 18,833,000 | 7,105,000 | $128,519,000 |
| Q4 1999 | 22,017,000 | 10,116,000 | $208,900,000 |

### GALLON PUSHING INCREASED BOTTLER INVENTORY LEVELS BEYOND WHAT WAS NECESSARY TO MEET FORECASTED DEMAND FOR THE PERIOD

19.     For year end 1996 through year end 1999, bottler sales of finished products to retailers in Japan increased approximately 11 percent in the aggregate amount. As sales of finished products by bottlers drive the sale of concentrate by CCJC, inventory levels at CCJC's bottlers should have increased approximately by a corresponding amount during this same time period. Gallon pushing, however, caused bottler inventory levels to increase 62 percent during this time period – a rate approximately six times greater than the increase in bottler sales to retailers. Hence, gallon pushing resulted in Japanese bottlers carrying significantly higher levels of inventory than was necessary to meet forecasted demand in the current quarter.

20.    The concentrate inventory versus sales of finished products disparity was even greater with respect to Georgia Coffee and Coke. Given that sales by bottlers to retailers of Georgia Coffee and Coke were in fact declining between 1997 and 1999, inventory levels of Georgia Coffee and Coke should have declined as well. Yet, it was gallon pushed sales of Georgia Coffee and Coke concentrate alone that were causing the bottlers' overall inventory levels to rise six times faster than their overall sales of finished products to retailers.

## COCA-COLA'S GALLON PUSHING PUT FUTURE INCOME AT RISK

21.    CCJC forecasted and tracked its actual results against its annual business plan throughout the year in monthly "rolling estimates." In addition to containing balance sheet and income statement information, CCJC's rolling estimates included concentrate sales to bottlers, bottlers' sales to retailers, and estimated bottlers' inventory levels.

22.    CCJC's rolling estimates also included summary sections explaining any substantial variances within the rolling estimate as compared to the preexisting annual business plan. These variance summaries typically indicated that in the first and second month of reporting periods between 1997 and 1999, gallon sales of concentrate and the corresponding income generated by these concentrate sales were lower than expected as a result of gallon pushing in the prior period. The rolling estimates further illustrated that gallon pushing during the third and final month of a reporting period was necessary for CCJC to return to the sales and income targets contained within its annual business plan.

23.    The monthly rolling estimate analyses submitted by CCJC illustrate that gallon pushing during one reporting period negatively impacted the concentrate sales and income that would be generated in the following reporting period.

24.    CCJC also generated internal bottler inventory reports and bottler sales reports, typically broken down into "major brand" categories. The bottler inventory reports indicated that bottlers were carrying inventory levels of Georgia Coffee and Coke that, even considering their higher sales volume as compared to other products, were in excess of all other products. The bottler sales reports further indicated that although Georgia Coffee and Coke were two of the highest volume products for bottlers, overall bottler sales of Georgia Coffee and Coke were in fact decreasing compared to prior periods.

25.    Moreover, since gallon pushing was designed to address earnings shortfalls rather than actual forecasted demand for the current quarter, gallon pushing increased bottler inventories of Georgia Coffee and Coke beyond what bottlers required to satisfy demand for the period.

26.    During 1999, bottler inventory levels had increased to the point that gallon pushing could no longer be implemented at desired levels. In May 1999, a request from Coca-Cola was made to CCJC for a specific amount of income to be generated to assist Coca-Cola in eliminating a consolidated earnings shortfall for the second quarter. CCJC declined the request because CCJC had already incorporated and planned a gallon push as part of

meeting its annual business plan and thought that it was impractical for bottlers to purchase even more concentrate to address Coca-Cola's anticipated earnings shortfall.

27.     During the fourth quarter of 1999, CCJC conducted its largest gallon push – generating revenue in excess of $208 million. This fourth quarter 1999 gallon push contributed roughly $0.02 to Coca-Cola's consolidated earnings and, absent one time items, enabled Coca-Cola to meet its modified earnings expectations. While in the process of implementing this gallon push, employees of CCJC's finance department contacted officers and employees of Coca-Cola and informed them that gallon pushing had reached its maximum limit and was not sustainable at existing levels. Coca-Cola's future inability to gallon push at existing levels necessitated that gallon pushing either significantly decrease in scope or cease entirely -- either of which would result in a substantial decrease in revenue and income flowing to Coca-Cola from CCJC.

28.     At no time between 1997 and 1999 did Coca-Cola disclose any information from which investors could determine the existence of gallon pushing, the impact of such gallon pushing on current income, or the likely impact of gallon pushing on future income.

## COCA-COLA ISSUED A FORM 8-K
## CONTAINING FALSE AND MISLEADING STATEMENTS

29.     On January 26, 2000, Coca-Cola filed a Form 8-K with the Commission which disclosed, among other things, a worldwide concentrate inventory reduction planned to occur during the first half of the year 2000. The inventory reduction was to be accomplished by Coca-Cola's operating divisions, specifically including CCJC, ceasing to sell concentrate to bottlers until bottlers naturally reduced their inventory to purported "optimum" levels. The impact on Coca-Cola's earnings for the first and second quarter of 2000 was estimated to be between $0.11 and $0.13 per share.

30.     In describing the inventory reduction, Coca-Cola stated that: (a) "[t]hroughout the past several months, [Coca-Cola had] worked with bottlers around the world to determine the optimum level of bottler inventory;" (b) the management of Coca-Cola and its bottlers, specifically including bottlers in Japan, had jointly determined "that opportunities exist to reduce concentrate inventory carried by bottlers;" and (c) certain bottlers throughout the world, specifically including those in Japan, had "indicated that they intend to reduce their inventory levels during the first half of the year 2000."

31.     These statements are false and misleading as a review of inventory levels in the context of determining an optimum level for bottlers had not occurred throughout the past several months. Such a review did not take place until, at the earliest, January 2000 – immediately after the fourth quarter 1999 gallon push had occurred and CCJC finance employees had informed Coca-Cola that gallon pushing could not continue at existing levels. Moreover, Coca-Cola did not identify a single bottler that, prior to the Form 8-K being filed, was aware of any planned inventory reduction.

32.     The Form 8-K further is misleading in that, despite its language describing the inventory reduction as a joint proactive efficiency measure between Coca-Cola and its bottlers, the inventory reduction was in fact solely a Coca-Cola initiative. In addition, the Form 8-K did not disclose that of the estimated $0.11 to $0.13 impact to earnings for the Company as a whole, more than $0.05 would be attributable to an anticipated reduction of sales for Japan. CCJC's portion of the estimated gross profit impact was more than five times greater than that of any other operating division in the world.

## COCA-COLA'S VIOLATIONS OF SECTIONS 17(A)(2) AND 17(A)(3) OF THE SECURITIES ACT

33.     Sections 17(a)(2) and 17(a)(3) of the Securities Act prohibit making untrue statements of fact and misleading omissions of facts in the offer or sale of a security. Section 17(a)(2) specifically proscribes obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Section 17(a)(3) specifically proscribes engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." To constitute a violation of Sections 17(a)(2) and 17(a)(3), the alleged untrue statements or omitted facts must be material. Information is deemed material upon a showing of a substantial likelihood that the misrepresented or omitted facts would have assumed significance in the investment deliberations of a reasonable investor. Basic, Inc. v. Levinson, 485 U.S. 224 (1988). Establishing violations of Sections 17(a)(2) and 17(a)(3) does not require a showing of scienter; negligence is sufficient. Aaron v. SEC, 446 U.S. 680 (1980); SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997).

34.     As set forth above, Coca-Cola's Forms 10-K and 10-Q for the reporting periods between 1997 and 1999, certain of which were incorporated by reference in Coca-Cola's S-8 Registration Statements filed with the Commission, were misleading in that they failed to disclose within Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), or anywhere else within such filings, the existence of gallon pushing, the impact on Coca-Cola's current income of gallon pushing, and the likely impact of gallon pushing on its future income. In addition to the substantial likelihood that in making a decision regarding an investment in Coca-Cola, a reasonable investor, or potential investor, would have wanted to know of the existence and purpose of gallon pushing as an end of period sales practice, gallon pushing was further material in that in 8 out of 12 reporting periods from 1997 to 1999 and 6 out of 8 reporting periods from 1998 to 1999, it provided the income necessary for Coca-Cola to meet its modified earnings expectations.

35.     The investing public and analysts following Coca-Cola could not discern this information from the public disclosures made by the Company. Based on the conduct described above, Coca-Cola violated Sections 17(a)(2) and 17(a)(3) of the Securities Act with respect to its Forms 10-K and 10-Q filed with the Commission between 1997 and 1999 and incorporated by reference into its S-8 Registration Statements filed with the Commission between 1997 and 2000.

36.    As set forth above, Coca-Cola's January 26, 2000, Form 8-K filed with the Commission contained false statements concerning the existence of a several month long optimum inventory study conducted as a joint effort between Coca-Cola and its bottlers. Additionally, the Form 8-K was misleading by omission as it failed to disclose the impact of past gallon pushing practices in Japan in the context of the planned inventory reduction. There is a substantial likelihood that the false statements surrounding the inventory reduction and misleading omissions regarding gallon pushing within the Form 8-K would have assumed significance in the investment deliberations of a reasonable investor. Based on the conduct described above, Coca-Cola violated Sections 17(a)(2) and 17(a)(3) of the Securities Act with respect to its January 26, 2000 Form 8-K filed with the Commission and incorporated by reference into its S-8 Registration Statements filed between 1997 and 2000.

## COCA-COLA'S REPORTING VIOLATIONS: SECTION 13(a) OF THE EXCHANGE ACT AND RULES 12b-20, 13a-1, 13a-11, AND 13a-13 THEREUNDER

37.    Section 13(a) of the Exchange Act requires issuers such as Coca-Cola to file periodic reports with the Commission containing such information as the Commission prescribes by rule. Exchange Act Rules 13a-1, 13a-11, and 13a-13 require, respectively, issuers to file Forms 10-K, 8-K, and 10-Q. Under Exchange Act Rule 12b-20, the reports must contain, in addition to disclosures expressly required by statute and rules, such other information as is necessary to ensure that the statements made are not, under the circumstances, materially misleading. The obligation to file reports includes the requirement that the reports be true and correct. United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991). The reporting provisions are violated if false and misleading reports are filed. SEC v. Falstaff Brewing Corp., 629 F.2d 62, 67 (D.C. Cir. 1980). Scienter is not an element of a Section 13(a) violation. SEC v. Savoy Indus., Inc., 587 F.2d 1149,1167 (D.C. Cir. 1978).

38.    As set forth above, Coca-Cola's Forms 10-K and 10-Q for the reporting periods between 1997 and 1999 were materially misleading because they failed to disclose the existence of gallon pushing, the impact of gallon pushing on current earnings, and the likely impact of gallon pushing on future earnings.

39.    Additionally, Regulation S-K Item 303 requires registrants to disclose in the MD&A sections of required periodic filings "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material ... unfavorable impact on net sales or revenues or income from continuing operations." The failure to comply with Regulation S-K constitutes a violation under Section 13(a) of the Exchange Act.

40.    Contrary to the requirements of Regulation S-K, Coca-Cola failed to disclose the material impact of gallon pushing on current and future income within its required MD&A sections.

41.    As set forth above, Coca-Cola's Form 8-K filed with the Commission on January 26, 2000 was materially false and misleading.

42.    Based on the conduct described above, Coca-Cola violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

### REMEDIAL EFFORTS

43.    In determining to accept the Offer, the Commission considered the following remedial efforts that the Respondent initiated prior to and during the Commission staff's investigation:

> a.    Coca-Cola has established an Ethics & Compliance Office to administer its Code of Business Conduct and ensure, among other things, that the Respondent conducts its business in compliance with the Code of Business Conduct and with various laws;

> b.    Coca-Cola has established a Disclosure Committee to assist its Chief Executive Officer and Chief Financial Officer in fulfilling their responsibility for oversight of the accuracy and timeliness of the disclosures made by Coca-Cola;

> c.    Coca-Cola now requires that its divisions certify quarterly that they have not changed or extended payment terms for any bottler or customer and have not granted any special or unusual credit terms or incentives to any bottler or customer, unless they received approval for such terms; and

> d.    Coca-Cola's Audit Committee employs independent counsel experienced in securities laws disclosure issues and will continue to employ such experienced legal counsel chosen by the Audit Committee. Such counsel shall advise the Audit Committee as to implementation of the undertakings in this Order.

### UNDERTAKINGS

44.    Respondent has undertaken to:

> a.    Permanently maintain the aforementioned remedial efforts or the functional equivalents thereof, except as may be approved by the Commission;

> b.    Require the Audit Committee, within 90 days of the date of this Order, to review with management of Respondent the process by which the MD&A sections of periodic reports filed by Respondent with the Commission are prepared and material information about the business and prospects, including but not limited to, trend information and known events and uncertainties that may have a material impact on liquidity or future financial performance, is identified for discussion in the MD&A sections of such reports, and to approve a set of criteria to be used by the Disclosure Committee and management to reasonably assure that appropriate

items are identified and discussed. The Audit Committee will meet periodically, at least annually, with the Chair of the Disclosure Committee to review such criteria, and will review and discuss with the Chief Financial Officer the proposed MD&A section of each periodic report to be filed with the Commission;

c.    Require the Disclosure Committee to: (i) use the aforementioned criteria to identify items that might need to be disclosed within the MD&A section of Respondent's periodic reports filed with the Commission; and (ii) use the aforementioned criteria to evaluate those items and recommend whether, and to what extent, disclosure is appropriate with respect to each item. The Chair of the Disclosure Committee will also report to the Audit Committee, on a quarterly basis, any recommended departures from the aforementioned criteria and the rationale supporting each such recommendation;

d.    Adhere to the guidance articulated in SEC Staff Accounting Bulletin No. 101 on disclosures that are required with respect to the recognition of revenue;

e.    Maintain for ten (10) years documentation sufficient to show for every of its Forms 8-K filed with the Commission, the preparers of each Form 8-K and those persons who reviewed and approved each Form 8-K; and

f.    Provide a written report, within 120 days of the date of this Order, to the Commission staff that details the Respondent's implementation of the undertakings articulated herein.

45.    In determining whether to accept the Offer, the Commission has considered the remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff.

IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions specified in Respondent Coca-Cola's Offer.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Coca-Cola cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

By the Commission.

                                        Jonathan G. Katz
                                        Secretary

-11-

# EXHIBIT B

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549


FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):
April 18, 2005


THE COCA-COLA COMPANY
(Exact name of registrant as specified in its charter)


| Delaware | 001-02217 | 58-0628465 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |


One Coca-Cola Plaza                                    30313
Atlanta, Georgia                                  (Zip Code)
(Address of principal executive offices)


Registrant's telephone number, including area code: (404) 676-2121


Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

/ / Written communications pursuant to Rule 425 under the Securities Act
    (17 CFR 230.425)

/ / Soliciting material pursuant to Rule 14a-12 under the Exchange Act
    (17 CFR 240.14a-12)

/ / Pre-commencement communications pursuant to Rule 14d-2(b) under the
    Exchange Act (17 CFR 240.14d-2(b))

/ / Pre-commencement communications pursuant to Rule 13e-4(c) under the
    Exchange Act (17 CFR 240.13e-4(c))

Item 1.01     Entry into a Definitive Material Agreement.

On April 18, 2005, The Coca-Cola Company (the "Company") issued a press release announcing that it had reached settlement with the Securities and Exchange Commission ("SEC") in connection with the investigation initiated by the SEC in 2003.  The Company also confirmed that, in view of the SEC settlement, the Department of Justice had decided to close the investigation it initiated in 2003. A copy of the press release is attached hereto as Exhibit 99.1.

In connection with the settlement, the Company consented to the entry of an Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 (the "Order"), a copy of which is attached hereto as Exhibit 99.2. The Company had previously submitted to the SEC an Offer of Settlement of The Coca-Cola Company (the "Offer"), a copy of which is attached hereto as Exhibit 99.3.

The Order provides that the SEC, in determining to accept the Offer, considered certain remedial efforts that the Company initiated prior to and during the SEC staff's investigation. These remedial efforts are as follows:

    a.   the Company has established an Ethics & Compliance Office to administer its Code of Business Conduct and ensure, among other things, that the Company conducts its business in compliance with the Code of Business Conduct and with various laws;

    b.   the Company has established a Disclosure Committee to assist its Chief Executive Officer and Chief Financial Officer in fulfilling their responsibility for oversight of the accuracy and timeliness of the disclosures made by the Company;

    c.   the Company now requires that divisions certify quarterly that they have not changed or extended payment terms for any bottler or customer and have not granted any special or unusual credit terms or incentives to any bottler or customer, unless they received approval for such terms; and

    d.   the Company's Audit Committee employs independent counsel experienced in securities laws disclosure issues and will continue to employ such experienced legal counsel chosen by the Audit Committee. Such counsel shall advise the Audit Committee as to the implementation of the undertakings in the Order.

In addition, pursuant to the Order, the Company undertook to:

    a.   Permanently maintain the aforementioned remedial efforts or the functional equivalents thereof, except as may be approved by the SEC;

    b.   Require the Audit Committee, within 90 days of the date of the Order, to review with management of the Company the process by which the MD&A sections of periodic reports filed by the Company with the SEC are prepared and material information about the business and prospects, including but not limited to, trend information and known events and uncertainties that may have a material impact on liquidity or future financial performance, is identified for discussion in the MD&A sections of such reports, and to approve a set of criteria to be used by the Disclosure Committee and management to reasonably assure that appropriate items are identified and discussed. The Audit Committee will meet periodically, at least annually, with the Chair of the Disclosure Committee to review such criteria, and will review and discuss with the Chief Financial Officer the proposed MD&A section of each periodic report to be filed with the SEC;

    c.   Require the Disclosure Committee to: (i) use the aforementioned criteria to identify items that might need to be disclosed within the MD&A section of the Company's periodic reports filed with the SEC; and (ii) use the aforementioned criteria to evaluate those items and recommend whether, and to what extent, disclosure is appropriate with respect to each item. The Chair of the Disclosure Committee will also report to the Audit Committee, on a quarterly basis, any recommended departures from the aforementioned criteria and the rationale supporting each such recommendation;

    d.   Adhere to the guidance articulated in the SEC Staff Accounting Bulletin No. 101 on disclosures that are required with respect to the recognition of revenue;

    e.   Maintain for ten (10) years documentation sufficient to show for every of its Forms 8-K filed with the SEC, the preparers of each Form 8-K and those persons who reviewed and approved each Form 8-K; and

    f.   Provide a written report, within 120 days of the date of the Order, to the SEC staff that details the Company's implementation of the undertakings articulated in the Order.

Item 9.01(c).    Exhibits

    Exhibit 99.1    Press Release of The Coca-Cola Company issued on April 18, 2005

    Exhibit 99.2    Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934

    Exhibit 99.3    Offer of Settlement of The Coca-Cola Company

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

THE COCA-COLA COMPANY
(REGISTRANT)


Date: April 18, 2005          By:     /s/ Connie D. McDaniel
                                      --------------------------------
                                      Connie D. McDaniel
                                      Vice President and Controller

Exhibit Index

Exhibit No.

| | |
|---|---|
| Exhibit 99.1 | Press Release of The Coca-Cola Company issued on April 18, 2005 |
| Exhibit | 99.2 Order Instituting Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934 |
| Exhibit 99.3 | Offer of Settlement of The Coca-Cola Company |

EXHIBIT 99.1

THE COCA-COLA COMPANY
news
release

FOR IMMEDIATE RELEASE                    Contact: Ben Deutsch
                                                  (404) 676-2683

THE COCA-COLA COMPANY COMMENTS ON SEC SETTLEMENT

ATLANTA, April 18, 2005 -- Neville Isdell, chairman and chief executive officer of The Coca-Cola Company, today issued the following statement:

"We are pleased that today's settlement with the Securities and Exchange Commission, and the decision by the Department of Justice to close its investigation, mark an end to the U.S. government inquiries initiated in 2003."

Attached is a communication from Mr. Isdell that was distributed to the Company's employees today:

============================
EXECUTIVE OFFICE MEMORANDUM
============================

From:    EOM on 04/18/2005 11:09 AM

To:      All Employees Worldwide

Subject: Conclusion of SEC and DOJ Investigations

Atlanta, Georgia        No. 05-28              April 18, 2005

TO:              ALL EMPLOYEES WORLDWIDE

Earlier today, the U.S. Securities and Exchange Commission (SEC) announced a settlement with our Company that brings to an end the investigation initiated in 2003 into allegations raised by a former employee. Under the settlement, we have agreed to maintain certain measures that the Company implemented prior to or during the last two years and to undertake additional remedial actions in the areas of corporate compliance and disclosure. The settlement does not include a monetary fine or penalty. In addition, the Company was also informed that the Department of Justice has decided to close its investigation.

The settlement agreement provides that we neither admit nor deny the factual findings made by the SEC. Accordingly, out of respect for our agreement, we will not comment on specific allegations. I can say, however, that we are pleased that

                            - more -

Page 2 of 2

this settlement, and the decision by the Department of Justice to close its
investigation, mark an end to the U.S. government inquiries initiated in 2003.
Further, I am gratified that the SEC has acknowledged the fact that the Company
cooperated with its investigation, which was the primary directive provided by
management and the Board throughout this process.

We continue to expect all of our operations around the world to adhere to the
highest ethical standards. The measures identified in this settlement and those
we have taken over the past few years are an important step forward in ensuring
our systems continually improve. That is an obligation we all share that
requires constant vigilance.

                         NEVILLE ISDELL


This message is intended for employees of The Coca-Cola Company.

To see recent EOMs, visit @KO at Announcements.



                              # # #


                                                        EXHIBIT 99.2

                    UNITED STATES OF AMERICA
                           Before the
                 SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8569 / April 18, 2005

SECURITIES EXCHANGE ACT OF 1934
Release No. 51565 / April 18, 2005

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 2232 / April 18, 2005

ADMINISTRATIVE PROCEEDING
File No. 3-11902

--------------------------------

In the Matter of                        ORDER INSTITUTING CEASE-
                                        AND-DESIST PROCEEDINGS,
    The Coca-Cola Company,              MAKING FINDINGS AND
                                        IMPOSING A CEASE-AND-
Respondent.                             DESIST ORDER PURSUANT TO
                                        SECTION 8A OF THE
                                        SECURITIES ACT OF 1933 AND
                                        SECTION 21C OF THE
                                        SECURITIES EXCHANGE ACT
                                        OF 1934

--------------------------------
                              I.

     The Securities and Exchange Commission ("Commission") deems it
appropriate that cease-and-desist proceedings be, and hereby are, instituted
pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and
Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") as to The
Coca-Cola Company ("Coca-Cola" or "Respondent").

                              II.

     In anticipation of the institution of these proceedings, Respondent has
submitted an Offer of Settlement (the "Offer") which the Commission has
determined to accept. Solely for the purpose of these proceedings and any other
proceedings brought by or on behalf of the Commission, or to which the
Commission is a party, and without admitting or denying the findings herein,
except as to the Commission's jurisdiction over it and the subject matter of
these proceedings, Respondent consents to the entry of this Order Instituting
Cease-and-Desist Proceedings, Making Findings and Imposing a Cease-and-Desist
Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of
the Securities Exchange Act of 1934 ("Order"), as set forth below.

III.

On the basis of this Order and Respondent's Offer, the Commission finds that:{1}

### RESPONDENT

1. Coca-Cola is a Delaware corporation headquartered in Atlanta, Georgia. Coca-Cola's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the symbol KO. Coca-Cola is the largest manufacturer, distributor and marketer of nonalcoholic beverage concentrates and syrups in the world. Coca-Cola's reported net operating revenues for the past ten years have ranged between $16 billion and $22 billion.

2. Coca-Cola offered and sold securities in registered offerings during 1997, 1999 and 2000. Specifically, Coca-Cola conducted securities offering pursuant to employee benefit plans and S-8 Registration Statements filed with the Commission in May 1997, May 1999 and April 2000, which incorporated by reference certain Forms 10-K, 10-Q and 8-K filed by Coca-Cola during this period.

### RELEVANT ENTITY

3. The Coca-Cola (Japan) Company, Ltd. ("CCJC") is a Japanese corporation and wholly-owned subsidiary of Coca-Cola. CCJC is engaged in marketing, manufacture and distribution of Coca-Cola beverage concentrate in Japan. Historically, CCJC is one of Coca-Cola's two or three greatest sources of net operating revenue and, on a per gallon of concentrate sold basis, CCJC is the most profitable operating division of Coca-Cola throughout the world.

### COCA-COLA HAD AN ESTABLISHED HISTORY
### OF MEETING OR EXCEEDING EARNINGS EXPECTATIONS

4. From 1990 through 1996, Coca-Cola consistently met or exceeded earnings expectations while achieving a compound annual earnings per share growth rate of 18.3 percent -- more than twice the average growth rate of the S&P 500. Coca-Cola's superior earnings performance resulted in its common stock trading at a price to earnings multiple ("P/E Ratio") of 38.1 by the end of 1996, as compared to the S&P 500's P/E Ratio of 20.8.

5. In the mid-1990s, Coca-Cola began experiencing increased competition and more difficult economic environments. Nevertheless, Coca-Cola publicly maintained between 1996 and 1999 that it expected its earnings per share to continue to grow between 15 percent and 20 percent annually.

--------
{1} The findings herein are made pursuant to Coca-Cola's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

COCA-COLA "GALLON PUSHED" IN JAPAN TO MEET
BUSINESS PLAN TARGETS AND EARNINGS EXPECTATIONS

6. At or near the end of each reporting period between 1997 and 1999, Coca-Cola, through its officers and employees implemented a "channel stuffing" practice in Japan known as "gallon pushing." In connection with this practice, CCJC asked bottlers in Japan to make additional purchases of concentrate for the purpose of generating revenue to meet both annual business plan and earnings targets. The income generated by gallon pushing in Japan was the difference between Coca-Cola meeting or missing analysts' consensus or modified consensus earnings estimates for 8 out of 12 quarters from 1997 through 1999.

7. To accomplish gallon pushing's purpose, at or near the end of reporting periods CCJC offered extended credit terms to bottlers, as described below, to induce them to purchase quantities of concentrate the bottlers otherwise would not have purchased until a following period. The quantities of concentrate CCJC sold to its bottlers in connection with a gallon push were in excess of the bottlers' forecasted demand; the bottlers nevertheless purchased the concentrate to preserve their relationships with Coca-Cola.

8. Concentrate sales by CCJC to its bottlers typically track and correspond to anticipated and actual bottler sales of finished products to retailers. Increases in the inventory level of concentrate held by bottlers often anticipate increases in sales of finished products. As a result of gallon pushing, however, concentrate inventory levels at CCJC's bottlers increased more than 60 percent from the start of 1997 through the close of 1999. During this same time, bottler sales of finished products to retailers only increased approximately 11 percent.

9. Coca-Cola estimated its bottlers' inventory levels, forecasted purchasing demand, and was aware that quarter-end gallon pushing likely could not continue at existing levels and likely would cause a corresponding reduction in sales in a future period. At no point between 1997 and 1999, however, did Coca-Cola publicly disclose to shareholders the existence of gallon pushing, the impact of gallon pushing on its current income, or the likely impact of gallon pushing on its future income.

COCA-COLA GALLON PUSHED
ITS MOST PROFITABLE PRODUCTS

10. In connection with gallon pushes, bottlers primarily purchased only two products: Georgia Coffee, a canned flavored coffee beverage, and branded Coca-Cola ("Coke"). Georgia Coffee and Coke were typically two of the highest sales volume products for CCJC to its bottlers. Additionally, of Coca-Cola's major products, Georgia Coffee and Coke were two of the highest profit-margin per gallon products CCJC could include in a gallon push. From Coca-Cola and CCJC's perspective, therefore, in order to generate sales sufficient to meet the additional income targets, it was most efficient to push the bottlers to purchase additional gallons of Georgia Coffee and Coke.

3

11. For CCJC's bottlers, however, sales of Georgia Coffee and Coke to retailers were actually declining from 1997 through 1999. Hence, Coca-Cola, through CCJC, was inducing its bottlers to purchase quantities of concentrate that were in excess of forecasted sales demand for the current quarter.

12. Gallon pushing for the purpose of meeting earnings expectations occurred at no Coca-Cola operating division other than CCJC. As CCJC was Coca-Cola's single most profitable division throughout the world on a per gallon of concentrate sold basis, it was by far the most efficient location from which to push additional inventory for the purpose of managing earnings.

CCJC IMPLEMENTED GALLON PUSHING
THROUGH THE USE OF EXTENDED CREDIT TERMS

13. To encourage bottlers to purchase additional concentrate, CCJC extended more favorable credit terms than usual to bottlers, typically increasing payment terms from eight to twenty-eight or thirty days. No rights of return on gallons sold pursuant to gallon pushing were offered to bottlers, and no concentrate sold pursuant to gallon pushing was returned to CCJC or Coca-Cola. All concentrate sold pursuant to gallon pushing was paid for by the bottlers.

14. CCJC's extension of credit terms required the express approval of certain of Coca-Cola's officers and employees in Atlanta. In order to obtain approval for credit extensions, CCJC's finance department was required to submit formal Requests for Authorization which identified both the approximate amount of gallons of concentrate to be sold with the extended credit terms and the approximate amount of revenue to be generated by the additional sales.

15. After receiving approved Requests for Authorization back from Atlanta, CCJC's finance department then contacted its bottlers' finance departments, offering the more favorable credit terms and requesting that the bottlers purchase specific quantities of concentrate above the amounts that the bottlers already had planned to purchase to meet forecasted demand for the period. In contrast to sales made in connection with a gallon push, routine concentrate sales involved CCJC's sales and marketing departments corresponding with the bottlers' purchasing departments.

COCA-COLA'S RECURRING USE OF GALLON PUSHING TO
MEET ITS BUSINESS PLAN TARGETS AND EARNINGS ESTIMATES

16. Gallon pushing shifted concentrate purchases that bottlers would have made in a future period into the then current period. As a result, the previous period's gallon push caused bottlers to start the next quarter with more inventory than they anticipated needing to meet forecasted demand and caused CCJC to start the future period with a sales "deficit." In order to avoid selling less concentrate in the future period as a result of the previous period's gallon push, and having to lower income targets, Coca-Cola instead

4

would engage in another gallon push, again shifting future sales and income to the present period.

17. CCJC's gallon pushing practice was incorporated into its annual business plans -- not simply for the purpose of increasing sales and meeting Coca-Cola's future earnings targets, but also to prevent a decrease in concentrate sales and corresponding decrease in earnings in the present period. Gallon pushing therefore became a recurrent component of CCJC's annual business plan as Coca-Cola refused to allow CCJC to suffer the sales and income declines resulting from a prior gallon push.

18. The chart below shows the estimated volume of gallons pushed and revenue generated thereby for each quarter from 1997 through 1999. In order to meet annual business plan targets and consolidated earnings estimates CCJC continually had to push more and more gallons of concentrate on the bottlers. At the end of the fourth quarter of 1999, nearly one out of every two gallons of concentrate held in inventory by CCJC's bottlers had been sold in connection with a gallon push.

| Reporting Period | Bottlers Ending Inventory (in gallons) | Gallons Pushed | Revenue Generated from Gallon Push |
|---|---|---|---|
| Q1 1997 | 15,571,000 | 3,317,000 | $46,201,000 |
| Q2 1997 | 18,408,000 | 4,380,000 | $64,850,000 |
| Q3 1997 | 17,569,000 | 3,012,000 | $62,949,000 |
| Q4 1997 | 20,016,000 | 8,090,000 | $131,541,000 |
| Q1 1998 | 15,180,000 | 1,000,000 | $17,061,000 |
| Q2 1998 | 20,363,000 | 7,117,000 | $98,253,000 |
| Q3 1998 | 17,526,000 | 5,171,000 | $79,807,000 |
| Q4 1998 | 21,800,000 | 9,659,000 | $181,331,000 |
| Q1 1999 | 17,053,000 | 4,180,000 | $67,644,000 |
| Q2 1999 | 23,544,000 | 8,181,000 | $126,131,000 |
| Q3 1999 | 18,833,000 | 7,105,000 | $128,519,000 |
| Q4 1999 | 22,017,000 | 10,116,000 | $208,900,000 |

GALLON PUSHING INCREASED BOTTLER INVENTORY
LEVELS BEYOND WHAT WAS NECESSARY TO MEET
FORECASTED DEMAND FOR THE PERIOD

19. For year end 1996 through year end 1999, bottler sales of finished products to retailers in Japan increased approximately 11 percent in the aggregate amount. As sales of finished products by bottlers drive the sale of concentrate by CCJC, inventory levels at CCJC's bottlers should have increased approximately by a corresponding amount during this same time period. Gallon pushing, however, caused bottler inventory levels to increase 62 percent during this time period -- a rate approximately six times greater than the increase in bottler sales to retailers. Hence, gallon pushing resulted in Japanese bottlers carrying significantly higher levels of inventory than was necessary to meet forecasted demand in the current quarter.

5

20. The concentrate inventory versus sales of finished products disparity was even greater with respect to Georgia Coffee and Coke. Given that sales by bottlers to retailers of Georgia Coffee and Coke were in fact declining between 1997 and 1999, inventory levels of Georgia Coffee and Coke should have declined as well. Yet, it was gallon pushed sales of Georgia Coffee and Coke concentrate alone that were causing the bottlers' overall inventory levels to rise six times faster than their overall sales of finished products to retailers.

## COCA-COLA'S GALLON PUSHING PUT FUTURE INCOME AT RISK

21. CCJC forecasted and tracked its actual results against its annual business plan throughout the year in monthly "rolling estimates." In addition to containing balance sheet and income statement information, CCJC's rolling estimates included concentrate sales to bottlers, bottlers' sales to retailers, and estimated bottlers' inventory levels.

22. CCJC's rolling estimates also included summary sections explaining any substantial variances within the rolling estimate as compared to the preexisting annual business plan. These variance summaries typically indicated that in the first and second month of reporting periods between 1997 and 1999, gallon sales of concentrate and the corresponding income generated by these concentrate sales were lower than expected as a result of gallon pushing in the prior period. The rolling estimates further illustrated that gallon pushing during the third and final month of a reporting period was necessary for CCJC to return to the sales and income targets contained within its annual business plan.

23. The monthly rolling estimate analyses submitted by CCJC illustrate that gallon pushing during one reporting period negatively impacted the concentrate sales and income that would be generated in the following reporting period.

24. CCJC also generated internal bottler inventory reports and bottler sales reports, typically broken down into "major brand" categories. The bottler inventory reports indicated that bottlers were carrying inventory levels of Georgia Coffee and Coke that, even considering their higher sales volume as compared to other products, were in excess of all other products. The bottler sales reports further indicated that although Georgia Coffee and Coke were two of the highest volume products for bottlers, overall bottler sales of Georgia Coffee and Coke were in fact decreasing compared to prior periods.

25. Moreover, since gallon pushing was designed to address earnings shortfalls rather than actual forecasted demand for the current quarter, gallon pushing increased bottler inventories of Georgia Coffee and Coke beyond what bottlers required to satisfy demand for the period.

26. During 1999, bottler inventory levels had increased to the point that gallon pushing could no longer be implemented at desired levels. In May 1999, a request from Coca-Cola was made to CCJC for a specific amount of income to be generated to assist Coca-Cola in eliminating a consolidated earnings shortfall for the second quarter. CCJC declined the request because CCJC had already incorporated and planned a gallon push as part of

6

meeting its annual business plan and thought that it was impractical for bottlers to purchase even more concentrate to address Coca-Cola's anticipated earnings shortfall.

27. During the fourth quarter of 1999, CCJC conducted its largest gallon push -- generating revenue in excess of $208 million. This fourth quarter 1999 gallon push contributed roughly $0.02 to Coca-Cola's consolidated earnings and, absent one time items, enabled Coca-Cola to meet its modified earnings expectations. While in the process of implementing this gallon push, employees of CCJC's finance department contacted officers and employees of Coca-Cola and informed them that gallon pushing had reached its maximum limit and was not sustainable at existing levels. Coca-Cola's future inability to gallon push at existing levels necessitated that gallon pushing either significantly decrease in scope or cease entirely -- either of which would result in a substantial decrease in revenue and income flowing to Coca-Cola from CCJC.

28. At no time between 1997 and 1999 did Coca-Cola disclose any information from which investors could determine the existence of gallon pushing, the impact of such gallon pushing on current income, or the likely impact of gallon pushing on future income.

COCA-COLA ISSUED A FORM 8-K
CONTAINING FALSE AND MISLEADING STATEMENTS

29. On January 26, 2000, Coca-Cola filed a Form 8-K with the Commission which disclosed, among other things, a worldwide concentrate inventory reduction planned to occur during the first half of the year 2000. The inventory reduction was to be accomplished by Coca-Cola's operating divisions, specifically including CCJC, ceasing to sell concentrate to bottlers until bottlers naturally reduced their inventory to purported "optimum" levels. The impact on Coca-Cola's earnings for the first and second quarter of 2000 was estimated to be between $0.11 and $0.13 per share.

30. In describing the inventory reduction, Coca-Cola stated that: (a) "{t}hroughout the past several months, {Coca-Cola had} worked with bottlers around the world to determine the optimum level of bottler inventory;" (b) the management of Coca-Cola and its bottlers, specifically including bottlers in Japan, had jointly determined "that opportunities exist to reduce concentrate inventory carried by bottlers;" and (c) certain bottlers throughout the world, specifically including those in Japan, had "indicated that they intend to reduce their inventory levels during the first half of the year 2000."

31. These statements are false and misleading as a review of inventory levels in the context of determining an optimum level for bottlers had not occurred throughout the past several months. Such a review did not take place until, at the earliest, January 2000 -- immediately after the fourth quarter 1999 gallon push had occurred and CCJC finance employees had informed Coca-Cola that gallon pushing could not continue at existing levels. Moreover, Coca-Cola did not identify a single bottler that, prior to the Form 8-K being filed, was aware of any planned inventory reduction.

7

32. The Form 8-K further is misleading in that, despite its language describing the inventory reduction as a joint proactive efficiency measure between Coca-Cola and its bottlers, the inventory reduction was in fact solely a Coca-Cola initiative. In addition, the Form 8-K did not disclose that of the estimated $0.11 to $0.13 impact to earnings for the Company as a whole, more than $0.05 would be attributable to an anticipated reduction of sales for Japan. CCJC's portion of the estimated gross profit impact was more than five times greater than that of any other operating division in the world.

## COCA-COLA'S VIOLATIONS OF SECTIONS
## 17(A)(2) AND 17(A)(3) OF THE SECURITIES ACT

33. Sections 17(a)(2) and 17(a)(3) of the Securities Act prohibit making untrue statements of fact and misleading omissions of facts in the offer or a sale of a security. Section 17(a)(2) specifically proscribes obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Section 17(a)(3) specifically proscribes engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." To constitute a violation of Sections 17(a)(2) and 17(a)(3), the alleged untrue statements or omitted facts must be material. Information is deemed material upon a showing of a substantial likelihood that the misrepresented or omitted facts would have assumed significance in the investment deliberations of a reasonable investor. Basic, Inc. v. Levinson, 485 U.S. 224 (1988). Establishing violations of Sections 17(a)(2) and 17(a)(3) does not require a showing of scienter; negligence is sufficient. Aaron v. SEC, 446 U.S. 680 (1980); SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997).

34. As set forth above, Coca-Cola's Forms 10-K and 10-Q for the reporting periods between 1997 and 1999, certain of which were incorporated by reference in Coca-Cola's S-8 Registration Statements filed with the Commission, were misleading in that they failed to disclose within Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), or anywhere else within such filings, the existence of gallon pushing, the impact on Coca-Cola's current income of gallon pushing, and the likely impact of gallon pushing on its future income. In addition to the substantial likelihood that in making a decision regarding an investment in Coca-Cola, a reasonable investor, or potential investor, would have wanted to know of the existence and purpose of gallon pushing as an end of period sales practice, gallon pushing was further material in that in 8 out of 12 reporting periods from 1997 to 1999 and 6 out of 8 reporting periods from 1998 to 1999, it provided the income necessary for Coca-Cola to meet its modified earnings expectations.

35. The investing public and analysts following Coca-Cola could not discern this information from the public disclosures made by the Company. Based on the conduct described above, Coca-Cola violated Sections 17(a)(2) and 17(a)(3) of the Securities Act with respect to its Forms 10-K and 10-Q filed with the Commission between 1997 and 1999 and incorporated by reference into its S-8 Registration Statements filed with the Commission between 1997 and 2000.

8

36. As set forth above, Coca-Cola's January 26, 2000, Form 8-K filed with the Commission contained false statements concerning the existence of a several month long optimum inventory study conducted as a joint effort between Coca-Cola and its bottlers. Additionally, the Form 8-K was misleading by omission as it failed to disclose the impact of past gallon pushing practices in Japan in the context of the planned inventory reduction. There is a substantial likelihood that the false statements surrounding the inventory reduction and misleading omissions regarding gallon pushing within the Form 8-K would have assumed significance in the investment deliberations of a reasonable investor. Based on the conduct described above, Coca-Cola violated Sections 17(a)(2) and 17(a)(3) of the Securities Act with respect to its January 26, 2000 Form 8-K filed with the Commission and incorporated by reference into its S-8 Registration Statements filed between 1997 and 2000.

COCA-COLA'S REPORTING VIOLATIONS: SECTION 13(a) OF THE
EXCHANGE ACT AND RULES 12b-20, 13a-1, 13a-11, AND 13a-13 THEREUNDER

37. Section 13(a) of the Exchange Act requires issuers such as Coca-Cola to file periodic reports with the Commission containing such information as the Commission prescribes by rule. Exchange Act Rules 13a-1, 13a-11, and 13a-13 require, respectively, issuers to file Forms 10-K, 8-K, and 10-Q. Under Exchange Act Rule 12b-20, the reports must contain, in addition to disclosures expressly required by statute and rules, such other information as is necessary to ensure that the statements made are not, under the circumstances, materially misleading. The obligation to file reports includes the requirement that the reports be true and correct. United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991). The reporting provisions are violated if false and misleading reports are filed. SEC v. Falstaff Brewing Corp., 629 F.2d 62, 67 (D.C. Cir. 1980). Scienter is not an element of a Section 13(a) violation. SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1167 (D.C. Cir. 1978).

38. As set forth above, Coca-Cola's Forms 10-K and 10-Q for the reporting periods between 1997 and 1999 were materially misleading because they failed to disclose the existence of gallon pushing, the impact of gallon pushing on current earnings, and the likely impact of gallon pushing on future earnings.

39. Additionally, Regulation S-K Item 303 requires registrants to disclose in the MD&A sections of required periodic filings "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from continuing operations." The failure to comply with Regulation S-K constitutes a violation under Section 13(a) of the Exchange Act.

40. Contrary to the requirements to Regulation S-K, Coca-Cola failed to disclose the material impact of gallon pushing on current and future income within its required MD&A sections.

9

41. As set forth above, Coca-Cola's Form 8-K filed with the Commission on January 26, 2000 was materially false and misleading.

42. Based on the conduct described above, Coca-Cola violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

## REMEDIAL EFFORTS

43. In determining to accept the Offer, the Commission considered the following remedial efforts that the Respondent initiated prior to and during the Commission staff's investigation:

> a. Coca-Cola has established an Ethics & Compliance Office to administer its Code of Business Conduct and ensure, among other things, that the Respondent conducts its business in compliance with the Code of Business Conduct and with various laws;

> b. Coca-Cola has established a Disclosure Committee to assist its Chief Executive Officer and Chief Financial Officer in fulfilling their responsibility for oversight of the accuracy and timeliness of the disclosures made by Coca-Cola;

> c. Coca-Cola now requires that its divisions certify quarterly that they have not changed or extended payment terms for any bottler or customer and have not granted any special or unusual credit terms or incentives to any bottler or customer, unless they received approval for such terms; and

> d. Coca-Cola's Audit Committee employs independent counsel experienced in securities laws disclosure issues and will continue to employ such experienced legal counsel chosen by the Audit Committee. Such counsel shall advise the Audit Committee as to implementation of the undertakings in this Order.

## UNDERTAKINGS

44. Respondent has undertaken to:

> a. Permanently maintain the aforementioned remedial efforts or the functional equivalents thereof, except as may be approved by the Commission;

> b. Require the Audit Committee, within 90 days of the date of this Order, to review with management of Respondent the process by which the MD&A sections of periodic reports filed by Respondent with the Commission are prepared and material information about the business and prospects, including but not limited to, trend information and known events and uncertainties that may have a material impact on liquidity or future financial performance, is identified for discussion in the MD&A sections of such reports, and to approve a set of criteria to be used by the Disclosure Committee and management to reasonably assure that appropriate

10

items are identified and discussed. The Audit Committee will meet periodically, at least annually, with the Chair of the Disclosure Committee to review such criteria, and will review and discuss with the Chief Financial Officer the proposed MD&A section of each periodic report to be filed with the Commission;

c. Require the Disclosure Committee to: (i) use the aforementioned criteria to identify items that might need to be disclosed within the MD&A section of Respondent's periodic reports filed with the Commission; and (ii) use the aforementioned criteria to evaluate those items and recommend whether, and to what extent, disclosure is appropriate with respect to each item. The Chair of the Disclosure Committee will also report to the Audit Committee, on a quarterly basis, any recommended departures from the aforementioned criteria and the rationale supporting each such recommendation;

d. Adhere to the guidance articulated in SEC Staff Accounting Bulletin No. 101 on disclosures that are required with respect to the recognition of revenue;

e. Maintain for ten (10) years documentation sufficient to show for every of its Forms 8-K filed with the Commission, the preparers of each Form 8-K and those persons who reviewed and approved each Form 8-K; and

f. Provide a written report, within 120 days of the date of this Order, to the Commission staff that details the Respondent's implementation of the undertakings articulated herein.

45. In determining whether to accept the Offer, the Commission has considered the remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff.

IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions specified in Respondent Coca-Cola's Offer.

ACCORDINGLY, IT IS HEREBY ORDERED:

Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Coca-Cola cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

By the Commission.

Jonathan G. Katz
Secretary

11

--------

1 The findings herein are made pursuant to Coca-Cola's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

EXHIBIT 99.3
{COMPOSITE VERSION REFLECTING AMENDMENT}

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING

File No.

       In the Matter of       :
                        :
       The Coca-Cola Company,  :    OFFER OF SETTLEMENT
                        :    OF THE COCA-COLA COMPANY
       Respondent,         :
                        :
                        :
------------------------------------:

I.

The Coca-Cola Company ("Coca-Cola" or "Respondent"), pursuant to Rule 240(a) of the Rules of Practice of the Securities and Exchange Commission ("Commission") {17 C.F.R. {Section} 201.240(a)} submits this Offer of Settlement ("Offer") in anticipation of cease-and-desist proceedings to be instituted against it by the Commission, pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act").

II.

This Offer is submitted solely for the purpose of settling these proceedings, with the express understanding that it will not be used in any way in these or any other proceedings, unless the Offer is accepted by the Commission. If the Offer is not accepted by the Commission, the Offer is withdrawn without prejudice to Respondent and shall not become a part of the record in these or any other proceedings, except for the waiver expressed in Section V with respect to Rule 240(c)(5) of the Commission's Rules of Practice {17 C.F.R. {Section} 201.240(c)(5)}.

III.

Consistent with the provisions of 17 C.F.R. {Section} 202.5(f), Respondent waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.

IV.

Respondent hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996 or any other provision of law to pursue reimbursement of attorney's fees or other fees, expenses or costs expended by Respondent to defend

against this action. For these purposes, Respondent agrees that Respondent is
not the prevailing party in this action since the parties have reached a good
faith settlement.

V.

By submitting this Offer, Respondent hereby acknowledges its waiver of
those rights specified in Rules 240(c)(4) and (5) {17 C.F.R. {Section}
201.240(c)(4) and (5)} of the Commission's Rules of Practice. Respondent also
hereby waives service of the Order.

VI.

Solely for the purpose of these proceedings and any other proceedings
brought by or on behalf of the Commission or in which the Commission is a party
and without admitting or denying the findings contained in the Commission's
Order Instituting Cease-and-Desist Proceedings, Making Findings, And Imposing a
Cease-and-Desist Order Pursuant to Section 8A of the Securities Act and Section
21C of the Exchange Act ("Order"), Respondent consents to the entry of the
attached Order by the Commission.

VII.

Respondent undertakes to:

A. Permanently maintain the remedial efforts or the functional
equivalents thereof set forth in Paragraph 43 of the Order, except as may be
approved by the Commission;

B. Require its Audit Committee, within 90 days of the date of the
Order, to review with management of Respondent the process by which the MD&A
sections of periodic reports filed by Respondent with the Commission are
prepared and material information about the business and prospects, including
but not limited to, trend information and known events and uncertainties that
may have a material impact on liquidity or future financial performance, is
identified for discussion in the MD&A sections of such reports, and to approve a
set of criteria to be used by its Disclosure Committee and management to
reasonably assure that appropriate items are identified and discussed. The Audit
Committee will meet periodically, at least annually, with the Chair of the
Disclosure Committee to review such criteria, and will review and discuss with
the Chief Financial Officer the proposed MD&A section of each periodic report to
be filed with the Commission;

C. Require its Disclosure Committee to: (i) use the aforementioned
criteria to identify items that might need to be disclosed within the MD&A
section of Respondent's periodic reports filed with the Commission; and (ii) use
the aforementioned criteria to evaluate those items and recommend whether, and
to what extent, disclosure is appropriate with respect to each item. The Chair
of the Disclosure Committee will also report to the Audit Committee, on a
quarterly basis, any recommended departures from the aforementioned criteria and
the rationale supporting each such recommendation;

2

D. Adhere to the guidance articulated in SEC Staff Accounting Bulletin No. 101 on disclosures that are required with respect to the recognition of revenue;

E. Maintain for ten (10) years documentation sufficient to show for every of its Forms 8-K filed with the Commission, the preparers of each Form 8-K and those persons who reviewed and approved each Form 8-K; and

F. Provide a written report, within 120 days of the date of this Order, to the Commission staff that details the Respondent's implementation of the undertakings articulated herein.

VIII.

Respondent hereby:

A. Admits the jurisdiction of the Commission over it and over the matters set forth in the Order;

B. Consents to the issuance of the Order by the Commission, without otherwise admitting or denying the findings set forth in the Order, in which the Commission:

1. finds that Coca-Cola violated Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

2. Orders that Coca-Cola cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

IX.

Respondent understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings" {17 C.F.R. {Section} 202.5(e)}. In compliance with this policy, Respondent agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in the Order or creating the impression that the Order is without factual basis; and (ii) that upon the filing of this Offer of Settlement, Respondent hereby withdraws any papers previously filed in this proceeding to the extent that they deny, directly or indirectly, any finding in the Order. If Respondent breaches this agreement, the Division of Enforcement may petition the Commission to vacate the Order and restore this proceeding to its active docket. Nothing in this provision affects Respondent's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

3

X.

Respondent states that it has read and understands the foregoing Offer, that this Offer is made voluntarily, and that no promises, offers, threats, or inducements of any kind or nature whatsoever have been made by the Commission or any member, officer, employee, agent, or representative of the Commission in consideration of this Offer or otherwise to induce it to submit to this Offer.

23rd Day of March, 2005        /s/ Geoffrey J. Kelly
                               -------------------------
                               The Coca-Cola Company

                               G. J. Kelly
                               -------------------------
                               (NAME)

                               Acting General Counsel
                               -------------------------
                               (TITLE)


                               {TITLE}


STATE OF GEORGIA       }
                       }              ss:
COUNTY OF FULTON       }


The foregoing instrument was acknowledged before me this 23 day of March, 2005, by G. J. Kelly, __X__ who is personally - known to me or ____ who has produced a _____ driver's license as identification and who did take an oath.


Jo Ann Crabb
Notary Public
State of Georgia
Commission Number       :              {STAMP}
Commission Expiration   :
                               Notary Public Dekalb County, GA
                               My Commission Expires June 19th, 2006
                               Jo Ann Crabb


4

EXHIBIT C

# Justice Dept. Ends Probe of Coca-Cola; Firm Settles With SEC

By Harry R. Weber
Associated Press
Tuesday, April 19, 2005; Page E02

ATLANTA, April 18 -- The Justice Department ended its criminal investigation of Coca-Cola Co. without taking action, the world's biggest soft drink maker said Monday.

Separately, the Atlanta company said it reached a settlement with the Securities and Exchange Commission over its business practices in Japan.

The end to the dual investigations closes an embarrassing chapter for the company that was sparked by a 2003 lawsuit filed by former manager Matthew Whitley, who claimed he was fired in retaliation for reporting allegations of fraud and accounting mistakes.

It was not clear why the Justice Department dropped its investigation, which included grand jury testimony from several current and former Coca-Cola executives. Patrick Crosby, a spokesman for the U.S. attorney's office in Atlanta, declined to comment. Coca-Cola spokesman Ben Deutsch said only that the company received a letter Monday from the Justice Department saying it was terminating its probe.

Whitley alleged that Coca-Cola rigged a marketing test at Burger King restaurants in 2000 and made false or misleading statements or omissions in connection with the reporting of sales volume.

Another facet of the Justice Department investigation involved Coca-Cola's relationship with Lancer Corp. of San Antonio. Whitley claimed Coca-Cola and Lancer hid a slush fund by filing false financial information to the SEC about Lancer's sales of equipment to Coca-Cola.

Coca-Cola denied most of the allegations but admitted that some of its officials undermined the Burger King marketing test. It later settled Whitley's lawsuit for $540,000.

In a memo to employees Monday, chief executive E. Neville Isdell said that under the settlement with the SEC, Coca-Cola has agreed to take unspecified remedial actions in corporate compliance and disclosure. He said the SEC settlement does not include a monetary fine or penalty and added that Coca-Cola does not admit or deny wrongdoing.

According to an order issued Monday, the SEC found that, at or near the end of each reporting period between 1997 and 1999, Coca-Cola implemented an undisclosed practice in Japan in which Japanese bottlers were offered extended credit terms to induce them to purchase quantities of beverage concentrate the bottlers otherwise would not have purchased until later.

Coca-Cola typically sells gallons of concentrate to its bottlers corresponding to their sales of finished products to retailers. As a result, bottlers' concentrate inventory levels typically increase in proportion to their sales of finished products to retailers.

However, from 1997 to 1999, Japanese bottlers' concentrate inventory levels increased at a rate more than five times greater than that of finished product sales to retailers, the SEC said. That pulled forward sales from subsequent periods and made it likely that Coca-Cola's bottlers would purchase less concentrate in the later periods.

The practice, known as "channel stuffing," contributed about 1 to 2 cents per share to Coca-Cola's quarterly earnings and was the difference in 8 of the 12 quarters from 1997 to 1999 between Coca-Cola meeting and missing analysts' earnings estimates.

Coca-Cola shares fell 32 cents to close at $40.97 on Monday.

© 2005 The Washington Post Company