UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CARPENTERS HEALTH & WELFARE FUND, ET AL., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Misc. No. 1:06-mc-00508-JDB |
| THE COCA-COLA CO., et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

**SUPPLEMENTAL BRIEF OF K. CHRIS TODD IN OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL DOCUMENT PRODUCTION**

K. Chris Todd respectfully submits this supplemental brief in response to the Court's January 22, 2007 order requesting that each party provide information in its possession about the status of any government investigation relevant to Plaintiffs' motion to compel, and address the relevance to that motion of *Braswell v. United States*, 487 U.S. 99 (1988), and *In re Sealed Case (Gov't Records)*, 950 F.2d 736 (D.C. Cir. 1991) ("*Gov't Records*").

**I.   STATUS OF THE INVESTIGATION BY THE DEPARTMENT OF JUSTICE INTO COCA-COLA'S ACCOUNTING PRACTICES**

Mr. Todd has no information concerning the investigation by the Department of Justice ("DOJ") into the accounting practices that are the subject of Plaintiffs' complaint other than previously noted. As stated in Mr. Todd's Opposition to Plaintiffs' Motion to Compel Document Production (filed Dec. 1, 2006) (Dkt. No. 3) ("Opp. Br."), he is aware that the United States Attorney's Office in Atlanta opened an investigation into those practices in 2004. *See* Chad Terhune, *U.S. Probes Coca-Cola's Deal with Takasago on Shipments*, Wall St. J., Mar. 1, 2004,

at B5 (Ex. A to Opp. Br.) ("Officials from the U.S. Attorney's Office and the U.S. Securities Exchange Commission in Atlanta are looking at whether Coca-Cola engaged in 'channel stuffing' with Japan's Takasago International Corp."). However, Mr. Todd does not know whether the investigation has been formally closed or whether the government is investigating other individuals with respect to this same issue. Further, the Department of Justice does not, as a matter of policy, confirm that an individual or company is the subject of an investigation if it receives such an inquiry.

The press release issued by Coke regarding the investigation is not an official government statement. This press release, moreover, does not say anything about an investigation of individual Coke employees such as Ms. Minick-Scokalo. What is more, Coke's press release is ambiguous with regard to whether the investigation purportedly closed was the same Japan-centered investigation reported in the *Wall Street Journal*. News articles about Coke's announcement suggest that the DOJ investigation that had purportedly been closed did not concern alleged channel stuffing in Japan, but instead was a separate investigation focused on the falsification of a Burger King marketing test here in the United States. *See, e.g.*, Harry Weber, *Justice Dept. Ends Probe of Coca-Cola; Firm Settles with SEC*, Wash. Post, Apr. 19, 2005, at E2 (attached hereto as Ex. A).

Based on the available evidence, Mr. Todd has reason to believe that if Plaintiffs were to subpoena Ms. Minick-Scokalo she would have a legitimate Fifth Amendment right to refuse to produce responsive documents in her possession. For that reason, he, in turn, may not produce any documents (if such documents exist) that were given to him in the course of his

representation of Ms. Minick-Scokalo (whom, it should be noted, is no longer represented by Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.).[1]

## II. THE DOCUMENTS SOUGHT BY PLAINTIFFS ARE NOT SUBJECT TO THE CORPORATE RECORDS EXCEPTION CREATED IN *BRASWELL* AND *GOVERNMENT RECORDS*

In *Braswell*, the Supreme Court held that a current employee of a corporation may not claim a Fifth Amendment act of production privilege to refuse to produce corporate documents belonging to his or her employer, even when the act of producing those documents would incriminate the employee. *See* 487 U.S. at 109-10. The employee – an officer of two closely held corporations – had been individually subpoenaed to produce the following corporate records:

> [R]eceipts and disbursement journals; general ledger and subsidiaries; accounts receivable/accounts payable ledgers, cards, and all customer data; bank records of savings and checking accounts, including statements, checks, and deposit tickets; contracts, invoices – sales and purchase – conveyances, and correspondence; minutes and stock books and ledgers; loan disclosure statements and agreements; liability ledgers; and retained copies of Forms 1120, W-2, W-4, 1099, 940 and 941."

*Id.* at 101 n.1

The Court reasoned that a custodian of corporate records holds everyday business documents in a representative rather than a personal capacity. *See id.* at 109-10. Because artificial entities such as corporations may act only through their agents, and "a custodian's assumption of his representative capacity leads to certain obligations," a custodian may be obliged, on behalf of the corporation, to produce corporate records on proper demand by the

---

[1] *See Fisher v. United States*, 425 U.S. 391, 403-04 (1976) ("[P]re-existing documents *which could have been obtained by court process from the client* when he was in possession may also be obtained from the attorney by similar process following transfer by client in order to obtain more informed legal advice.") (emphasis added); *id.* at 404 ("[W]hen the client himself would be privileged from production of the document, either as a party at common law . . . *or as exempt from self-incrimination*, the attorney having possession of the document is not bound to produce.") (emphasis added; internal quotation marks omitted).

3

Government. *Id.* at 110. "Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation – which of course possesses no such privilege." *Id.*

In *Government Records*, the D.C. Circuit applied *Braswell* to a former government official who had been ordered by this Court to produce "official records" belonging to the Department of Housing and Urban Development. *See* 950 F.2d at 737, 740. The district court had failed to set forth the basis upon which it had determined that certain documents were and were not official records, and the court of appeals, after enumerating certain distinguishing characteristics of corporate and non-corporate documents, including the ownership, genesis, and dissemination of the documents, directed the district court to examine the contested documents and distinguish between official and personal documents according to their nature, purpose, and use. *See id.* at 739-40.

> A. **Even if the Corporate Records Exception Applied to the Documents Sought by Plaintiffs, the Attorney-Client Privilege Would Preclude Mr. Todd's Production of those Documents**

In his Opposition Brief, Mr. Todd set forth two independent reasons why he may not produce documents in response to Plaintiffs' subpoena. The first reason, which is at issue in this supplemental brief, is that documents given by a client to an attorney may not be obtained from the attorney unless they could be obtained via subpoena from the client. Mr. Todd argued that because he believes Ms. Minick-Scokalo would have a valid Fifth Amendment right to resist any such subpoena, he may not produce any documents she gave him in the course of his representation. Although, as explained below, Mr. Todd does not believe that the documents sought by plaintiffs are subject to the corporate records exception, he does acknowledge that if the Court were to find that the exception applies, then Ms. Minick-Scokalo would, in all

4

likelihood, be obliged to produce those documents if she were subpoenaed directly. But that would mean only that the Fifth Amendment is no bar to Mr. Todd's production of the documents.

Such a finding would not undermine Mr. Todd's other reason for declining to produce documents – namely, that the testimonial aspects of his act of production would communicate to Plaintiffs and future finders of fact confidential information about the existence, authenticity, and genesis of documents that were given to him in confidence by his then-client, Ms. Minick-Scokalo. *See* Opp. Br. at 12-17. The attorney-client privilege would therefore bar production of the requested documents regardless of whether they qualify as corporate business records and regardless whether the documents might implicate Ms. Minick-Scokalo's Fifth Amendment rights. The Court should deny Plaintiffs' motion to compel.

> B.   **The Corporate Records Exception Does Not Apply to the Subpoenaed Documents**

As the *Braswell* and *Government Records* courts made clear, not all documents produced during the course of one's employment are corporate records for Fifth Amendment purposes. Rather, the determination whether a document is a company record is a question of fact, function, and context, that will in many cases require *in camera* review of each document by the court. *See Gov't Records*, 950 F.2d at 738-39.

In this case, several characteristics of the subpoenaed documents show that they are not corporate records in the sense described by *Braswell* and *Government Records*. Unlike the account ledgers and bank statements at issue in *Braswell*, these were not documents that Coke was required to keep as official records (and, as Plaintiffs concede, Coke did not in fact keep these documents as corporate records, but instead "thr[ew] Minick-Scokalo's report back in her face," and "turned a blind eye to [her] findings and concern."). Mot. Compel at 3-4; *see*

5

*Braswell*, 487 U.S. at 115 (explaining that the rationale for the corporate records exception is to permit the discovery of evidence contained in the "official records and documents" of a corporation). Nor is there any indication that Coke has ever exercised any claim of ownership of the documents, or that Ms. Minick-Scokalo ever held them as a custodian, on behalf of her employer.[2] *See Braswell*, 487 U.S. at 109-110 (noting that corporate records are those documents "that the custodian of corporate or entity records holds [] in a representative rather than a personal capacity"); *Gov't Records*, 950 F.2d at 740 ("[C]orporate records belong to the corporation and are held for the entity by the custodian only in an agency capacity").

In addition, the requested documents were not furnished to Ms. Minick-Scokalo by Coke for use in the performance of her duties. *See In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981*, 522 F. Supp. 977, 983-84 (S.D.N.Y. 1981) (finding that desk calendars were corporate records because they were "purchased by the company and provided to its employees for use as diaries in the performance of their corporate duties"). The documents were not produced at the direction of the company, and were not necessary for the performance of Ms. Minick-Scokalo's duties. *See Gov't Records*, 950 F.2d at 741 ("[W]here either a collective entity or a government agency directs employees to keep certain papers or notes in performing assigned work, the direction counts as evidence that the document is job-related and not simply or principally a personal record."); *see also United States v. Dean*, 989 F.2d 1205, 1209 (D.C. Cir. 1993) (noting that corporate records include documents employees are required to keep, and finding that documents were not required documents when employee "had no obligation to create the documents in the first place" and "could have fulfilled her duties . . . without keeping" the documents). And the documents were not widely circulated within Coke as shared corporate

---

[2] There is no evidence, for example, that Plaintiffs sought these documents from Coke and were told that the person responsible for keeping the documents was Ms. Minick-Scokalo.

documents, but were, according to Plaintiffs, shown only to two very senior Coke employees who then kept their existence secret.  *See, e.g.*, *Gov't Records*, 950 F.2d at 741 ("Office procedures, such as a secretary's or co-workers' access to and use of a document, can also help inform the court as to the nature of the document."); *In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981*, 522 F. Supp. at 984 (finding desk diary a corporate record when employee's secretary made entries in the calendar and "anyone who entered the witness's office could walk over to his desk and examine the calendar.").

Unlike the indisputably corporate records at issue in *Braswell*, the records subpoenaed in this case were, according to Plaintiffs, unauthorized, unrequested, and unwanted by Coke, and Plaintiffs have even alleged that Ms. Minick-Scokalo left the company precisely because Coke refused to adopt her observations and findings.  *See* Am. Consol. Class Action Compl. for Violation of the Securities Exchange act of 1934 ¶ 152 (filed June 2, 2003, N.D. Ga) (Ex. A to Decl. of Ted Minehan in Supp. of Mot. Compel).  This Court should find that those documents are not corporate records, and that the Fifth Amendment exception adopted in *Braswell* does not apply in this case.

  **C.**  **The Corporate Records Exception Does Not Apply to Former Employees Unless the Corporation is Proven to Own the Subpoenaed Documents**

Even if this Court were to find that the documents sought by Plaintiffs are corporate records, the Fifth Amendment exception adopted in *Braswell* would not apply in this case because Ms. Minick-Scokalo is no longer an employee of Coke.  As the Second Circuit has recognized, a *former* employee, such as Ms. Minick-Scokalo, is no longer an agent of the corporation for which she used to work; therefore, when she produces even corporate records, she does only in her individual capacity.  *See United States v. Doe (In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999)*, 191 F.3d 173, 179 (2d Cir. 1999); *see also*

7

*Braswell*, 487 U.S. at 109-110 (noting that corporate records are those documents "that the custodian of corporate or entity records holds [] in a representative rather than a personal capacity."). As the *Doe* court put it, once an employee has left the company, "[i]n no sense can it be said, as *Braswell* requires, that the corporation produced the records subpoenaed." 191 F.3d at 179 (internal quotation marks omitted). For that reason, at least three courts of appeals have expressly held that the corporate records exception created in *Braswell* does not apply to former employees. *See id.*; *United States v. McLaughlin,* 126 F.3d 130, 134 (3d Cir. 1997) (a former employee "is obviously not within the scope of the *Braswell* rule."); *Mora v. United States*, 71 F.3d 723, 724 (9th Cir. 1995) ("[T]he collective entity rule does not apply to a former employee of a collective entity who is no longer acting on behalf of the collective entity").

In *Government Records* and *Dean* (a post-remand case involving the same witness and the same documents), the D.C. Circuit did apply *Braswell* to a former government official, but it did so while recognizing that the documents in question remained government property. *See Gov't Records*, 950 F.2d at 740; *Dean*, 989 F.2d at 1207 ("government records do not belong to the custodian, in this case, the appellee [Dean], but to the government agency.") (internal quotation marks omitted). The fact that the government continued to own the documents provided an ongoing link between the government and the documents, thereby making it possible for the court to conclude that, under these specific circumstances, the former employer, not the individual, was the one producing the documents for Fifth Amendment purposes. *See Braswell*, 479 U.S. at 118. Conversely, where the former employer does not still own the documents, there is no reason to believe that *Braswell*, which relies heavily on principles of imputed-agency, would apply to a former employee.

8

In the case of a former government employee, it may be presumed that retained documents still belong to the government. Indeed, the *Government Records* court specifically noted in this context that it is a criminal offense to take or conceal government property or records. *See* 950 F.2d at 740. In the corporate world, however, continued ownership of documents may not be presumed; there is no corresponding general legal prohibition on retaining documents produced during one's employment by a private company. What is more, not every document produced in the course of one's employment belongs to one's employer, and, even in the case of documents that an employer would have the right to demand upon the termination of one's employment, that does not always happen, as is often the case with writing samples, customer lists, rejected proposals, and any other documents for which a company no longer has any use.

In this case, no one has suggested that Coke owns the documents at issue. Nor, as far as Mr. Todd knows, has Coke ever claimed any rights over those documents. In fact, according to Plaintiffs, Coke did not want the documents, and actively rejected them. *See* Mot. Compel at 3-4 (Coke "thr[ew] Minick-Scokalo's report back in her face"). Thus, even if these documents were at one time corporate records that Coke could have demanded when Ms. Minick-Scokalo left the company, there is no evidence that it ever did so, or that it would have the right to do so now, more than six years after her departure. Absent any evidence, or even allegation, of continued ownership by Coke, this Court should find that Ms. Minick-Scokalo is no longer a corporate custodian of the requested documents and that the corporate records exception to her Fifth Amendment rights does not apply in this case.

**CONCLUSION**

For the foregoing reasons, Mr. Todd respectfully submits that the corporate records exception to the Fifth Amendment act of production privilege does not apply to the documents subpoenaed by Plaintiffs and that he may lawfully refuse to produce documents in response to that subpoena on the ground that Ms. Minick-Scokalo could not be compelled to produce those same documents. And for the reasons presented in his opposition to the motion to compel, Mr. Todd should not be compelled to produce documents responsive to Plaintiffs' subpoena because doing so would violate the attorney-client privilege.

Respectfully submitted,

  */s/ James Webster*

James Webster
  D.C. Bar No. 450516
Steven F. Benz
  D.C. Bar No. 428026
Geoffrey M. Klineberg
  D.C. Bar No. 444503
KELLOGG, HUBER, HANSEN,
  TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jwebster@khhte.com

*Counsel for K. Chris Todd*

January 29, 2007

**CERTIFICATE OF SERVICE**

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 29, 2007.

                */s/ James Webster*
                James Webster
                  D.C. Bar No. 450516
                KELLOGG, HUBER, HANSEN,
                  TODD, EVANS & FIGEL, P.L.L.C.
                1615 M Street, N.W., Suite 400
                Washington, DC 20036
                Tel: (202) 326-7900
                Fax: (202) 326-7999

                jwebster@khhte.com

# Exhibit A

Case 1:06-mc-00508-JDB    Document 10-2    Filed 01/29/2007    Page 1 of 3

1 of 1 DOCUMENT

Copyright 2005 The Washington Post



The Washington Post

April 19, 2005 Tuesday
Final Edition

**SECTION:** Financial; E02

**LENGTH:** 538 words

**HEADLINE:** Justice Dept. Ends Probe of Coca-Cola;
Firm Settles With SEC

**BYLINE:** Harry R. Weber, Associated Press

**DATELINE:** ATLANTA April 18

**BODY:**

The Justice Department ended its criminal investigation of Coca-Cola Co. without taking action, the world's biggest soft drink maker said Monday.

Separately, the Atlanta company said it reached a settlement with the Securities and Exchange Commission over its business practices in Japan.

The end to the dual investigations closes an embarrassing chapter for the company that was sparked by a 2003 lawsuit filed by former manager Matthew Whitley, who claimed he was fired in retaliation for reporting allegations of fraud and accounting mistakes.

It was not clear why the Justice Department dropped its investigation, which included grand jury testimony from several current and former Coca-Cola executives. Patrick Crosby, a spokesman for the U.S. attorney's office in Atlanta, declined to comment. Coca-Cola spokesman Ben Deutsch said only that the company received a letter Monday from the Justice Department saying it was terminating its probe.

Whitley alleged that Coca-Cola rigged a marketing test at Burger King restaurants in 2000 and made false or misleading statements or omissions in connection with the reporting of sales volume.

Another facet of the Justice Department investigation involved Coca-Cola's relationship with Lancer Corp. of San Antonio. Whitley claimed Coca-Cola and Lancer hid a slush fund by filing false financial information to the SEC about Lancer's sales of equipment to Coca-Cola.

Coca-Cola denied most of the allegations but admitted that some of its officials undermined the Burger King

Case 1:06-mc-00508-JDB   Document 10-2   Filed 01/29/2007   Page 3 of 3

Page 2
Justice Dept. Ends Probe of Coca-Cola; Firm Settles With SEC The Washing

marketing test. It later settled Whitley's lawsuit for $540,000.

In a memo to employees Monday, chief executive E. Neville Isdell said that under the settlement with the SEC, Coca-Cola has agreed to take unspecified remedial actions in corporate compliance and disclosure. He said the SEC settlement does not include a monetary fine or penalty and added that Coca-Cola does not admit or deny wrongdoing.

According to an order issued Monday, the SEC found that, at or near the end of each reporting period between 1997 and 1999, Coca-Cola implemented an undisclosed practice in Japan in which Japanese bottlers were offered extended credit terms to induce them to purchase quantities of beverage concentrate the bottlers otherwise would not have purchased until later.

Coca-Cola typically sells gallons of concentrate to its bottlers corresponding to their sales of finished products to retailers. As a result, bottlers' concentrate inventory levels typically increase in proportion to their sales of finished products to retailers.

However, from 1997 to 1999, Japanese bottlers' concentrate inventory levels increased at a rate more than five times greater than that of finished product sales to retailers, the SEC said. That pulled forward sales from subsequent periods and made it likely that Coca-Cola's bottlers would purchase less concentrate in the later periods.

The practice, known as "channel stuffing," contributed about 1 to 2 cents per share to Coca-Cola's quarterly earnings and was the difference in 8 of the 12 quarters from 1997 to 1999 between Coca-Cola meeting and missing analysts' earnings estimates.

Coca-Cola shares fell 32 cents to close at $40.97 on Monday.

**LOAD-DATE:** April 19, 2005